**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel*. | § | |
| BakerRipley | § | |
| 4450 Harrisburg, Suite 200 | § | |
| Houston, TX 77011 | § | |
| | § | |
| & BakerRipley | § | |
| **Plaintiffs** | § | **Case No.23-cv-1124** |
| | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| Kids U US, Inc. d/b/a Fueling Brains, | § | |
| Cimberli Johnson Darrough, an individual, | § | |
| Antonio Corrales, an individual, | § | |
| Sterling Evaluation and Assessment, LLC, | § | **JURY DEMANDED** |
| Michele Peters, an individual, and | § | |
| MNA Evaluation and Assessment, LLC | § | |
| | § | |
| | § | |
| **Defendants** | § | |

## SECOND AMENDED COMPLAINT

Relator BakerRipley, by and through its attorneys, brings this suit under the False Claims Act ("FCA") on behalf of the United States of America ("the Government") and BakerRipley, acting on its own behalf, brings additional related statutory, common law, and equitable causes of action, against the defendants, individually and collectively.

### I.    THE PARTIES & OVERVIEW OF FALSE CLAIMS

1.    **Plaintiff is the United States of America**. Through the Department of Health and Human Services ("HHS"), the United States of America funds, awards, and administers federal Head Start and Early Head Start program grants nationally and throughout Texas.

1

**2.**     **Relator/Co-Plaintiff is BakerRipley ("Relator", "Agency", or "Co-Plaintiff")**, a Texas nonprofit corporation and public charity that operates Head Start and Early Head Start Federal programs throughout the Houston, Texas area as the Federal Government's designated Head Start Agency and Grantee.[1]

**3.**     Defendants' violations of the FCA arise from the Agency's participation in the Early Head Start and Head Start programs administered by the Office of Head Start ("OHS") within the Administration for Children and Families ("ACF") at HHS (collectively "Federal Government"). The Federal Government provides grants directly to local entities, including the Agency.[2]

**4.**     Defendants engaged in wrongful actions and submitted false claims that have defrauded the United States of America and the Agency. As described in more detail below, the Agency began looking for solutions to ameliorate the impacts of the COVID-19 pandemic on its Head Start students in 2020. In that process, the Agency (and by virtue of that, the Government) became the victim of a scam perpetrated by Defendants including three vendors and the (now former) senior director of the Agency's Head Start division.

**5.**     Two of the vendors were professors intimately involved in the senior director's graduate school program, unbeknownst to the Agency. One of those professors also started a business with this senior director. The third vendor purported to offer "virtual learning" and "virtual material kits" to close students' development gaps during the pandemic, however it was all false and a sham. Unbeknownst to the Agency, this third vendor was secretly in business with the two professors who promoted its sham products and services, offered endorsements, received

---

[1] 45 C.F.R. § 1305.2
[2] *Head Start Programs*, Office of Head Start (October 31, 2022), available at: https://www.acf.hhs.gov/ohs/about/head-start.

remuneration for sales of its products and services, and offered "independent evaluations" of the third vendor's program that were anything but independent.

**6.**     All of these Defendants worked together to deceive and defraud BakerRipley, other school districts, publicly funded entities throughout Texas, and ultimately the Government. Through its investigation, BakerRipley uncovered wrongdoing by its senior director, the vendors, and a number of public employees who were supporting or acting in furtherance of the fraud and wrongdoing. As a result of the wrongdoing of its senior director and the vendors, BakerRipley paid these vendors in excess of $800,000 of federal funds.

**7.**     Moreover, one of BakerRipley's current employees and one of its former employees are former employees of Fueling Brains. Through BakerRipley's investigation into Fueling Brains' fraud and wrongdoing, the former Fueling Brains' employees have provided BakerRipley with testimony detailing specific actions taken by Fueling Brains in furtherance of its scheme to defraud the Federal Government.[3] Documents uncovered also suggest that Fueling Brains and these other vendors have defrauded other entities throughout the state of Texas in amounts totaling well in excess of $3 million.

**8.**     **Defendant Kids U Us, Inc. d/b/a in Texas as Fueling Brains ("Fueling Brains")**, as well as any subsidiaries, assumed names, joint ventures, partnerships, and affiliates, is a Canadian for-profit educational service corporation registered to transact business in Texas as a foreign corporation. Fueling Brains is located in and operates out of Houston, Texas, and contracted with the Agency, purportedly to provide a "virtual curriculum," associated professional development

---

[3] *See* Exhibit A attached herein and incorporated by reference (Affidavit of N. Esch) (describing Fueling Brains' "kickback" scheme, data manipulation, and secret meetings with public school officials); Exhibit B attached herein and incorporated by reference (Affidavit of V. Ozorio) (detailing Fueling Brains' requests for Ozorio to alter banking information and secret meetings involving large cash transactions; describing the faulty material kits provided to public schools and Fueling Brains' intentional manipulation of data regarding the efficacy of its program).

and "virtual" material kits. Anil Karim is the co-founder and director of Fueling Brains. Unknown and undisclosed to the Agency, Fueling Brains received renumeration in the form of a percentage of the sales of Defendant Sterling Evaluation and Assessment, LLC services to the Agency as further discussed below.

9.     **Defendant Cimberli Johnson Darrough ("Darrough")** was the Agency's Senior Director of Early Head Start/Head Start programs and project director/principal officer overseeing the Agency's Head Start programs. Darrough was also the principal investigator for the Head Start grant administration and knew or should have known of both the Agency's internal policies and procedures for granting contracts under the comparative quote threshold as well as the Federal Government's procurement regulations and guidelines—all of which she violated by virtue of the conduct alleged herein. Relevant to the false claims and fraud, Darrough was also a doctoral student and degree recipient of the University of Houston-Clear Lake ("UHCL"). Two of the co-Defendants, Antonio Corrales and Michelle Peters, are professors at UHCL who directly oversaw Darrough's doctoral degree work and simultaneously worked for Fueling Brains. Along with Defendants Corrales and Peters, Darrough assisted with obtaining sales and new clients for Defendant Fueling Brains. Darrough used her position at the Agency to facilitate the submission of false claims by facilitating the Agency's contracts with, and payments, to Defendants Fueling Brains, Corrales, and Peters. Darrough also used her position at the Agency to solicit and aid the other Defendants in soliciting other head start agencies, public school systems, and other federal grantees/subgrantees in obtaining sales and new clients for Fueling Brains.

10.    **Defendant Antonio Corrales ("Corrales")** is a citizen and resident of the United States and the State of Texas. Corrales is a professor in Educational Leadership and the Coordinator of the Educational Leadership doctoral program at the UHCL. Unbeknownst to the Agency, during

all relevant times of Defendants' fraud Corrales was Darrough's dissertation committee chairperson and degree advisor and thus labored under a conflict of interest in the procurement and performance of the contracts with the Agency.

11.     Also unknown to the Agency, Corrales is the Strategic Advisor to Fueling Brains. Corrales additionally failed to disclose that as Strategic Advisor to Fueling Brains, he receives a 20% commission for referrals that result in contracts between Fueling Brains and educational entities including school districts, charter schools, and other federal grantees. Darrough and Corrales are also co-directors of Imperial Community Resources, Inc., an educational 501(c)(3) operating in Texas that they organize and control which may have been formed to further Defendants' fraudulent scheme against the Federal Government and the Agency.

12.     **Defendant Sterling Evaluation and Assessment, LLC ("Sterling")** is a Texas Limited Liability Company that conducts business in Texas. Defendant Corrales is the founder, principal, member, or manager of Sterling. Corrales receives financial benefits of Sterling. Among other things, Sterling was contracted by Darrough to provide the Agency with financial literacy and emotional trauma training. Inexplicably, Sterling also pays Fueling Brains a percentage of its sales for such services - services that otherwise appear entirely unrelated to Fueling Brains.

13.     Corrales and/or Sterling entered into arrangements with referral sources to support sales of Fueling Brains to federal grantees,  including entering into personal sales agreements with at least two public employees to promote Fueling Brains.[4] Corrales d/b/a Sterling also hired an Assistant Superintendent of a Houston area ISD to assist with Fueling Brains sales, all described

---

[4] Texas has established twenty (20) Regional Education Service Centers ("ESC") that are quasi-state agencies. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d. 318 (5th Cir. 2002). They provide services and technical support to local educational agencies, including Head Start programs and that are also federal grant recipients. *See* Texas Education Agency, *Education Service Centers,* https://tea.texas.gov/about-tea/other-services/education-service-centers. The two employees referenced are both ESC employees.

in more detail below. It is Relator's understanding that payments to these referral sources are also funneled at times through other entities in order to circumvent conflict of interest reporting and transparency requirements under state law.

14.     **Defendant Michelle Peters ("Peters")** is a citizen and resident of the United States and the State of Texas. Peters is employed by UHCL as the Department Chair of Educational Leadership & Policy Analysis and Professor of Research & Statistics. During the relevant time period Peters was Darrough's doctoral methodology advisor—a connection that was not known to the Agency. Peters contracted with the Agency to provide an "independent evaluation" of the efficacy of the Fueling Brains program for the Agency's Head Start students. However, Peters failed to disclose to the Agency that she was also the Executive Director of Research & Evaluation for Fueling Brains during the relevant time period and thus labored under an unresolvable conflict of interest in the procurement and performance of the contract.

15.     **Defendant MNA Evaluation & Assessment, LLC ("MNA")** is or was a Texas Limited Liability Company.[5] Peters is the registered agent of MNA and the founder, principal, member, or manager, who receives financial benefits of MNA. MNA did not contract directly with Relator. On information and belief, MNA was established and utilized to further the false claims, fraud, and movement of monies amongst Peters, Defendants, and other persons involved or for other unlawful purposes, including but not limited to offering fraudulent "independent" assessments of the Fueling Brains program.

16.     Darrough acted in concert with Co-Defendants—conspiring to circumvent federal and Agency contract procurement requirements in order to award HHS vendor contracts to the Defendants. Darrough's undisclosed relationships with the Agency vendors named as Defendants,

---

[5] MNA is currently forfeited by the State.

both financial, professional, and personal constituted impermissible conflicts of interest. The Defendant vendors failed to perform under the contracts with the Agency, which failures Darrough helped obfuscate while she facilitated their false and fraudulent claims pushing payments through the Agency's system. Darrough and the Defendants also used the Agency's name to promote Fueling Brains without the Agency's knowledge or consent. They then used their official positions as an administrator with the Agency and as independent research professors at UHCL, holding out their "independence" to recommend and pursue contracts for services for Fueling Brains with other school systems and federal grantees.

17.     On information and belief, the Defendants further benefitted from the conspiracy by paying each other commissions or "kickbacks" on the contracts fraudulently obtained with other school systems and federal grantees, and Defendants knowingly structured payments in such a way as to avoid contractual, state, and federal conflicts of interest disclosures and detection. Defendants knowingly failed to disclose their conflicts of interest to the Agency and other school systems and federal grantees, knowingly misrepresented their interrelationships, and made affirmative false representations of "independence" in order to further their claims.

18.     Exacerbating the harm, the Defendants committed fraud against the Agency and the Federal Government and other grantees and school systems during the COVID pandemic, when children were suffering very real learning losses in education as a direct result of the pandemic, and educators were desperate for meaningful solutions to mitigate those losses. Defendants took advantage of the influx of emergency federal funds by offering fraudulent "virtual" learning but then overcharging for services and failing to perform what had been promised.

19.     Defendants also took advantage of and unlawfully profited from the Agency after a cyber-security attack compromised and disabled the Agency's systems so that the Agency was unable to

verify procurements and payments to vendors in a timely manner. This caused the Agency to temporarily rely on Darrough with respect to contract terms and payments, a circumstance of which Darrough was well aware.

20.     Defendants' actions resulted in significant overcharging and submission of false and fraudulent claims to the Federal Government through the Agency, claims which would not have been submitted or paid had the Agency known of the Defendants' wrongful conduct. Once the Agency uncovered the Defendants' fraudulent schemes, it attempted to recoup the monies by demanding their return from Defendants. Defendants have improperly retained the fraudulently obtained monies that are due to the Agency and the United States of America. Consequently, the Agency has filed this suit, will make the required disclosure to the United States Attorney General and United States Attorney, and is self-reporting subsequent to this suit to the Office of Head Start and Office of the Inspector General for HHS.

21.     Defendants, among other fraudulent activities, knowingly and recklessly conspired to submit, caused to be submitted, or facilitated the submission of false and fraudulent documents and claims and made false and fraudulent representations to the Agency, a Federal Government grantee, over a period of several years, thereby plundering the Agency's federal funds and resources for the Defendants' illegitimate and unlawful purposes. All of Defendants' conduct was performed knowingly—Defendants had actual knowledge of the false information, deliberately ignored the truth or falsity of the information and/or had reckless disregard for the truth or falsity of the information submitted to the Agency and the Federal Government.

## I.     EARLY HEAD START/HEAD START PROGRAM BACKGROUND

22.     Early Head Start and Head Start (collectively "Head Start") is a federal program that provides comprehensive early childhood development services to low-income children and their

families. The program does this by promoting school readiness and enhancing the social and cognitive development of children through the provision of educational, health, nutritional, social, and other services. To this end, Head Start provides funding to school districts, nonprofits, and other community educational providers to promote the school readiness of infants, toddlers, and preschool-aged children from low-income families.[6]

23.     Because Head Start programs strongly emphasize the involvement of families and the local community to ensure that programs are responsive to the unique needs of each community, OHS provides grants directly from the Federal Government to local entities rather than providing funding through the state. These entities may be public or private agencies, nonprofit or for-profit, faith-based, or secular.[7] However, organizations must qualify to become a Head Start grantee or delegate agency to receive federal funding. Once an organization becomes a grantee or delegate agency, it must provide financial certifications to HHS on a yearly basis along with quarterly reporting and certification of all disbursements. To access and receive the government Head Start funds, the grantee or delegate agency draws down money from the Federal Payment Management System or submits vouchers based on approved budgets and expenses to accurately represent the manner in which those funds were used in relation to Head Start programs and services funded pursuant to government grant contracts.

## II.     THE FALSE CLAIMS ACT ("FCA") BACKGROUND

24.     The FCA is the primary civil remedial statute designed to deter fraud upon the Federal Government and reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."[8]

---

[6] 42 U.S.C. § 9831.
[7] *Head Start Programs*, Office of Head Start (October 31, 2022), https://www.acf.hhs.gov/ohs/about/head-start.
[8] S. Rep. 99-345 (1986), at 1, as reprinted in 1986 U.S.C.C.A.N. 5266.

25.    A defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."[9] A defendant also violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[10] Moreover, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."[11] Anyone who conspires to commit a violation of any of the provisions of the FCA can also be held liable under the False Claims Act.[12]

26.    In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA").[13] Under FERA, liability under the FCA "attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without *regard to whether the wrongdoer deals directly with the Federal Government*."[14] As it relates to this case, the term "claim" under § 3729(b)(2) of the FCA includes ". . . any request or demand, whether under a contract or otherwise, for money . . . that . . . (ii) is made to a contractor, *grantee*, or other recipient, if the money or property to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money. . . requested or demanded; or (II) will reimburse such

---

[9] 31 U.S.C. § 3729(a)(1)(A).
[10] *Id*. § 3729(a)(1)(B).
[11] *Id*. at § 3729(a)(1)(G).
[12] *Id*. at § (a)(1)(C).
[13] 31 U.S.C. 3729(a)(1)(A) amending the FCA.
[14] S. Rep. 111-10, 10, 10, 2009 U.S.C.C.A.N. 430, 438, 2009 WL 787872 (Mar. 23, 2009) (emphasis added).

contractor, grantee, or other recipient for any portion of the money which is requested or demanded."[15]

27.     For purposes of the FCA, "the terms 'knowing' and 'knowingly'. . . mean that a person. . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and . . . require no proof of specific intent to defraud."[16]

28.     As amended, the FCA additionally provides that any person who knowingly submits a false or fraudulent claim for payment or approval to the United States Government or to a contractor, grantee, or other recipient, if the money is to be spent on the Government's behalf and if the Government provides any of the money demanded or if the Government will reimburse the contractor or grantee, is liable for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim, plus three (3) times the amount of damages sustained by the Federal Government for each claim.[17]

## III.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. §§ 3729(a), 3730(a) and 3732 as well as 28 U.S.C. §§ 1331 and 1345.

30.     This Court has supplemental jurisdiction over state law claims under 28 U.S.C. §1367.

31.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because at all times relevant to this case Defendants resided in and/or regularly conducted business in this judicial district, a substantial part of the events or omissions giving rise to the claims occurred within this judicial district, and all Defendants are subject to the court's jurisdiction under

---

[15] *Id*. at § 3729(b)(2) (emphasis added).
[16] *Id*. at § 3729(b)(1).
[17] *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

the FCA.

## IV.   FACTUAL ALLEGATIONS

**32.**      All facts alleged herein are based upon facts and knowledge of the Agency, and the Agency is the original source of the claims raised in this complaint.

### A.      Summary of Factual Allegations

**33.**      Fueling Brains is a for-profit company that purports to offer early childhood education. It purports to provide a "curriculum" to Head Start programs, school districts, charter schools, and Pre-K programs based on "left brain/right brain research," and relevant to this lawsuit, purported to provide a "virtual learning platform" during the COVID-19 pandemic, supported by its other offerings, professional development, and "virtual material kits."[18] In fact, Fueling Brains provided no virtual learning platform or program to the Agency or its Head Start students.

**34.**      Unknown to the Agency at the time, Corrales and/or Sterling received the aforementioned 20% commission for referrals that resulted in contracts between Defendant Fueling Brains and educational entities including school districts and Head Start agencies. To increase sales, Corrales, Sterling, and/or Fueling Brains recruited persons to be referral sources for Fueling Brains. These referral sources included persons who, through their employment, exercise discretion in connection with Federal Government contracts, purchases, payments, claims, or other financial

---

[18] In neuroscience, it appears that "left brain/right brain" is a well-known catchphrase, but it is not based on sound scientific evidence or reliable research and has fallen under increasing critical review and skepticism. *See e.g.,* Kara Blacker, *Debunking the Left-Brain/Right-Brain Myth*, John Hopkins Science of Learning Institute (Dec. 15, 2016), http://scienceoflearning.jhu.edu/science-to-practice/resources/debunking-the-myth-about-left-brain-right-brain-learning-styles; *see* Organisation for Economic Co-operation and Development, *Neuromyth 6,* https://www.oecd.org/education/ceri/neuromyth6.htm; *see also* Jared A. Nielsen *et. al, An Evaluation of the Left-Brain vs. Right-Brain Hypothesis with Resting State Functional Connectivity Magnetic Resonance Imaging,* PLOS, (Aug. 14, 2013), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0071275; *see also* Robert H. Shmerling, MD, *Right brain/left brain, right?,* Harvard Health Publishing, *(Mar. 24, 2022),* https://www.health.harvard.edu/blog/right-brainleft-brain-right-2017082512222.

transactions.

**35.**     These referral sources included state and local government or federal grantee public employees and officials who are legally prohibited from using their offices and positions in this manner or accepting monies or gratuities from vendors such as Defendants. There exists strict conflict of interest laws, both federal and state, that impose criminal and civil penalties for violations.

**36.**     The Fueling Brains referral sources circumvented procurement guidelines with respect to federal (and commingled state) transactions in order to push through contracts which would result in the purchase of sham goods and services. In exchange for the Fueling Brains procurement of these Federal Government vendor contracts, the referral source received financial benefit in the form of kickbacks from Fueling Brains, Corrales, and/or Sterling. The referral sources were encouraged to create entities through which payments were made in order to avoid detection.[19]

**37.**     The Head Start Act strictly prohibits "any conflict of interest, and any appearance of a conflict of interest. . . by officers and employees of the Head Start agency, and consultants and agents who provide services or furnish goods to the Head Start agency."[20] Further, the applicable Federal regulations and guidance provide standards governing conflicts of interest, both real or apparent.[21] The Agency also established and maintained conflict of interest policies consistent with these requirements. Defendants knowingly violated these laws and standards.

---

[19] *See* TEX. PENAL CODE § 36.08(d); TEX. LOCAL GOVT. CODE Chapters 171 and 176.
[20] 42 U.S.C. § 9837(c)(1)(E)(iv)(X).
[21] 45 CFR Part 75, § 75.327(c)(1) (as authorized by 5 U.S.C. 301; 2 CFR part 200). The Anti-*Kickback* Act of 1986 (now codified at 41 U.S.C. chapter 87, *Kickbacks*,) was passed to deter *subcontractors* from making payments and contractors from accepting payments for the purpose of improperly obtaining or rewarding favorable treatment in connection with a contract paid with federal funds.

**38.**     On information and belief, the targets of this scheme extend to numerous Federal Government grantees, Head Start agencies, public school systems, other entities throughout the State of Texas and in other states where Defendants may conduct business, and, of course, the children these programs serve.

## V.     RELATOR BAKERRIPLEY ("THE AGENCY")

**39.**     Relator BakerRipley ("Agency") is a community developer, not-for-profit, multi-purpose social service company that operates community programs throughout the Houston area that are aimed at combating poverty and its adverse effects in the low-income and at-risk communities. The Agency serves approximately 500,000 people in the Houston region every year and provides services to communities through its five community centers, early childhood education program, community school district, senior wellness programs, utility assistance, disaster recovery programs, workforce offices, tax services, veterans' services, economic mobility initiatives, and other programs.

**40.**     The Agency began as the Houston Settlement Association in 1907 and opened the first free nursery school program in the region shortly thereafter. In the 1960s, The Agency – then known as Neighborhood Centers - was involved in the design of the Head Start program, and in 1965 it piloted the very first Head Start Program Model.

**41.**     The Agency is a grantee of Federal Government funds, including Head Start and Early Head Start funds. In 1998, the Agency was awarded a contract for the Early Head Start and Head Start programs in Southwest Harris County. In 2015, the Agency took over the contract for Early Head Start and Head Start programming in Fort Bend County. The Agency currently has approximately twenty-six Early Head Start/Head Start sites in the region, including twelve

collaboration sites within Houston ISD schools, serving approximately 3,000 children ages 0-5 and their families.

42.    The Agency's Head Start grant is subject to the National Defense Authorization Act ("NDAA"). In accordance with the NDAA, the threshold for micro-purchases under Federal financial assistance awards is $10,000.00, and the threshold for simplified acquisitions is $250,000.00 for all recipients. Thereunder, grantees are further required to implement the terms and conditions of their awards, and recipients of existing Federal financial assistance awards may implement them in their internal controls. For purchases of $250,000.00 and over, the Agency uses the Request for Proposal ("RFP") process, which takes approximately two to three months to complete.

43.    The Agency implemented a lower simplified acquisition threshold of $150,000.00 requiring an RFP. For significant purchases of under $150,000.00, the program seeking to make such a purchase is directed to request and obtain at least three quotes to ensure that services and prices are reasonably competitive against comparable options. The Agency's procurement policy and practice requires its personnel to document an adequate number of quotes obtained from qualified sources using a Competitive Quote Summary ("CQS") to substantiate significant purchases under the $150,000.00 small purchase threshold.[22]

## VI.    SUMMARY OF DARROUGH'S ROLE IN THE CONSPIRACY TO DEFRAUD THE FEDERAL GOVERNMENT

44.    Darrough served as the Senior Director of Early Head Start and Head Start and as the Principal Investigator of the grants as defined by federal grant requirements beginning in June 2018. She was responsible for federal grant applications and certifications as well as developing, implementing, and coordinating the delivery of Head Start services in a manner consistent with

---

[22] Agency Procurement Policies #303, 304.

the requirements of contractual agreements, laws, regulations, policies, procedures, funding documents, and standards. Darrough also had decision-making authority and substantial control over vendor procurement and contracts for goods and services.

45.     Darrough participated in a conspiracy against the Agency along with multiple vendors, specifically including the other Defendants. Darrough, acting in concert with these vendors, conspired to circumvent federal and Agency contract procurement law and requirements to award fraudulent HHS vendor contracts to the certain vendors with whom she had both professional and personal relationships. Once the contracts were awarded, the vendors failed to perform under the contracts (failures Darrough helped obfuscate while she pushed payments through the Agency's financial systems) and colluded to affirmatively cover up the fraudulent claims and payments.

46.     As described below with respect to each vendor contract, from 2020 through 2021 Darrough, among other things, authorized fraudulent contracts with, and made and authorized federal fund payments to, among others: (1) Fueling Brains; (2) Antonio Corrales d/b/a Sterling Evaluation and Assessment; and (3) Michelle Peters, individually and/or Peters d/b/a MNA Evaluation & Assessment LLC. Despite knowing these vendors materially failed to perform under the contracts, Darrough authorized payments to them using HHS funds. In some instances, Darrough colluded with the vendors and authorized fraudulent contract payments (and double payments) for services that were not contracted for and not provided to the Agency. Had BakerRipley known of this wrongful conduct, it would not have paid the invoices presented by these vendors.

47.     Once Darrough negotiated services or executed a contract with a vendor to provide services under the HHS/ACF/OHS program, in compliance with the terms of the agreement or contract, Darrough was to submit a purchase order request for payment. Darrough knew that the invoiced services were not contracted for, not provided, and/or double billed, and deliberately and recklessly

withheld this information from BakerRipley. Based upon Darrough's material representations regarding vendor payment requests, and her failure to disclose critical information about the legitimacy of the invoiced services, Agency employees would "draw down" the HHS/ACF/OHS grant funds and pay the vendors.

48.     Shortly after she became the Senior Director, Darrough began her Doctor of Education (Ed.D.) program at UHCL in the fall of 2018. Darrough's dissertation required approval from Corrales and Peters along with two other professors. As stated above, Corrales is the Doctoral Program Director and Associate Professor of Educational leadership at UHCL, and he was Darrough's dissertation committee chairperson. Peters is the Department Chair of Educational Leadership & Policy Analysis, Professor of Research & Statistics, and UHCL*Teach* Co-Director in the College of Education at UHCL. Peters was Darrough's dissertation methodology advisor.

49.     Both Corrales and Peters, Agency vendors, were also employed by Fueling Brains at all relevant times.

50.     Darrough knowingly created and submitted false contracts and false claims to the Agency and directed fraudulent payments to be made to Fueling Brains, Corrales d/b/a Sterling (Darrough's business partner); Corrales and Peters (Darrough's Ed.D. dissertation professors and Fueling Brains employees) for goods and services not provided under the terms of the contracts when such contracts even existed and even when they did not exist.

51.     Corrales and/or Corrales d/b/a Sterling received remuneration in the form of kickbacks and unlawful payments structured as "commissions" from Fueling Brains for the sale of Fueling Brains program and services. Fueling Brains, Corrales, and/or Sterling also paid others for their referrals and assistance in the procurement of Sterling and/or Fueling Brains contracts. The payments that were made used at least part of federal funds received by the Agency.

52.     These payments are core to the fraud and false claims submitted to the Agency. To further her Ed.D. program and career goals and likely other impermissible personal benefit, Darrough approved an arrangement with Fueling Brains that circumvented and violated the Agency's procurement policies.

53.     The arrangement included: a) Darrough procuring and approving contracts with Defendants outside of the proscribed contract procurement requirements of both the Federal Government and the Agency; b) Darrough directing Defendants to "re-structure" submittals, quotes, contracts, and invoices to circumvent Federal Government and Agency policies and controls; c) Darrough authorizing, approving, and directing payments to the other Defendants for services that she knew were not rendered or knew were of no value and did not meet the needs of the Agency or the Head Start Program; d) Darrough authorizing fraudulent and/or duplicative payments to the Defendants in order to meet the financial terms and objectives of the Defendants and likely "off the books" arrangements between Defendants; and e) doing all of the above and other wrongful acts knowing of prohibited conflicts of interest amongst the Defendants and in conspiracy with same. As discussed above, in the Spring of 2021 Darrough also formed a non-profit entity, Imperial Community Resources Inc., with Corrales as a co-director.

54.     Darrough, individually or in concert with others, knowingly submitted legally and factually false and fraudulent claims and made false statements or records material to the false or fraudulent claims to the Agency—a Federal Government grantee. These false claims and false statements or records were material to the Grantee Agency's payment of the claims and were also material to the Grantee Agency's progress reporting and certification of the claims to the Federal Government.

55.     From 2019 through 2021 Darrough, created false and fraudulent procurement forms, authorized false and fraudulent contracts, and made and authorized federal fund payments on false

or fraudulent claims submitted by, among others: (1) Fueling Brains; (2) Antonio Corrales, individually and/or Corrales d/b/a Sterling Evaluation and Assessment, LLC; and (3) Michelle Peters, individually and/or Peters d/b/a MNA Evaluation & Assessment, LLC to provide goods and services to the Agency's Head Start program.

56.     Relying on the material representations of the CQSs, agreements, and claims, the Agency provided grant assurances, financial reports, and grant progress reports to trigger payments from the Federal Government. Had Defendants not defrauded the Agency and properly disclosed the true nature of the Defendants' conduct, the Agency would never have provided grant assurances, financial reports, and/or grant progress reports to trigger payment from the Federal Government. And Defendants knew that their fraudulent misrepresentations and reckless failures to disclose would result in the Federal Government paying for claims for services that were never contracted for or never performed. By way of example, the Agency submitted reports to the Federal Government on July 21, 2020, May 17, 2021, November 20, 2021, and February 21, 2022.

57.     Despite knowing these vendors materially failed to perform under the contracts and that they all labored together under several conflicts of interest, Darrough structured and authorized false and fraudulent payments to them using HHS funds. In some instances, Darrough colluded with the Defendants and authorized payments (and double payments) for goods and services that were not provided to the Agency. Had the Agency known of this wrongful conduct, it would not have paid the invoices presented by these vendors.

VII.    SPECIFIC INSTANCES OF FALSE CLAIMS ACT VIOLATIONS BY FUELING BRAINS AND DARROUGH

58.     Fueling Brains, individually and in concert with others, knowingly submitted legally and factually false and fraudulent claims and made false statements or records material to the false or fraudulent claims to the Agency—a Federal Government grantee. These false claims and false

statements or records were material to the Grantee's Agency's payment of the claims and were also material to the Grantee Agency's progress reporting and certification of the claims to the Federal Government.

59. In July of 2020, Darrough introduced Fueling Brains to the Agency, suggesting that Fueling Brains "would be a great accelerated learning program for our children…" Fueling Brains represented that its model used a virtual learning platform for low-income students:

> *based on interactive coaching for the entire educational community, a learning management system, and recurrent assessment tools to measure student growth. In that direction, an executive function assessment is implemented on an ongoing basis to observe, analyze, and understand each child that comes into our program. To accomplish such tasks, customized lesson plans within the organization's scope and sequence are developed for each child to further enhance their learning outcomes. This virtual learning model is tailored specially for students in need, where brain development is the main approach while delivering content and pedagogy.*[23]

A. **The Fueling Brains August 2020 Proposal, the $300,000 Bill, and Fueling Brains' Complete Failure to Perform**

60. On August 27, 2020, Fueling Brains submitted a proposal to Darrough to provide the Agency's Head Start programs with a virtual learning platform that included material kits and curriculum, ongoing professional development, student and program assessment, and support services for 3000 students and their families during the for the 2020-2021 school year at a cost of $300,000.00. The proposal indicated "*[t]he idea is to serve the entire organization*"[24]

61. Fueling Brains promised to provide a "virtual learning platform for low-income students," a "brain metric assessment," and a "customized individual curriculum that is continuously being re-assessed," explaining that "[t]he proprietary executive function assessment we implement allows us to design a curriculum to maximize the learning capacity of an individual child's left

---

[23] August 2020 proposal of Fueling Brains for the Agency.
[24] *Id.*

brain, right brain and movement."

**62.** In November 2020, the Agency sent Darrough an email notifying her that the Agency had not received a reply from Fueling Brains in response to an information request that was necessary to complete the contracting process for the August 2020 proposal. Darrough forwarded that message – not to Fueling Brains as the potential vendor – but rather to her personal email account and then to Corrales from her personal email account. This "back channel" communication reflects Darrough's intent to obfuscate and hide communications from BakerRipley, her knowledge that Corrales worked for Fueling Brains, her efforts to facilitate and ensure that Fueling Brains' false claims were paid by the Agency using HHS federal grant funding, and her effort to conceal her own nefarious relationship with Corrales.

**63.** On December 11, 2020, rather than submitting the additional information needed for the $300,000 contract, Darrough submitted a CQS form for the Fueling Brains virtual learning platform for a total cost of $100,000.00. However, the comparators Darrough listed on the Fueling Brains CQS form were materially false because the comparable quote provided in the amount of $175,002 was actually from a daycare franchisee that does not advertise any training services, much less training comparable to the training quote that was to be provided by Sterling on the CQS form.[25] Darrough materially misrepresented the facts by creating a false narrative using fictional comparative quotes to further the submission of false claims and fraud. Had the Agency knew of the Darrough's or Fueling Brains' fraud, it would not have entered into an agreement or paid the false claims.

---

[25] Daycare centers generally do not provide professional development to teachers, and according to this daycare's website, this company does not offer this or any comparable service. Notably, the contact information for the franchisee included a Hotmail email address, which is unexpected if the quote was actually obtained from a national company. Moreover, the franchisee uses @krkcare.com for its email server, not @hotmail.com.

**64.**     On December 15, 2020, despite not having received any goods or services from Fueling Brains as promised, Darrough submitted a purchase order request for payment to Fueling Brains in the amount of $100,000.00 for the "Fueling Brains Program for the 2020-2021 school year."

**65.**     However, it is clear Darrough and Fueling Brains had always intended for Fueling Brains to be fraudulently compensated, with federal grant money, for the original $300,000.00. Despite representing to the Agency that the service agreement totaled $100,000.00, Darrough worked behind the scenes to ensure Fueling Brains received the full $300,000.00. For example, she sent Fueling Brains an email stating, "We are working with our Procurement Department to submit one invoice for the amount of the full curriculum (sic) the payment can be procured during our budget period that ends on 12/31."[26]

**66.**     In another email sent within the Agency that same month, Darrough stated that Fueling Brains would be paid $300,000.00.[27] These, and other communications, demonstrate that Darrough was intentionally and fraudulently bypassing the Agency's and the federal grant requirements to ensure payment of fraudulent claims using federal HHS funds.

**67.**     On December 15, 2020, Fueling Brains submitted an invoice for $100,000.00, for the "Purchase of Fueling Brains Program for 2020-2021 school year." Included in this $100,000.00 claim was $10,000.00 for a "pilot program" that never existed. The Fueling Brains invoice also stated that an incremental increase of $90,000.00 was included because more students were unforeseeably added to the program. However, this was another false claim as no "additional" students were added to the program. Relying on Darrough's supervision and directive as the Senior Director and Project Investigator for the Head Start/Early Head Start grand-funded program, and believing this $100,000 payment was for Fueling Brains' comprehensive program, the Agency

---

[26] Email from Darrough (Oct. 1, 2020).
[27] Email from Darrough (Oct. 5, 2020).

unwittingly paid Fueling Brains.

**68.**     Sidestepping the procurement process, Fueling Brains submitted another invoice to the Agency in January 2021 for an additional $100,000.00, asserting it was for the "Purchase of Fueling Brains Program for 2020-2021 school year (2nd installment)." Fueling Brains submitted a third claim for $100,000.00 in February 2021, noting "Purchase of Fueling Brains Program for 2020-2021 school year (3rd installment)." These references to "installment" payments make clear that Darrough and Fueling Brains understood that this was a scheme to avoid the procurement requirements and to pay Fueling Brains a total of $300,000.00 despite having been granted $100,000 for the entire program.

**69.**     When the Agency asked Darrough about the two additional invoices for $100,000.00 in February 2021, Darrough's assistant represented that payment was required, despite the lack of a proper procurement because "*we have already incurred the charges*." This statement was false. Darrough knew at that time Fueling Brains had provided no "virtual learning platform," no "brain metric assessment," no "customized individual curriculum" and conducted no work for the Agency during the 2020-2021 school year, aside from a single meeting at a single Head Start location, some Zoom calls to interview staff, and a report based on existing third party GOLD data in June 2021, months after Darrough's assistant sent the email misrepresenting that "*we have already incurred the charges*." Had the Agency known of Defendants' wrongdoing discussed herein, it would not have paid any of these claims.

1.     *Fueling Brains Failed to Provide Assessment or Analysis*

**70.**     In the August 2020 proposal, Fueling Brains explained that it would assess 300 children based on teacher input into the Fueling Brains platform. After the preliminary findings of these assessments were reviewed, Fueling Brains would then assess the remaining student population of

approximately 2,700 students and based on an analysis of the data, create a customized program of curriculum and instruction which would integrate strategies purportedly provided to teachers during its professional development training. It never happened.

71.     Fueling Brains only provided access to teachers to enter information on the Fueling Brains platform for beginning-of-year assessments to two (2) of the twenty-six (26) Agency Head Start locations in the Fall of 2021. Not only did Fueling Brains fail to provide access to the platform for all of the campuses, Fueling Brains never provided any analysis or reports for data entered by the teachers that did have access to its platform.

2.     <em>Fueling Brains Failed to Support Families</em>

72.     In its proposal Fueling Brains promised to offer "access to parents to learn about how to help their children at home," offering parents "professional development, activities, initiatives, and first-hand coaching to help their children's brain development at home in an easy and nurturing way." Fueling Brains promised to provide "[a]ccess to home based activities for virtual learning" and "[v]irtual communication to manage asynchronous learning." It never happened. The Agency's Head Start families were never provided any access to any aspect of Fueling Brains' alleged "curriculum" online or in person, and Fueling Brains never communicated with families or solicited any input from them.

3.     <em>Fueling Brains Failed to Provide Professional Development</em>

73.     Fueling Brains' August 2020 proposal included providing interactive coaching, training, and professional development to the Agency's teachers through December 2021. Fueling Brains failed to provide the services it agreed to provide. During the summer of 2021, 497 teaching staff were entered into the system to attend Fueling Brains virtual teacher training/professional development. Of those staff, 266 completed the training. Seventy-eight staff members did not

receive any training, and despite requests to Fueling Brains to reopen the platform and allow these staff to get the training towards the end of the summer in 2021, Fueling Brains never reopened the platform. The only training Fueling Brains provided, which was provided under the August 2020 proposal, was for approximately <u>11</u> hours, which occurred primarily in the summer of 2021. This was because Fueling Brains' entire program, as promoted, was a sham, and they were never capable of performing.

**74.**     Not only did Fueling Brains fail to provide the summer 2021 professional development services it agreed to provide under the August 2020 proposal, but on March 24, 2021, Fueling Brains submitted an additional invoice for $250,000 for the same professional development services it had already agreed to—but failed—to provide.

**75.**     Further, it was only after the invoice was submitted to the Agency for payment that Darrough completed a CQS for this service that unambiguously noted she obtained the comparable quotes *after* Fueling Brains submitted its claim for payment. The comparable quotes were also cut and pasted from the prior Fueling Brains CQS and were materially false.

**76.**     To the extent Fueling Brains claims it is owed payment under this false claim, Fueling Brains' professional development March 24, 2021, proposal required *120 hours* of professional development for approximately 500 teaching staff. The proposal also provided for prepayment of $250,000.00, which would be due on or before May 3, 2021. Fueling Brains did not provide these services, and the Agency did not pay this claim.

4.     *Fueling Brains Materially Failed to Timely Deliver Material Kits*

**77.**     Fueling Brains was obligated to provide, *inter alia*, professional training, and material kits before the school year started; beginning-of-year, middle-of-year, and end-of-year assessments to provide an individualized program and to demonstrate the success of the Fueling Brain program.

Fueling Brains' August 2020 proposal stated that all training and all necessary materials, including virtual material kits, would be provided to the Agency. As with the "professional development" proposal, Fueling Brains separately invoiced the Agency for an additional $250,000.00 for "virtual" material kits that it was already obligated to provide and had been paid for.[28]

78.     Fueling Brains was to deliver the "virtual" material kits to the Agency prior to the beginning of the 2021-2022 school year. Darrough was aware this did not occur and still pushed through false claims for goods that were never provided. After the start of the 2021-2022 school year, in September of 2021, Darrough emailed Fueling Brains stating, "…*we have not received the materials*." In October of 2021, the Agency emailed Darrough, copying Fueling Brains, reiterating, "…*we have not received the Fueling Brains materials as promised . . . Without these materials we will be unable to implement any activities in the classrooms related to Fueling Brains.*"[29]

79.     In response to Agency inquiries regarding Fueling Brains' continued failures, Fueling Brains offered "*sincere apologies for the delay in products*" and promised delivery during October. Darrough replied that the kits "*were promised at the beginning of the school year*" and that the latest promise "*will be the third date that has been provided*."

80.     While Fueling Brains eventually delivered the material kits throughout the fall of 2021, it only did so after it was too late for the Agency to actually implement the Fueling Brains program for the 2021-2022 school year. Fueling Brains' delay in delivery of the kits rendered the entirety of the program useless.

---

[28] Although Fueling Brains repeatedly used the word "virtual" to describe aspects of its program – a particularly salient selling point during a global pandemic - there was no aspect of the "curriculum" or material kits that was virtual.

[29] Email from Ja'Van Cobb to Darrough (Oct. 5, 2021).

**B.     The Agency Terminated the Fueling Brains Relationship**

**81.**     All elements of the Fueling Brains program – the "individualized curriculum," the "professional development," and the "material kits" – are necessary to implement the program. If training does not occur, teachers cannot implement the program. If teachers are not given access to input the data, no data reports or evaluations can be generated. If the material kits are delayed, the teachers cannot implement the program or follow the scope and sequence of any individualized curriculum.

**82.**     Because of all of these material failures, on November 1, 2021, the Agency notified Fueling Brains that, "[u]nfortunately, because of the delay in receiving the Fueling Brains materials and just receiving the last part of the shipment only days ago. . . we would like to formally inform you all that the Fueling Brains contract expiration date is December 1, 2021, and we will not be renewing the Fueling Brains contract."

**C.     Fueling Brains' Submission of Additional False Claims**

**83.**     Fueling Brains submitted claims to the Agency totaling $800,000, of which the Agency paid Fueling Brains $550,000. After the Agency learned of the fraudulent conspiracy, it refused to pay any outstanding invoice and demanded return of the $550,000 already paid; however, Fueling Brains has wrongfully retained the Federal Government monies.

**84.**     The disputed and fraudulent claims made by Fueling Brains are as follows:

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 10/16/2020 | Fueling Brains submits invoice for Purchase of Fueling Brains Program for 2020-2021 school year | $10,000.00 | | Invoice No. 20201002 |
| | | | | |

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 12/04/2020 | Fueling Brains "revises" its prior invoice:<br><br>Purchase of Fueling Brains Program for 2020-2021 school year | $100,000.00 (including prior invoice for $10,000) | | Invoice No. 20201002 |
| 12/15/2020 | Purchase Order created at Darrough's direction for $100,000.00. | | | The Purchase Order indicates: $10k was for the Fueling Brains Program with an "increase" of 90k on December 15, 2020. |
| 1/11/2021 | Check Request Approved and signed by Darrough | | $100,000.00 | Invoice No. 202201002<br><br>PO # 40389 |
| 1/20/2021 | Purchase of Fueling Brains Program for 2020-2021 school year (2nd Installment) | $100,000.00 | | Invoice No. 20210101 |
| 2/22/2021 | Check Request Approved and Signed by Darrough (2nd Installment) | | $100,000.00 | PO # 13720 |
| 2/23/2021 | Purchase of Fueling Brains Program for 2020-2021 school year (3rd Installment) | $100,000.00 | | Invoice No. 20210201 |
| | | | | |

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 03/24/2021 | Fueling Brains submits Professional Development invoice for $250,000.00 | $250,000.00 | **Not Paid by Agency** | Invoice No. 2113 |
| 03/25/2021 | Professional Development CQS completed *after* Payment made to Fueling Brains. Fueling Brains quoted $250,000.00 | | | Invoice No. 2113 |
| 03/24/2021 | Fueling Brains Activity Kits Invoice submitted | $250,000.00 | | Invoice No. 2112 |
| 4/08/2021 | Check Request Approved and Signed by Darrough for Fueling Brains Program (3rd Installment) | | $100,000.00 | PO # 40389 |
| 06/03/2021 | Check Request Approved and signed by Darrough for Virtual Learning Material Kits | | | Invoice No. 2112 |
| 06/20/2021 | ACH Wire Transfer for Virtual Learning Material Kit approved and submitted by Darrough | | $250,000.00 | Invoice No. 2112 PO # 349693 |
| **Totals** | | **$800,000.00** | **$550,000.00** | |

**D.    The Agency's Investigations into Fueling Brains' Wrongdoing**

**85.**    In April 2022, the $300,000 payments to Fueling Brains were the subject of an Agency audit finding based on Darrough's failure to follow procurement procedures. When the Agency asked Darrough why the Agency procured $100,000.00 but paid $300,000.00 for the "virtual learning" program, Darrough responded that:

*The Pandemic created an immediate crisis in education in 2020…The EHS/HS experienced a different barrier that included lack of basic needs for our low-income families to obtain the services we provided. [Fueling Brains] was the only entity that was able to fulfill all the needs and requirements to implement a virtual learning platform. In the Fall of 2020, the Agency EHS/HS program was the only program in the county that returned to face-to-face instruction for our parents who were essential workers. Although, the children returned to the classroom the model was still hybrid as COVID continued to run rapid. There were still safety concerns and [Fueling Brains] was able to assist with the virtual Hybrid learning platform…I do understand that the amount and number of invoices have resulted in a finding. However, during the unprecedented times that COVID brought, we were able to continue quality services to our children and families, for 3000 low income children/families, through Kids R Kids. We no longer use the program and ended the contract in 2021 with confidence that it assisted with closing the achievement gaps that children experienced during the pandemic.[30]*

86.     Every important part of Darrough's response is wholly and materially false. There was never a virtual learning platform. Fueling Brains did not support the Agency's efforts to continue offering quality services to children. Fueling Brains was never implemented at the Agency, and therefore had no impact on closing any achievement gaps.

87.     In June of 2022, after Darrough had secured her Ph.D., and in response to a request from the Agency asking Darrough for information related to any complaints or concerns she had regarding Fueling Brains, despite Fueling Brains' complete failure to perform Darrough stated, *"We do not have any complaints, other than a delay in delivering products last Summer…They provided the services we needed to close achievement gaps and offered a platform for virtual learning and professional development."*[31] However, Fueling Brains had provided no services, no assessment, no virtual learning platform, and scant professional development, and therefore could not have had any impact on closing any achievement gap.

---

[30] E-mail from Darrough (May 17, 2022). Darrough initially emailed another Agency employee on May 11, 2022, in response to the inquiry, stating, "*I'm not sure what my response should be.*" The audit finding and Darrough's explanation was regarding Kids U US/Fueling Brains, however Darrough mistakenly referenced another vendor named "Kids R Kids."
[31] Email from Darrough (June 20, 2022).

E.   **Fueling Brains Demands Payment on Fraudulent Invoices and the Agency's Demand for Recoupment**

88.   As a result of Defendant's wrongful conduct, the Agency has overpaid Fueling Brains a total of $550,000.00 for:

    a.   a $300,000 program it failed to provide, including an individualized "curriculum" that did not exist and that could not have been implemented in any case, in part due to the delay in delivery of the material kits; and

    b.   material kits that were untimely delivered for an additional $250,000.00.

89.   Additionally, and as discussed above, Fueling Brains submitted an invoice for $250,000.00 for "professional development" training that was also included in the August 2020 proposal and was thus a "double bill." On October 31, 2022, the Agency received a letter from Fueling Brains demanding payment of $250,000.00 for professional development. In December 2022, the Agency notified Fueling Brains it was not paying the claim and was investigating all prior work and invoices. On March 2, 2023, the Agency sent a demand to Fueling Brains for return of all unlawfully billed Federal Government monies totaling $550,000.00. As of the date of the filing of the complaint, Fueling Brains has retained the government funds.

90.   Fueling Brains, individually or in concert with others, knowingly submitted legally and factually false claims and made false statements or records material to the false or fraudulent claims to a Federal Government grantee. Further, Fueling Brains refused to return to Baker Ripley the monies owed. Every claim presented to the Agency, a Federal Government Grantee, for payment as a result of false or fraudulent representations by Fueling Brains and its withholding of overbilled funds, constitutes a false or fraudulent claim under the FCA, which the Agency would not have paid had it known of Defendants' wrongful conduct.

## VIII. SPECIFIC INSTANCES OF FALSE CLAIMS ACT VIOLATIONS BY DARROUGH AND CORRALES AND/OR STERLING EVALUATION AND ASSESSMENT, LLC (COLLECTIVELY "STERLING" OR "CORRALES")

91.     Corrales and/or Sterling Evaluation and Assessment, LLC, each individually or in concert with others, knowingly submitted legally and factually false and fraudulent claims and made false statements or records material to the false or fraudulent claims to the Agency—a Federal Government grantee. These false claims and false statements or records were material to the Grantee's Agency's payment of the claims and were also material to the Grantee Agency's progress reporting and certification of the claims to the Federal Government.

92.     In August 2019, as Darrough was beginning the second year of her doctoral program (which focuses on working with advisors in order to complete a dissertation), Darrough authorized a contract between Corrales, one of her dissertation advisors, and the Agency. Under the terms of the contract, Corrales was to provide ongoing professional development to the Agency at a rate of $500.00 per 1.5 hours. The contract was terminated in April 2020, and this contract is not at issue.

93.     Unbeknownst to the Agency at the time, in April 2021, as co-directors, Darrough and Corrales established Imperial Community Resources, Inc., an educational 501(c)(3) operating in Texas. Darrough and Corrales are listed as the co-directors, which may have been formed to further Defendants' fraudulent scheme against the Federal Government and the Agency.

94.     As discussed above, also in April 2021, Darrough submitted requisition requests of $250,000.00 and $329,000.00 for Fueling Brains, which Corrales also worked for and received commissions from, to provide goods and services that were already included under another contract.

95.     Shortly thereafter, in May 2021 and while Darrough was Corrales' doctoral student and business partner, Corrales d/b/a Sterling submitted, to Darrough, two separate contract proposals

to provide: 1) emotional intelligence/trauma training and 2) financial literacy training for a total cost of $300,110.00.

**96.** On June 16, 2021, Darrough completed Competitive Quote Summaries (CQS) approving Corrales' proposals despite both being over the small purchase procurement threshold.[32]

**97.** On June 19, 2021, Darrough submitted her final Ph.D. dissertation proposal. Corrales and Peters were on Darrough's dissertation committee.

**98.** However, the cost of the two proposals were above the Agency's small purchase threshold and required a full Request for Proposal (RFP). While the procurement of the training courses began as two separate proposals, since they were provided by the same vendor using the same delivery medium using the same billing method, Darrough and Corrales worked together to consolidate the courses into one proposal and contract for a total cost of $149,990.

**99.** Darrough subsequently submitted a revised proposal and CQS, which covered both the financial literacy and emotional intelligence training for the total cost of $149,990.00, to be split into two payments (and intentionally structured by Darrough).

**100.** On July 22, 2021, the parties entered into a formal services agreement for Corrales d/b/a Sterling to provide training to the Agency's Head Start/Early Head Start parents in financial literacy, emotional intelligence, and trauma for a total cost of $149,990.00.

**101.** In signing the agreement, Corrales agreed :

> . . . to fully and completely indemnify, protect, defend and hold harmless Agency, its corporate affiliates, and its and their respective officers, directors, employees, volunteers, agents and representatives (collectively, the "Agency Parties") from and against any and all claims, losses, allegations, demands, lawsuits, causes of action, judgments or other litigation against Agency Parties to the extent any such claims, losses, allegations, demands, lawsuits, causes of action, judgments or other litigation are caused by or result from any act or omission of Contractor or any agent, representative or employee of Contractor on account of death, personal

---

[32] The Agency later discovered that the CQSs submitted by Darrough were not valid.

injury or property damage or on account of the breach by Contractor of any of its representations, covenants or agreements set forth in the Contract, all regardless of whether Agency Parties are negligent in whole or in part. The indemnity obligations of Contractor hereunder shall extend to and include, without limitation, any costs or expenses including attorney's fees incurred by Agency Parties in connection therewith. In the event Agency is the prevailing party under an action for breach, Contractor shall be liable for payment of reasonable attorney's fees and for costs and expenses as allowed by law.

**102.** On August 4, 2021, an unauthorized user infiltrated the Agency's Local Area Network (LAN) and corrupted multiple systems, including email and financial systems. The attack was reported to the FBI and required significant rebuilding of the Agency's financial systems. Darrough knew of the debilitating impact on the Agency's financial systems.

**103.** Corrales ultimately submitted false claims for $300,110.00, and Darrough fraudulently ensured Corrales was paid the $300,110.00. While in the midst of a cyber-attack, which Darrough knew incapacitated the Agency's financial tracking systems and controls, Corrales submitted four separate fraudulent claims to Darrough which totaled $300,110.00–the exact amount of the original, but rejected, proposal. During the exigency and knowing the Agency did not have the capacity or controls at the time to verify the claims due to the cyber-attack, Darrough directed the Agency pay the $300,110.00 using government grant funds.

**104.** Specifically, on September 10, 2021, while the system was still down due to the cyber-attack, Corrales submitted, and Darrough authorized and approved, payment to Sterling for trauma and emotional intelligence training for $74,995 and financial literacy training for $75,060. Because the financial systems were down, the Agency relied on Darrough's representation that the amounts she was requesting were valid and accurate. Consequently, it provided the payments to Sterling.

**105.** On October 13, 2021, while the financial systems were still down, Corrales submitted two additional invoices for trauma and emotional intelligence training for $74,995 and financial literacy training for $75,060.

**106.** The very next day, on October 14, 2021, Corrales referred Darrough, who he describes as one of his doctoral students, to UH College of Education Director of Student Relations for instructions on applying for a superintendent certification to assist her with a job opportunity.

**107.** Shortly after Corrales aided Darrough regarding a job opportunity, on October 29, 2021, Darrough approved the two additional payment requests and directed Accounts Payable to make payments of $74,995 and $75,060 to Corrales d/b/a Sterling using federal grant funds. Because Accounts Payable could not check the Purchase Order directly because its program was still down, it relied on Darrough's material representation that the amounts requested were valid. Consequently, the Agency made the payment to Corrales using government funds.

**108.** Corrales knowingly made false claims to the Agency, and Darrough knowingly approved, authorized, and submitted the false claims to the Agency four times in September and October 2021 for a total cost of $300,110.00:

| Invoice Number | Invoice Date | Invoice Amount |
|---|---|---|
| 001 | 09/09/2021 | $74,995 |
| 002 | 09/09/2021 | $75,060 |
| 003 | 10/13/2021 | $74,995 |
| 004 | 10/13/2021 | $75,060 |

**109.** Had the Agency known Corrales' claims were false or that Darrough's representations were fraudulent, it would have refused the payments.

**110.** Having later detected the overpayment, in December 2022, the Agency demanded Corrales d/b/a Sterling return the overbilled payments. Corrales has refused to return the government's monies to the Agency.

**A.** **Sterling Failed to Comply with the Terms of the Executed Agreement**

**111.** Not only did Corrales submit false claims to the Agency for payments from HHS grants, but Corrales also failed to comply with the requirements for services he was contracted to

provide—a fact that Darrough was aware of all along.

112.     The training to be provided under the July 2021 services agreement purportedly began in October 2021. Sterling was contracted to provide 10 hours of training each month for 10 months to 3,000 families for a total cost of $149,999.00. Over the 10 month period, Sterling, at most, provided virtual emotional intelligence training to 3 people and provided financial literacy training to a total of 127 people.

113.     Corrales failed to provide the training as agreed to. Of the 125 financial literacy sessions, 105 sessions had zero attendees. Darrough was aware that participation in these classes was virtually non-existent, but instead of cancelling the contract that included a termination with or without cause clause, as early as December 2021, Darrough inexplicably directed the "classes" continue—even though most had zero participants. Corrales knowingly failed to perform the services for which he received federal monies, and Darrough perpetuated the fraud.

114.     Corrales d/b/a Sterling fraudulently invoiced the Agency $150,055.00 for services neither contracted for nor provided and additionally made claims of another $150,055.00 for services not provided. Darrough knowingly approved of and directed payment for these false claims, which is not coincidentally the same amount Darrough originally approved for payment to Sterling.

**B.     The Agency' Investigation into the Sterling Contract Shows Further Collusion with Darrough**

115.     After discovering these false claims, the Agency initiated further investigation into the Sterling contract. The investigation revealed that the procurement conducted by Darrough contained fraudulent competitive price quotes.

116.     Under a simplified acquisition procurement threshold, the purchasing department or program must obtain an adequate number of quotes from qualified sources to ensure that services and prices are reasonably competitive against comparable options. However, the alternative quotes

on the CQS form for Sterling demonstrate Darrough knowingly used invalid and/or inaccurate comparisons in favor of Corrales and/or Sterling.

117.    The first quote on the CQS form for financial literacy/trauma training listed a quote of $260,000.00 from a company that publicly posts prices on its website, and because of this price, Darrough rejected the vendor. However, based on the vendor's publicly posted prices, the Agency's purchase of training for all 34 of the Agency's Head Start locations with this vendor would have been $135,830.00.[33] Yet, just 18 locations, based on the Sterling quote, would have cost $71,910.00. Darrough's cost comparison claim is simply false.

118.    The third quote Darrough listed on the CQS form was materially false because the quote of $175,002 was actually from a daycare franchisee that does not advertise any training services, much less training comparable to the training that was to be provided by Sterling.[34] Darrough materially misrepresented the facts by creating a false narrative using fictional comparative quotes to further false claims and fraud. Had the Agency knew of the Darrough's or Corrales' fraud, it would not have entered into a contract with or paid the false claims to Sterling d/b/a Corrales.

119.    Corrales has individually or in concert with others knowingly submitted a legally and factually false claim and made a false statement or record material to his false or fraudulent claim to a Federal Government grantee. Further, Corrales d/b/a Sterling has refused to return to the government its monies. Every claim presented to the Agency, a Federal Government HHS grantee, and all monies retained by Corrales d/b/a Sterling, as a result of false or fraudulent representations

---

[33] The 18 locations referenced in the Sterling invoice would have cost the Agency only $71,910.00 with this vendor, as opposed to the $149,990.00 charged in the Sterling contract.
[34] Daycare centers generally do not provide professional development to teachers, and according to this daycare's website, this company does not offer this or any comparable service. Notably, the contact information for the franchisee included a Hotmail email address, which is unexpected if the quote was actually obtained from a national company. Moreover, the franchisee uses @krkcare.com for its email server, not @hotmail.com.

by Darrough and/or Corrales d/b/a Sterling constitutes a false or fraudulent claim under the FCA. The Agency would not have certified its compliance with HHS grant guidelines or paid these claims had it been aware of the Defendants' wrongdoing.

IX.   **SPECIFIC INSTANCES OF FALSE CLAIMS ACT VIOLATIONS BY MICHELLE PETERS ("PETERS") AND MNA EVALUATION & ASSESSMENT, LLC ("MNA")**

120.   Similar to the circumstances surrounding the 2019 training provided by Corrales, in July 2019, as Darrough was beginning the second year of her doctoral program, Darrough authorized a contract between Peters, another one of her dissertation advisors, and employee of Fueling Brains, and the Agency. Just days later, Darrough submitted her final Ph.D. proposal. The Agency was not aware of Peters' affiliation with Fueling Brains or that Peters was Darrough's dissertation methodology professor.

121.   Specifically, on June 7, 2021, Peters d/b/a MNA submitted a two-page proposal to provide the Agency's teachers, parents, and instructional coaches with STEM Professional Development in exchange for $149,999.00. Notably, this amount was structured to be just one dollar below the Agency's simplified acquisition procurement threshold. However, on June 16, 2021, Darrough submitted a CQS for Peters in the amount of $164,160.00.

122.   Not only was the CQS Darrough provided over the quoted proposal amount as well as the CQS small threshold amount, but the comparable quotes were also fraudulent. The second quote on the CQS was for $190,000.00 and was purportedly submitted by Corrales d/b/a Sterling. The third quote of $165,000.00 was purportedly from the same local unqualified daycare franchisee referenced in the various other CQS forms discussed *supra*.[35]

---

[35] The CQS further states that all three entities were sent a request to bid on June 6, 2021, and all three purportedly submitted a bid on the same day, which is not only improbable, but MNA's bid was actually dated June 7, 2021, a day after the CQS was created.

**123.** Darrough pushed through and approved the contract for services entered into and effective on August 1, 2021, with Peters d/b/a MNA. On August 9, 2021, Peters submitted a claim to the Agency for $75,000.00. Peters submitted a second claim to the Agency on November 1, 2021, for $74,999.00, which Darrough also approved on November 9, 2021.

**A.      Peters' "Independent" Evaluation**

**124.** Head Start grantees must conduct independent assessments of their program goals using aggregated child assessment data and professional development and parent and family engagement data in order to evaluate the program's progress toward meeting its goals, compliance with program performance standards throughout the program year, and the effectiveness of the professional development and family engagement systems in promoting school readiness.[36] The purpose of these assessments is to identify program strengths and needs, develop and implement plans that address program needs, and continually evaluate compliance with program performance standards and progress toward achieving program goals.[37]

**125.** In March of 2021, while Peters was still one of Darrough's dissertation advisors, Peters d/b/a MNA submitted a proposal to the Agency to conduct an *independent* and *unbiased* evaluation of the impact of Fueling Brain's programming on the Agency's service population. The evaluation would cost $75,000.00 and was to be paid prior to the start of the evaluation.

**126.** Darrough signed a CQS Sheet for the MNA contract. As is the case with the CQS' for Corrales and Fueling Brains, the procurement conducted by Darrough evidences she knowingly engaged in fraudulent competitive price quotes which also involved impermissible conflicts of interest. By way of example, the second quote listed on this CQS form was from Corrales d/b/a/Sterling. However, Sterling could not have been used as a competitor quote because

---

[36] HSPPS §1302.102.

[37] *Id.*

Notwithstanding Peters was working for Fueling Brains, Darrough knew that Corrales d/b/a Sterling was working directly with/for Fueling Brains. Because of this, Sterling was excluded from providing an "independent" evaluation of the efficacy of the Fueling Brains program.

127.    The third quote Darrough listed was for the same local daycare center listed on the Sterling CQS, which, for the reasons stated above, could not have actually provided a quote or provide comparable evaluative services.[38] Darrough misrepresented material facts regarding competitive quotes in favor of Peters, her methodology advisor and the director of research and assessment for Fueling Brains.

128.    The Agency was unaware of Peters' affiliation with Fueling Brains at the time and would not have approved of any contract for Peters to conduct an independent evaluation of one of her employers. Unaware of Peters' conflict of interest, the Agency contracted with Peters to conduct the supposedly "independent evaluation" of the Agency's use of Fueling Brains and progress toward meeting its program goals. Peters failed to disclose her conflict of interest for "independently" evaluating Fueling Brains programs, namely that Peters was employed by Fueling Brains as their Executive Director for Research & Evaluation – in other words, Peters was creating the same Fueling Brains analyses and reports that the Agency was then paying her to independently evaluate.

129.    Peters failed to comply with the requirements for the evaluation as agreed to because, simply stated, she misrepresented that she could provide an independent evaluation and she also failed to actually conduct an evaluation. The contract described the various steps to be included as

---

[38] Again, the CQS listed the email address using a Hotmail domain not the daycare's actual email domain. Moreover, daycare centers generally do not provide programmatic evaluations and according to this daycare's website, this company does not offer this service or any comparable service but rather is simply a daycare.

part of the evaluation that was to be completed by March 21, 2022.[39] Consistent with the contract terms, the Agency paid Michelle Peters $75,000.00 on May 18, 2021.

130.    Not only could Peters not provide and independent evaluation of the efficacy of Fueling Brains given her employment position with Fueling Brains, but Peters failed to comply with the requirements for the services as agreed to by the Agency—a federal grantee. The only deliverable that Peters shared with the Agency that had any conceivable relationship to the Fueling Brains program was a report prepared by Fueling Brains regarding a survey of Agency staff following the "professional development" training, which only showed increased understanding of the Fueling Brains program by staff after receiving the training.

131.    Despite the clear conflicts of interest arising from her employment with Fueling Brains and her position as Darrough's dissertation committee member, Peters also expressly and falsely warranted:

> Contractor represents that it does not have nor will Contractor knowingly acquire any interest that would conflict in any manner with the performance of his or her obligations under this Contract. If Contractor knows or should have reason to know of a potential conflict of interest, Contractor must divulge this information promptly to Agency for evaluation of whether the potential conflict would adversely affect the performance of Services.

If the Agency knew Peters had made false statements in obtaining the agreement with the Agency, or of her status as Darrough's dissertation committee advisor, or her affiliation with Fueling Brains, it would have refused to enter into a contract with her or make any payment on her false claim.

132.    In signing the agreement with the Agency to perform this evaluation, Peters acknowledged

---

[39] The evaluation was to be conducted using the Extended-Term Mixed Method Evaluation Design to assess the impact of the Fueling Brains education program and its effectiveness on the Agency's students. To this end, the evaluation was to include a long-term timeline that incorporated short-term, formative, and summative data collection and rigorous analysis of the efficacy and impact of the Fueling Brains' program objectives.

she would be responsible for any and all losses, expenses, costs, and damages suffered by Agency related to her performance, non-performance, or negligence in performing the evaluation. Peters further agreed to indemnify and defend the Agency for any action asserted against the Agency resulting from her failure to perform under the terms of the agreement.

133. Ignoring this but acknowledging her material failure to perform under the contract, in December of 2021 Peters stated, "*I would like to have a report to Dr. Darrough by the end of January with data for the program evaluation of Fueling Brains*." In a follow-up email Peters stated, "*I am wanting to put a report together that is somewhat close to the original proposal/contract*." Peters again conceded via email dated December 27, 2022, that she had not delivered any evaluation of the efficacy of Fueling Brains' programming with respect to the Agency's students.

134. Although Darrough knew of this material failure to perform, Darrough never informed the Agency that Peters had failed to perform the contracted services or suggested the Agency seek recoupment of the payment to Peters. Consequently, the Agency certified its compliance with federal grant guidelines.

135. On January 12, 2023, the Agency sent Peters a demand to return the $75,000.00 of federal funds. To date, Peters has retained the Federal Government funds and has refused to remit payment back to the Agency.

136. Peters has individually or in concert with others knowingly submitted a legally and factually false claim and made a false statement or record material to her false or fraudulent claim to a Federal Government grantee. Further, Peters has refused to return to the government its $75,000.00.

**B.    Further Investigation Reveals Extensive Evidence of Wrongdoing and Collusion**

137. As part of the Agency's investigation amid concerns over conflicts between Darrough and

both Corrales and Peters as members of her doctoral candidacy committee and their affiliation with Fueling Brains, the Agency requested documentation and records from UHCL including e-mails involving Darrough, Corrales, Peters, and Fueling Brains.

138. Through this investigation, the Agency received substantial documentation that demonstrated the conspiracy between Fueling Brains, Corrales d/b/a Sterling, and Peters. For example, in November 2020, Peters communicated with Corrales regarding an evaluation tool that she was putting together for and on behalf of Kids U Canada, the parent company of Fueling Brains, as an employee.

139. The documentation also shows that in March of 2021, prior to Peters' submission of her evaluation proposal to the Agency, Corrales was already introducing Peters as "Fueling Brains Executive Director of Research and Development." In an email Peters was copied on to Mission CISD, Corrales identified Peters in that role and stated that Peters and others would "coordinate this effort with the Fueling Brains team and the district as we start serving your kiddos." Additionally, by August of 2021 at the latest Peters was using a Fueling Brains email address, and her emails had a signature block that identified her as Fueling Brains' "Executive Director Research & Evaluation." Moreover, in the Fall of 2021 Peters was directing the work performed by Fueling Brains—the very same work that she was contracted by the Agency to evaluate "independently and objectively."

140. Based on the patterns and practices amongst the Defendants, it is likely that Peters received renumeration directly from Fueling Brains or from Corrales for work she contracted to perform for the Agency, other school systems and grantees or otherwise. Peters never disclosed any conflict of interest to the Agency, despite having signed a contract that required just such a disclosure.

141. Every claim presented to the Agency, a Federal Government grantee, for payment as a

result of false or fraudulent representations by Peters and her failure to disclose her ineligibility to provide such services due to her impermissible conflict of interest constitutes a false or fraudulent claim under the FCA. Had the Agency known of Peters' conflicts of interest, financial ties to Fueling Brains and her lack of independence, it would not have paid the claims or contracted with her. Had the Agency known Peters would fail to perform, it would not have paid the claims. Further, Defendant has not returned overbilled or fraudulently billed funds despite the Agency's demand in further violation of the FCA.

## X.    MORE EVIDENCE OF DARROUGH'S COLLUSION

**142.**    The Defendants share joint financial and career arrangements which are clear conflicts of interest. Not only did Darrough benefit with respect to her career goals and doctoral candidacy by assisting Corrales d/b/a Sterling and Peters d/b/a MNA to submit false claims to the Agency, but on information and belief Darrough, along with Corrales and Peters, received financial and career benefit from Fueling Brains for the leads and referrals she directed to Fueling Brains, including contracts obtained through the Agency.

**143.**    Darrough provided marketing assistance to Fueling Brains. On October 12, 2020, Corrales sent an email to Darrough's personal email address providing her with marketing materials for Fueling Brains, saying, "*Besides our videos, we put together the attached Fueling Brains introductory brochure. Here you have it in case you need it.*" In December 2020, Darrough coordinated with Corrales when she provided him with a list of local Head Start providers so that he could market Fueling Brains, noting, *"This is everyone in the Houston Metropolitan Area that has any impact on Early Childhood Education…YOU OWE ME!"*[40]

---

[40] Email from Darrough (Dec. 4, 2020).

**144.**    Corrales then asked Darrough, *"Can you ask your assistant to find an excel sheet with the following columns from all the Headstarts in the nation,"* concluding with *"That would be the best move…I will owe you then for sure!"*[41] As Darrough was undoubtedly aware, Corrales requested this information so that he could expand his marketing efforts on behalf of Fueling Brains nationwide.

**145.**    Shortly thereafter, in January 2021, Corrales used the list Darrough provided to send a mass email to Houston-area Head Start Directors. In the email, Corrales, holding himself out as a UHCL professor and researcher and not disclosing that he received kickbacks from Fueling Brains, stated:

> *I would love to connect with you to talk about my latest research on early childhood education: Brain development, and more specifically Fueling Brains... We started a pilot program with several school managed by BakerRipley and its Sr. Director, Cimberli Darrough, who with over 25 years of experience in education, supports the impact this program has on children in Early Childhood education, and recommended it to be shared with other programs.*[42]

**146.**    The Agency was not aware of Darrough's endorsement of Fueling Brains in this marketing material and did not approve this message. Additionally, the Agency never participated in a pilot program with Fueling Brains, thus these are false statements made to other unsuspecting federal grantees.

**147.**    Darrough also used the Agency as a marketing and referral source for Fueling Brains. In April of 2021, Fueling Brains sent information to Darrough and Corrales regarding a co-branding plan for the Agency and Fueling Brains. Darrough responded, *"Thanks, and yes, I have received the information. Have a great day!"*[43] The Agency never knew about and never approved a co-branding plan with Fueling Brains or Corrales. In May 2021, Fueling Brains sent another email to Darrough's personal email address, copying Corrales, regarding co-branding of the Agency and

---

[41] Email from Corrales (Dec. 7, 2020).
[42] Email from Corrales (Jan. 22, 2021).
[43] Email from Darrough (April 29, 2021).

Fueling Brains.  It stated, "*Please see attached PNG of your approved [ready set grow] Co-brand for Baker Ripley. You can start incorporating this brand into your online and social communications*." Again, the Agency was never made aware of this plan and never approved co-branding with Fueling Brains.

148.    Darrough's behavior conforms with the conspiratorial scheme. Once Darrough established her non-profit organization with Corrales in April 2021, Darrough communicated with an assistant director at Bryan Independent School District ("Bryan ISD") regarding Fueling Brains. To support Fueling Brains' procurement of a contract, Darrough provided information to Bryan ISD that she knew was patently false. In response to questions about Fueling Brains, Darrough replied:

> 1. How long have you been using Fueling Brains? *1 year*
> 2. What curriculum are you using with Fueling Brains? *Frog Street*
> 3. Are you using ALL of the components of Fueling Brains? *Yes*
> 4. What do you like MOST about Fueling Brains? *The alignment with TEKS, Head Start Performance Standards, & Teacher Strategies GOLD. Also, the data that is provided from the assessments. It allows my instructional team to address achievement gaps.*
> 5. Any challenges with Fueling Brains? *Teacher buy in, because they feared this would be something that would increase their workload. I can send you the techniques I used to mitigate that. I have about 460 teachers, and we implemented during the pandemic. Now, all the teachers want to have Fueling Brains classrooms.[44]*

149.    However, all of Darrough's representations were false. Darrough states that the Agency had been using Fueling Brains for a year, despite the fact that no aspect of the Fueling Brains program had been implemented at the Agency at the time she wrote this email. Darrough states that "data that is provided from the assessments" allows her instructional team to "address achievement gaps," despite the fact that the instructional team never received such data. Darrough states that "we implemented during the pandemic" and now "all the teachers want to have Fueling Brains classrooms," however none of the teachers had implemented the program as they had not

---

[44] Email from Darrough (April 28, 2021).

received any "curriculum" or training, did not have access to the "virtual" material kits, and could not enter student data on the Fueling Brains platform.

150.    The only reasonable explanation as to why Darrough would make such blatant misrepresentations to a school district that is gathering information to decide whether to purchase the Fueling Brains program is that Darrough had a professional and/or financial incentive to further the false claims and fraud of Fueling Brains against another school system.

151.    Darrough blind-copied Corrales in this email. Based on the patterns and practices of Defendants it is likely Darrough was looping Corrales into this communication for the potential sale of Fueling Brains to Bryan ISD to receive remuneration if Bryan ISD engaged Fueling Brains services from either Fueling Brains, Sterling, and/or Corrales.

152.    The "marketing" arrangement between Corrales, Fueling Brains, and Darrough was designed to assist the Defendants in marketing Fueling Brains to other Head Start grantees and public-school systems where they would, on information and belief, defraud and submit false claims to numerous other federally funded agencies and school systems and receive remuneration from Sterling and/or Fueling Brains.

153.    One month after Corrales and Darrough established Imperial, their educational nonprofit entity, in May 2021, Darrough reached out to an Assistant Superintendent for Fort Bend Independent School District ("FBISD") stating, "*Anil has received $400 million to build a school. He wants to open a public PK charter for 3 & 4 year olds, in Fort Bend County, and partner with FBISD.*"[45] Throughout the summer of 2021, Darrough assisted in efforts to have Fueling Brains partner with the Agency in a school location in FBISD. On June 15, 2021, in a marketing email, Corrales identified Darrough as a reference for Fueling Brains, despite its complete failure to

---

[45] Email from Darrough (May 28, 2021).

provide the contracted goods and services to the Agency, using her personal email address and cell phone number.[46]

154.     Based on information and belief, and her otherwise inexplicable efforts regarding Bryan ISD and FBISD, it is likely Darrough was to receive a "commission" from Fueling Brains and/or Sterling for referrals she made to Fueling Brains that resulted in contracts. These likely were kickbacks related to Darrough's position with the Agency as Darrough was directly responsible for procuring, contracting, and implementing vendor contracts, and because Darrough was using her position as a senior director at the Agency to promote Fueling Brains through her endorsements.

## XI.     THE SCHEME TO DEFRAUD THE FEDERAL GOVERNMENT EXTENDS BEYOND THE AGENCY

### A.     Public Schools

155.     Public school employees are public officials and servants. A public servant is a person elected, selected, appointed, employed, or otherwise designated as an officer, employee, or agent of the government, even if the person has not yet qualified for office or assumed the person's duties. Subject to a few exceptions, a public servant who exercises discretion in connection with contracts, purchases, payments, claims, or other financial transactions of government commits a crime if the public servant solicits, accepts, or agrees to accept any benefit, payment, or gratuity from a person the public servant knows is interested in or likely to become interested in any contract, purchase, payment, claim, or transaction involving the exercise of his discretion.[47]

156.     As stated above, Corrales d/b/a Sterling received a 20% referral fee from Fueling Brains for contracts procured. Specifically, Corrales d/b/a Sterling informed Fueling Brains in an email

---

[46] Email from Corrales (June 15, 2021).
[47] TEX. PENAL CODE § 36.08(d); *see also* TEX. LOCAL GOVT. CODE Chapters 171 AND 176.

that he has or is expecting to receive the following "cuts":

| School District | Total Fueling Brains Contract | Total "Referral" Fee to Corrales d/b/a Sterling |
|---|---|---|
| Goose Creek CISD | $1,403,800.00 | $252,437.50 |
| Sheldon | $216,500.00 | $38,862.50 |
| Sheldon | $282,500.00 | $55,362.50 |
| Mission | $806,575.00 | $147,383.25 |
| Pasadena ISD | $51,750.00 | $12,937.50 |
| North East ISD | $428,400.00 | $107,100.00 |
| Poteet | $84,065.00 | $21,016.25 |
| San Marcos ISD | $129,250.00 | $23,617.50 |
| Bay City | $171,460.00 | $42,865.00 |

157.    Corrales entered into arrangements with referral sources to support his efforts to sell Fueling Brains to federal grantees. He entered into sales agreements with at least two different Regional Education Service Center ("ESC") employees for them to promote Fueling Brains to the exclusion of competing products. These individuals, acting individually and not on behalf of their employer ESCs, have since steered opportunities to Fueling Brains. Additionally, Fueling Brains hired a current assistant superintendent of a Houston area ISD, who has since steered opportunities to Fueling Brains.

158.    Based on investigatory records obtained by Relator it is likely that the Defendants were pursuing contracts and similar arrangements with other public-school systems and federal grantees in Texas (and perhaps nationally).

159.    Other documentation reviewed suggests relationships that may also have involved similar types of arrangements. For example, on May 24, 2022, Public Servant A, the Deputy Superintendent Curriculum & Instruction for Public School District A, without comment, forwarded a federal early childhood grant opportunity for Public School District A to Corrales, who in turn forwarded it to Peters, Public Servant B, an employee of an Educational Service Center

Region 20 ("ESC 20") discussed below, Fueling Brains director Anil Karim, and Dr. Amber Brown of UHCL stating:

> Hi ladies,
> [Public School District A] wants to tackle this grant.
> *It can help us a lot…*
> Please help leading this…if we work together we can do it…
> **We can put sterling as the evaluator company if necessary or another one…**
> Antonio
>
> Antonio Corrales, Ed.D.
>
> Program Coordinator
> Educational Leadership Doctoral Program[48]

**160.**   First, it is unclear what Public Servant A's motivation would be to send this opportunity to Corrales for Fueling Brains, without comment. Also, this email indicates Corrales was structuring Sterling to be the program evaluator to provide the appearance that an independent evaluation would be conducted. Because Corrales is employed by Fueling Brains, his company Sterling obviously could not provide an independent evaluation of the efficacy of the Fueling Brains program on Public School District A students.

**161.**   Also, Public School District A is served by ESC 1; therefore, Public Servant B of ESC 20 would not have been providing Public School District A with any educational assistance as it is not in her assigned service area. Therefore, there was no appropriate reason to include Public Servant B in this communication.

**B.     Sales Agreements with Staff of Regional Educational Service Centers ("ESC")**

**162.**   Corrales d/b/a Sterling entered into contracts with a number of ESC employees to compensate them for promoting Fueling Brains including Public Servant B, Consultant at ESC 20, and Public Servant C, Senior Education Specialist at ESC 4. As evidence of those relationships, in

---

[48] Email from Corrales (May 24, 2022) (emphasis added).

April 2022 Corrales sent a list of Fueling Brains clients with dollar breakdowns including who receives a "cut" for which services as between Fueling Brains and Corrales d/b/a Sterling. He stated, *"Obviously some of these stuff are still being negotiated and on the Sterling side, I'll have to pay commission to [Public Servant C, an ESC 4 State Employee] too for example and [Public Servant B] ..."*[49] However, the compensation arrangements were structured through various other entities to avoid detection and to circumvent state and federal conflict interest laws.

### C.    Public Servant B, Early Childhood Education Consultant, ESC 20

**163.**    In September of 2021, Public Servant B, an early childhood specialist and education consultant employed by ESC 20, forwarded a lead to Corrales for Fueling Brains to contract with Northside ISD. In October 2021, Public Servant B pitched Fueling Brains to Houston ISD. In June 2022, Corrales circulated a sales agreement signed by Public Servant B.  Public Servant B d/b/a PicTails LLC (created in 2020), was to receive 5% commission for referrals to Fueling Brains for its software, coaching, professional development, and program evaluations and 1.3% commission on the referral for Fueling Brains educational materials. Public Servant B's commission went through PicTails so as to avoid detection or disclosure of the conflict of interest.

**164.**    In the "Conflict of Interest" section of the sales agreement, Public Servant B agreed, "[d]uring the Term, [Public Servant B] may not represent, promote, or otherwise try to sell … any lines or products that, in the Company's judgment, compete with the Products." Thus, Public Servant B, as a state employee whose job is to provide guidance and support to school districts including assisting the school district in selecting educational materials for purchase,  has created a clear conflict of interest with respect to her employment with ESC 20.

**165.**    Public Servant B is a state employee of a state agency, and it is wholly improper and

---

[49] Email from Corrales (April 10, 2022).

unlawful for a vendor to pay Public Servant B a "commission," perhaps better described as a kickback, for using her position of influence and power to steer contracts to unsuspecting recipients of federal funds (school districts, charter schools, and other federally funded agencies). On information and belief, the conflicts of interest and financial arrangements were never disclosed by Public Servant B to ESC 20 or to any school districts or charter schools serviced by any ESC.

**D.    Public Servant C, Ed.D. Senior Education Specialist with ESC 4 (Houston Region)**

**166.**    As noted above, Public Servant C also received a "cut" of contracts obtained by Sterling and/or Fueling Brains. In July 2021, Corrales circulated a "Non-Exclusive Sales Representative Agreement" for review by Fueling Brains, noting, *"I'm planning to use this one for the first time with [Public Servant C]."* Public Servant C is a Senior Education Specialist in Education Service Center Region 4, a state agency and recipient of federal funds. Public Servant C is in a position of leadership and providing technical support to school districts and charter schools throughout the service area of ESC 4. It is wholly improper and unlawful for a vendor such as Fueling Brains, Corrales, or Sterling to employ or pay a "commission," perhaps better described as a kickback, to a state employee in return for using their position of influence and power to steer contracts to unsuspecting recipients of federal funds such as school districts, charter schools and other federally funded agencies. On information and belief, Public Servant C's conflicts of interest and financial arrangements were never disclosed to the ESC or to any school districts or charter schools serviced by the ESC.

**E.    Public Servant D, Assistant Superintendent Public School District B**

**167.**    As further evidence of this far-reaching scheme, in November 2021 Corrales confirmed that Public Servant D, an Assistant Superintendent of Public School District B had been hired by Fueling Brains, noting "[Public Servant D] has accepted working for us.... She'll get $3,000 per

month and will give us 15 hours a week. She is a current assistant superintendent at [Public School District B]. To avoid conflict of interest and *avoid closing the [Public School District B] doors on Fueling Brains, she will be under Sterling*."[50] The documented communications show again a clear pattern and intent to avoid detection and circumvent conflict of interest laws (state and federal), an effort to defraud Public School District B, and a broader circle of fraud by the Defendants. These actions appear to violate state conflict of interest laws and constitute state and likely federal criminal offenses.[51]

**168.** Like Darrough, Public Servant D has used her employment to steer opportunities to Fueling Brains and therefore obtain benefits from Fueling Brains. In 2022, Public Servant D forwarded Corrales a confidential email exchange regarding the Bezos Academy and Public School District B, noting it was "For your eyes only."[52]

**169.** In a later email exchange, Public Servant D wrote: "She is leaning hard this way because we get a LOT more money in our pockets this way. Allegedly and she is impressed with the name and the style. So [founder of Bezos Academy] has a heart for this since he was born to a teenage mom. And understands the importance of early childhood education. He went to Montessori schools and that is his focus and to what he attributes his success. Sorry, I was not at the real meeting to get a contact. She gave me the recap."[53] In turn, Corrales passed it along to Fueling Brains, noting, "FYI this is prime of the prime confidential info."[54]

---

[50] Email from Corrales (Sept. 17, 2021) (emphasis added).
[51] *See, e.g.,* 18 U.S.C. § 208; 2 C.F.R. § 200.112; TEX. LOC. GOV'T CODE §§ 176.001(4); 176.001(2-b); .003(a)(2)(B), (a-1); 176.013(c).
[52] Email from Public Servant D (May 3, 2022).
[53] Email from Public Servant D (Sep. 30, 2022).
[54] *Id.*

# FIRST CLAIM FOR RELIEF
## (All Defendants)
## Violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(A))
## The Submission of, or Causing the Submission of, False Claims

170.  Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

171.  By virtue of the acts described, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Federal Government, a contractor, grantee, or other recipient acting on the United States Government's behalf, or to advance the Government's Head Start/Early Head Start program, for payment or approval in connection with HHS Head Start grants and the Indirect Cost Funds in violation of 31 U.S.C. § 3729(a)(1)(a).

172.  Defendants, individually and knowingly or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented to the United States Government, a contractor, grantee, or other recipient acting on the United States Government's behalf or to advance the Head Start program, either directly or indirectly, false, or fraudulent claims for payment or approval in connection with HHS Head Start grants and the Indirect Cost Funds.

173.  As a result of Defendants' conduct, the United States, through HHS and its component agencies and Agency as grantee, paid false or fraudulent claims to the Defendants Corrales, Sterling, Peters, MNA, and Fueling Brains. Had the United States or the Agency/grantee known of Defendants' conduct, it would not have paid those claims. By reason of Defendants' conduct, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

174.  Similarly, false claims have been submitted or presented to numerous other public schools (including but not limited to those identified above) and federal grantees following the same pattern and practice of deceit, causing further damage to the Government.

## SECOND CLAIM FOR RELIEF
### (All Defendants)
### Violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(B))
### Use of False Statements

**175.** Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

**176.** By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records or false statements, to get false or fraudulent claims paid or approved by the United States Government or a contractor, grantee, or other recipient acting on the United States Government's behalf or to advance the Head Start program in violation of 31 U.S.C. § 3729(a)(1)(B).

**177.** As set forth above, by virtue of the acts described above, Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used false records and/or statements material to false or fraudulent claims relating to the Agency's receipt of HHS funds in connection with HHS grants and the Indirect Cost Funds.

**178.** Specifically, Defendants knowingly made, or caused the Agency to make, false or fraudulent records and/or statements that were material to false or fraudulent claims for receipt of HHS funds in connection with the Head Start HHS Grant Projects and the Indirect Cost Funds.

**179.** As a result of Defendants' conduct, the United States, through HHS and its component OHS, and through its grantee, the Agency, paid false or fraudulent claims to the Defendants. Had the United States and the Agency known of Defendants' conduct, it would not have paid those claims. By reason of Defendants' conduct, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

**180.** Similarly, following the same pattern and conduct, other public schools (including but not limited to those identified above) and federal grantees likewise paid false or fraudulent claims to Defendants, causing further damage to the Government.

**THIRD CLAIM FOR RELIEF**
**(All Defendants)**
**Violation of the False Claims Act (31 U.S.C. § 3729 (a)(1)(G))**
**Reverse False Claims**

**181.** Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

**182.** Defendants violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, and/or causing to be made or used false records and statements material to an obligation to pay or transmit money or property to the Government or its grantee by creating false records and making false statements relating to their failure to provide materials and services it was to provide the Agency and/or to repay the Agency for overpayments to which the Defendants were not entitled.

**183.** Had the Agency been aware of Defendants' wrongful conduct, it would have taken steps to recover them. The Agency has now done so via demands to the Defendants and this suit.

**184.** By virtue of the said false records, statements, and other acts of concealment and improper avoidance, the United States and its grantee have incurred damages in a substantial amount to be determined at trial and the Federal Government is entitled to a civil penalty as required by law for each violation.

**FOURTH CLAIM FOR RELIEF**
**(All Defendants)**
**Violation of the False Claims Act (31 U.S.C. § 3729(a)(3))**
**Conspiracy to Violate the FCA U.S.C. 3729 (a)(1)(C)**

**185.** Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

186.    Defendants violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to violate 31 U.S.C. §

3729(a)(1)(A), (B), and/or (G). Defendants shared a conspiratorial objective or specific intent to

defraud the United States and its grantee, the Agency (as well as other public-school systems and

federal grantees, including but not limited to those identified above), and acted in furtherance of

their conspiracy.

187.    Had The Agency (and other public schools and federal grantees) been aware of Defendants'

conspiracy and wrongful conduct, it (they) would have refused to make payments and/or pursued

other legal remedies. The Agency has now done so via this suit. By virtue of the said conspiracy

to submit unsupported claims, the United States and its grantee have incurred damages in a

substantial amount to be determined at trial and the Federal Government is entitled to a civil penalty

as required by law for each violation.

**FIFTH CLAIM FOR RELIEF**
**(Fueling Brains, Corrales, Peters)**
**Unjust Enrichment**

188.    Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in

full.

189.    This is a claim for the recovery of monies by which Defendants have been unjustly

enriched. By reason of their foregoing conduct, including breaching the contracts and failing and

refusing to honor their legal and/or contractual obligations to return funds overpaid to Defendants,

the Defendants have profited and enriched themselves unjustly at the expense and to the detriment

of BakerRipley.

190.    By directly or indirectly obtaining HHS funds from the United States through its grantee,

BakerRipley, funds to which Defendants were not entitled, Defendants were unjustly enriched,

and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial but are not less than $925,000.00.

## SIXTH CLAIM FOR RELIEF
### (Fueling Brains, Corrales, Peters)
### Payment by Mistake

**191.** Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

**192.** This is a claim for the recovery of monies BakerRipley paid directly or indirectly to Defendants as a result of mistaken understandings of fact.

**193.** BakerRipley's mistaken understandings of fact were material to its decision to pay the claims to Defendants using HHS funds that were submitted or caused to be submitted by Defendants for services.

**194.** BakerRipley, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of associated statements, invoices, and representations, paid monies directly or indirectly to Defendants to which they were not entitled. Thus, BakerRipley is entitled to recoup such monies, in an amount to be determined at trial but are not less than $925,000.00.

## SEVENTH CLAIM FOR RELIEF
### (Fueling Brains, Corrales, and Peters)
### Breach of Contract and Covenant of Good Faith and Fair Dealing

**195.** Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

**196.** This is a claim for breach of contract and covenant of good faith and fair dealing. At all times relevant to this litigation, BakerRipley was in contractual relationships with Fueling Brains, Corrales, and Peters and these Defendants owed a duty to BakerRipley to act in good faith and deal fairly with it. Acting in reasonable reliance on the contract, BakerRipley performed its

obligations under the contract, but Defendants did not. Defendants breached the contract(s) on more than one occasion by failing to perform under the terms of the contract and in some instances, double invoicing for goods and services not provided causing damages to the United States and its grantee, BakerRipley, as a result of the breach. Thus, BakerRipley is entitled to recoup such monies and damages in an amount to be determined at trial but are not less than $925,000.00.

## EIGHTH CAUSE OF ACTION
### (All Defendants)
### Fraud

**197.** Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

**198.** This is a claim for fraud. Defendants knowingly or recklessly made material misrepresentations to induce BakerRipley to enter into contracts and to act upon Defendants' misrepresentations. BakerRipley justifiably relied on Defendants' misrepresentations and paid Defendants for goods and services that Defendants knew they would not or could not provide or perform, which caused injury to BakerRipley in an amount of no less than $925,000.00. BakerRipley is entitled to recoup such monies and its damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (All Defendants)
### Fraud by Nondisclosure

**199.** Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

**200.** This is a claim for fraud by nondisclosure. Defendants concealed from or failed to disclose certain facts about the services alleged to be performed, their relationship with the other Defendants and other material facts. Defendants had a duty to disclose these facts and Defendants

knew that BakerRipley was not aware of these facts, and did not have an equal opportunity to discover, that Defendants had no intention of providing the represented goods and services and of the relationships between the Defendants. Defendants were deliberately silent when they had a duty to speak, and by failing to disclose these facts, Defendants intended to induce BakerRipley to take some action or refrain from acting as set forth herein. BakerRipley relied on Defendants' nondisclosure and was injured as a result of acting or being unable to act without knowledge of the undisclosed facts.

### TENTH CAUSE OF ACTION
**(Fueling Brains, Corrales, Peters)**
**(Violation of TTLA, Chapter 134 of the Texas Civil Practice and Remedies Code)**

**201.**    Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

**202.**    This is a claim for theft. By failing to perform as required under the law and/or under the terms of the contracts, and by failing to return funds paid and/or overpaid to Defendants by BakerRipley, Defendants have appropriated monies with the intent to deprive BakerRipley of its property. As detailed above, Defendants have invoiced and "double-invoiced", and were mistakenly paid by BakerRipley, for goods and services not provided by Defendants. Despite BakerRipley's demands for return of the funds, Defendants have refused. BakerRipley is entitled to recoup such monies and its damages in an amount to be determined at trial but are no less than $925,000.00.

## ELEVENTH CAUSE OF ACTION
### (All Defendants)
### Civil Conspiracy

203.    Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

204.    This is a claim for civil conspiracy. The Defendants caused injury to BakerRipley by acting in combination with each other for a common purpose—to be paid with BakerRipley's funds for goods and services none of the Defendants would or intended to actually provide. Defendants also caused injury to BakerRipley by conspiring to defraud BakerRipley of its monies by reaching a meeting of the minds on the object or course of action and took overt acts in pursuance of their course of action against BakerRipley. BakerRipley is entitled to recoup such monies and its damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (Fueling Brains, Corrales, and Peters)
### Money Had and Received

205.    Co-Plaintiff BakerRipley incorporates the preceding paragraphs herein as if set forth in full.

206.    This is a claim for the recovery of monies BakerRipley paid directly or indirectly to Defendants as a result of mistaken understandings of fact. BakerRipley's mistaken understandings of fact were material to its decision to pay the Defendants for claims that were submitted or caused to be submitted by Defendants for goods and services the Defendants failed to provide. Additionally, as described *supra*, BakerRipley mistakenly paid funds for "duplicate" invoices submitted by Defendants. Defendants hold money that belongs to BakerRipley in equity and good conscience.

207. BakerRipley, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of associated contracts, statements, invoices, and representations, paid monies directly or indirectly to Defendants to which they were not entitled. Thus, BakerRipley is entitled to recoup such monies, in an amount to be determined at trial.

## XII.   REQUEST FOR RELIEF

WHEREFORE, the Relator, on behalf of itself and the United States of America, and BakerRipley as Co-Plaintiff prays the court enter judgment against Defendants, jointly and severally, in an amount equal to three times the number of damages the United States and its grantee has sustained because of Defendants' actions in violating the Federal False Claims Act.

Relator and Co-Plaintiff pray the court enter judgment on all applicable federal statutory penalties against Defendants on Counts 1-4.

On Counts 1-4, Relator further prays, Relators be awarded an amount of the proceeds of this action or settlement of the claims as defined and permitted by the FCA.

Co-Plaintiff prays the Court render judgment in favor of Co-Plaintiff and against Defendants on Counts 5 – 12 of Co-Plaintiff's complaint and award compensatory and punitive damages.

Co-Plaintiff prays for an award of pre- and post-judgment interest and attorneys' fees and costs on Counts 5 – 12 of Co-Plaintiff's complaint against Defendants.

Relator and Co-Plaintiff further pray Relator and Co-Plaintiff be awarded all costs incurred, reasonable attorneys' fees and expenses, and any such further legal and equitable relief as is proper.

## XIII.   JURY DEMAND

Relator/Co-Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: February 2, 2024.

Respectfully submitted,

**SCHULMAN, LOPEZ, HOFFER & ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone:        210-538-5385
Facsimile:        210-538-5384

**Joseph E. Hoffer**
**Attorney-in-Charge**
State Bar No. 24049462
Federal ID No. 2006011
Email: jhoffer@slh-law.com
**Elizabeth Angelone**
State Bar No. 24077349
Federal ID No. 3042089
Email: eangelone@slh-law.com

**MARTINEZ REILLY, LLP**
**Marion M. Reilly**
State Bar No. 24079195
Federal ID. 1357491
Email: Marion@mrtrial.com
**John B. Martinez**
State Bar No. 24010212
Federal ID. No. 23612
Email: John@mrtrial.com
3636 S. Alameda, Ste. B119
Corpus Christi, Texas 78412
Dir: (361) 273-6771
Fax: (361) 704-8355
**Service Email address
Service@mrtrial.com

**ATTORNEYS FOR RELATORS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been sent to all known counsel pursuant to the Federal Rules of Civil Procedure on this 2nd day of February 2024 via the CM/ECF system or via email.

Dinesh H. Singhal
**The Singhal Law Firm**
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Tel: 713.222.8500
dinesh@singhallaw.com
**ATTORNEY FOR CIMBERLI DARROUGH**

Amanda Gadison
Randal H. Miller
**Bryan Cave Leighton Paisner**
2200 Ross Ave., Suite 4200 W
Dallas, Texas 75201
P: 214-721-8117
Amanda.gadison@bclplaw.com
**ATTORNEYS FOR KIDS U US, INC.**
**D/B/A FUELING BRAINS**

And I hereby certify that I have submitted the foregoing document via CMRRR, Regular mail, and email to the following non-CM/ECF participants:

Jordan Raschke Elton
Andrew Mytelka
**Greer, Herz & Adams, L.L.P.**
One Moody Plaza, 18th Floor
Galveston, Texas 77550
P: (409) 797-3239
jraschkeelton@greerherz.com
**ATTORNEYS FOR MICHELLE PETERS AND**
**MNA EVALUATIONS AND ASSESSMENTS,**
**LLC**

Fred D. Raschke
**Mills Shirley L.L.P.**
2200 Market Street Ste 300
Galveston, TX. 77550
P: 409-761-4028 (direct line)
fraschke@millsshirley.com
**ATTORNEY FOR ANTONIO CORRALES AND**
**STERLING EVALUATIONS AND**
**ASSESSMENT, LLC**

*/s/ Joseph E. Hoffer*
Joseph E. Hoffer
Attorney for BakerRipley