**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel*. | § | |
| BakerRipley | § | |
| 4450 Harrisburg, Suite 200 | § | |
| Houston, TX 77011 | § | |
| | § | |
| & BakerRipley | § | |
| *Plaintiffs* | § | **Case No. 23-cv-1124** |
| | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| Kids U US, Inc. d/b/a Fueling Brains, | § | |
| Cimberli Johnson Darrough, an individual, | § | |
| Antonio Corrales, an individual, | § | |
| Sterling Evaluation and Assessment, LLC, | § | **JURY DEMANDED** |
| Michele Peters, an individual, and | § | |
| MNA Evaluation and Assessment, LLC | § | |
| | § | |
| | § | |
| *Defendants* | § | |

**RESPONSE TO DEFENDANT'S, KIDS U US, INC. d/b/a FUELING BRAINS,**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

To the Honorable Judge of Said Court:

BakerRipley, Plaintiff and Relator on behalf of the United States of America ("Agency,"

or "Relator"), asks the Court to deny Defendant's, Kids U US, Inc. d/b/a Fueling Brains ("Fueling

Brains") Motion to Dismiss the Second Amended Complaint.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iv

I. INTRODUCTION ..................................................................................................... 1

II. STANDARD OF REVIEW ...................................................................................... 2

    A.    Federal Rule of Civil Procedure 9(b) ........................................................... 2

    B.    Federal Rule of Civil Procedure 12(b)(6) ..................................................... 2

III. ARGUMENT ........................................................................................................... 3

    A.    Fueling Brains' Motion to Dismiss Should be Denied as to the Agency's
            Affirmative FCA Claims ............................................................................... 3

           i.    Fueling Brains' Conduct Breached Existing Contracts and the False
                    Claims Act ....................................................................................... 5

           ii.    Fueling Brains Wrongfully Participated in a Kickback Scheme in
                    Violation of the FCA ....................................................................... 17

           iii.    Defendants, Including Fueling Brains, Wrongfully Benefitted
                    Despite Undisclosed Conflicts of Interest ................................... 23

    B.    Fueling Brains' Motion to Dismiss Should be Denied as to the Reverse
            False Claims Act Claim................................................................................. 24

    C.    Fueling Brains' Motion to Dismiss Should be Denied as to the FCA
            Conspiracy Claim ......................................................................................... 25

    D.    Fueling Brains' Motion to Dismiss Should be Denied as to the Common Law
            Claims ..........................................................................................................

           i.    The Agency's Fraud, Fraud by Nondisclosure, and Civil Conspiracy
                    Claims Survive Dismissal ............................................................... 28

           ii.    The Agency's Quasi-Contractual Claims Survive Dismissal ................. 31

           iii.    The Agency's Texas Theft Liability Act ("TTLA") Claim Survives
                    Dismissal ......................................................................................... 32

IV. ALTERNATIVE MOTION FOR LEAVE TO AMEND ...................................................... 33

V. CONCLUSION .................................................................................................................. 34

CERTIFICATE OF SERVICE .............................................................................................. 35

# INDEX OF AUTHORITIES

UNITED STATES SUPREME COURT CASES:

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ...................................................... 3

*Bell Atl. v. Twombly,*
 550 U.S. 544 (2007) ...................................................... 3

*United States v. Neifert–White Co.,*
 390 U.S. 228, 233 (1968) ...................................... 9, 10, 23

*Universal Health Servs. v. U.S. ex rel. Escobar,*
 579 U.S. 176 (2016) ................................................ 6, 14, 15


CASES FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT:

*Baker v. Putnal,*
 75 F.3d 190, 196 (5th Cir. 1996) ....................................... 3

*Benchmark Elec., Inc. v. J.M. Huber Corp.,*
 343 F.3d 719 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003) ........................................................................ 2

*Chavez v. De La Paz,*
 156 Fed. App'x 694 (5th Cir. 2005) .................................... 3

*Gonzalez v. Fresenius Med. Care N. Am.,*
 689 F.3d 470 (5th Cir. 2012) ........................................... 4

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,*
 313 F.3d 305 (5th Cir. 2002) .......................................... 33

*Homoki v. Conversion Services, Inc.,*
 717 F.3d 388 (5th Cir. 2013) .......................................... 30

*Morin v. Caire,*
 77 F.3d 116 (5th Cir. 1996) ............................................ 3

*Pace v. Cirrus Design Corp.,*
 93 F.4th 879 (5th Cir. 2024) ........................................... 2

*U.S. ex rel. Bain v. Georgia Gulf Corp.,*
 386 F.3d 648 (5th Cir. 2004) .......................................... 24

*U.S. ex re. Colquitt v. Abbott Laboratories,*
    858 F.3d 365 (5th Cir. 2017) ..................................................... 2, 5

*U.S. ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ................................................. 4, 5, 18

*U.S. ex rel. Harman v. Trinity Industries, Inc.,*
    872 F.3d 645 (5th Cir. 2017) ......................................................... 4

*U.S. ex rel. Longhi v. U.S.,*
    575 F.3d 458 (5th Cir. 2009) ................................................. 10, 16

*U.S. ex rel. Miniex v. Houston Housing Authority,*
    No. 21-20435, 2023 WL 6174416 (5th Cir. Sept. 22, 2023) ......................................... 2, 5

*U.S. v. Corporate Mgmt., Inc.,*
    78 F.4th 727 (5th Cir. 2023) ..................................................... 4, 15

*White v. U.S. Corr., L.L.C.,*
    996 F.3d 302 (5th Cir. 2021) ........................................................ 3


**CASES FROM OUR SISTER CIRCUITS:**

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
    352 F.3d 908 (4th Cir. 2003) ....................................................... 24

*U.S. ex rel. Matheny v. Medco Health Solutions, Inc.,*
    671 F.3d 1217 (11th Cir.2012) ..................................................... 25


**DISTRICT COURT CASES:**

*Abbott v. BP Exploration and Production, Inc.,*
    781 F. Supp. 2d 453 (S.D. Tex. 2011) ............................................. 10

*Amazon Tours, Inc. v. Quest Global Angling Adventures, L.L.C.,*
    No. Civ.A. 303CV2551M, 2004 WL 1788078, at *4 (N.D. Tex. June 30, 2004) ........... 30

*Khan v. Khaishgi,*
    No. 4:21-CV-02602, 2023 WL 5807841 (S.D. Tex. Sept. 6, 2023) .................... 32

*Nuncio v. Webb County,*
    No. 5:20-CV-92, 2021 WL 4442518 (S.D. Tex. Sept. 28, 2021) ...................... 5

*United States v. Americus Mortgage Corp.*,
No. 4:12–cv–02676, 2014 WL 4274279 (S.D. Tex. Aug. 29, 2014) ............................ 10

*U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group*,
370 F. Supp. 2d 18 (D.D.C. 2005) ................................................................... 24

*U.S. ex rel. Wuestenhoefer v. Jefferson*,
105 F. Supp. 3d 641 (N.D. Miss. 2015) .............................................................. 4

*U.S. v. Science Applications Intern. Corp.*,
555 F. Supp. 2d 40 (D.D.C. 2008) .................................................................. 24

*U.S. v. United Techs. Corp.*,
No. C-3-99-093, 2000 WL 988238 (S.D. Ohio Mar. 20, 2000) ..................................... 25

*Waldmann v. Fulp*,
259 F. Supp. 3d 579 (S.D. Tex. 2016) ............................................................15, 17

*Wellogix, Inc. v. Accenture, LLP*,
788 F. Supp. 2d 253, 542–43 (S.D. Tex. 2011) ...................................................... 33

## RULES & STATUTES:

45 CFR Part 75, § 75.327(c)(1) (as authorized by 5 U.S.C. 301; 2 CFR part 200) .....................23

31 U.S.C. §§ 3729(a)(1)(A) .............................................................................3

31 U.S.C. §§ 3729(a)(1)(B) .........................................................................3, 4

31 U.S.C. § 3729(a)(1)(G) ..........................................................................24, 25

42 U.S.C. § 9837(c)(1)(E)(iv)(X) ...................................................................... 23

FED. R. CIV. P. 9(b)...............................................................................*passim*

FED. R. CIV. P. 12(b)(6) ..........................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 134.002(2) ..........................................................32

TEX. CIV. PRAC. & REM. CODE § 134.003(a) .......................................................... 32

TEX. PENAL CODE § 31.01 ........................................................................... 32

TEX. PENAL CODE § 31.03 ........................................................................... 32

# I. INTRODUCTION

1.     BakerRipley is a Texas nonprofit corporation and public charity designated and funded by the Federal Government to operate Head Start and Early Head Start Federal programs throughout the Houston, Texas region.

2.     In the wake of unprecedented challenges posed by the COVID-19 pandemic, BakerRipley, true to its mission, sought innovative and accessible educational solutions for vulnerable, low-income communities. It was during this time that Fueling Brains, a self-touted champion for educational advancement, emerged on the scene, making grand promises of transformative virtual learning platforms that were tailored specifically for those in need. Although Fueling Brains, along with the other Defendants, made grand promises of providing "individualized curriculum," "independent evaluations," "professional development," and "material kits," none of it materialized as promised. Instead, Fueling Brains and the other Defendants exploited the dire circumstances of the pandemic to enrich themselves at the expense of low-income families, threatening the integrity of public funds in the process. Under the guise of providing essential educational services to vulnerable populations, Fueling Brains engaged in a calculated scheme to defraud the Government and the Agency, and unlawfully obtain federal grant funds.

3.     Fueling Brains did not merely fail to fulfill its promises, it actively participated in a deliberate and systematic effort to exploit benefits reserved for the most disadvantaged among us. In so doing, Fueling Brains not only betrayed the trust of the Agency and the community it purported to serve, but also undermined the very foundations of accountability and justice upon which our society relies.

## II.    STANDARD OF REVIEW

### A.    FEDERAL RULE OF CIVIL PROCEDURE 9(b)

4.      "As the False Claims Act is about fraud, claims asserted under it must comply with Rule 9(b)'s heightened pleading standard." *U.S. ex rel. Colquitt v. Abbott Laboratories*, 858 F.3d 365, 371 (5th Cir. 2017).  Rule 9(b) states: [i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  Rule 9(b) thus requires the "who, what, when, where, and how of the fraud or misrepresentation" be plead with particularity.  *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 889–90 (5th Cir. 2024).  But the amount of particularity required differs from case to case.  *See Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003).

5.      The Fifth Circuit recently found Rule 9(b)'s standard was met where the relator "outline[d] HHA's repeated requests for federal funding and . . . specific details regarding HHA's fraud via their alleged failure to conduct cost-estimates.  *U.S. ex rel. Miniex v. Houston Housing Auth.*, No. 21-20435, 2023 WL 6174416, at *3 (5th Cir. Sept. 22, 2023) ("Miniex alleged over twenty-five specific transactions that rendered HHA's certification of compliance false.  Because she outlined the "time, place, and contents" of those transactions, who was responsible for them, and what was gained out of it, Miniex has satisfied Rule 9(b).").

### B.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

6.      A Rule 12(b)(6) motion seeks to dismiss an action for failure to state a claim for which relief can be granted.  FED. R. CIV. P. 12(b)(6).  "A Rule 12(b)(6) motion to dismiss fails unless 'it appears . . . no relief could be granted under any set of facts that could be proved

consistent with the allegations' in the complaint." *Chavez v. De La Paz*, 156 Fed. App'x 694, 696 (5th Cir. 2005) (quoting *Morin v. Caire*, 77 F.3d 116 (5th Cir. 1996)).

7.      Rule 12(b)(6) must be read with Rule 8(a)'s pleading standard, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A plaintiff survives a Rule 12(b)(6) motion by pleading "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

8.      To do so, the plaintiff must plead sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Labels and conclusions, "a formulaic recitation of the elements of a cause of action," and bare assertions are insufficient. *Twombly*, 550 U.S. at 555. But the complaint must be liberally construed, all well-pleaded facts must be taken as true, and the Court "constru[es] all reasonable inferences in the light most favorable to the plaintiff." *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021); *Iqbal*, 556 U.S. at 679; *Baker v. Putnam,* 75 F.3d 190, 196 (5th Cir. 1996).

### III.      ARGUMENT

### A.      FUELING BRAINS' MOTION TO DISMISS SHOULD BE DENIED AS TO THE AGENCY'S AFFIRMATIVE FCA CLAIMS.

9.      Fueling Brains moves to dismiss the Agency's first and second claims for relief, which are founded on Fueling Brains' submission of false claims, and use of false statements. 31 U.S.C. § 3729(a)(1)(A) & (B).

10.      A defendant violates the False Claims Provision of the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Additionally, a defendant violates the FCA's False Statement Provision when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false or fraudulent claim." § 3729(a)(1)(B). "[T]he terms 'knowing' and 'knowingly'. . . mean that a person. . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and . . . require[s] no proof of specific intent to defraud." § 3729(b)(1). "'Knowing assistance' does not require that a person 'be the one who actually submitted the claim forms in order to be liable.'" *U.S. v. Corporate Mgmt., Inc.*, 78 F.4th 727, 741 (5th Cir. 2023) (quoting *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004)). To the contrary, "[t]he causation standard employs traditional notions of proximate causation to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim." *Id.* (*quoting U.S. ex rel. Wuestenhoefer v. Jefferson,* 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015)); *see also U.S. v. Hodge*, 933 F.3d 468, 474–75 (5th Cir. 2019) (applying proximate causation in an FCA housing case). Under the False Statement Provision, "the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; [courts] need not make the step of inferring that the record actually caused a claim to be presented to the Government." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

11.    Four elements are required for a court to find an FCA violation: (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 654 (5th Cir. 2017) (quoting *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012)). For FCA purposes, a "claim" includes "any request or demand . . . for money . . . made to a contractor, grantee, or other recipient, if the money or property [is] to be spent or used on the

Government's behalf or to advance a Government program or interest," and if the Government provides any portion of the money or reimburses the grantee. 31 U.S.C. § 3729(b)(2). Additionally, "a claim may be false or fraudulent under the FCA because it includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit." *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F.Supp.2d 745, 765 (S.D. Tex. 2010).

12. Contrary to Fueling Brains' assertion, "when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief." *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), *abrogated on other grounds*, *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928 (2009); *see also Nuncio v. Webb County*, No. 5:20-CV-92, 2021 WL 4442518, at *5, (S.D. Tex. Sept. 28, 2021); *U.S. ex rel. King v. Solvay S.A.*, No. H–06–2662, 2010 WL 2851725, at *1 (S.D. Tex. July 20, 2010); *compare* Dkt. No. 34, at 7. Thus, a plaintiff can survive a motion to dismiss FCA claims even without details of a false claim, so long as they allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *U.S. ex rel. Colquitt v. Abbott Laboratories*, 858 F.3d 365, 372 (5th Cir. 2017) (quoting *U.S. ex rel. Grubbs*, 565 F.3d at 191).

### i. Fueling Brains' Conduct Breached Existing Contracts and the False Claims Act.

13. In an attempt to minimize the egregiousness of its conduct, Fueling Brains insists that the Agency's FCA claims are "at most—a breach of contract." Dkt. No. 35, at 8. Although the Agency accepts Fueling Brains admission that it breached its contract, the case at hand is not a simplistic breach of contract case. Instead, the Agency sufficiently alleges that Fueling Brains

acted with the requisite scienter to defraud the Government, and fraudulently induced the contract without ever intending to perform under it.  SAC ¶¶ 58, 63–65, 67, 67, 73, 75.

14.     Fueling Brains' breach of contract and its violation of the FCA are intertwined, and liability under the FCA can be grounded in a breach of contract.  *See U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013) ("Some of the prototypical claims actionable under the FCA are those in which the claimant did not perform the service he requests compensation for or did perform the service but overcharged the government.").  True, "[t]he FCA is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.'"  *United States Stepe v. RS Consulting LLC*, 325 F.R.D. 699, 706 (M.D. Fla. 2017) (*quoting Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016)).  "But some breaches of contract can also violate the FCA, such as when a contractor, with the requisite scienter, [makes] a request for payment under a contract and with[holds] information about its noncompliance with material contractual requirements."  *Id.* (citations omitted); *see also U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011) ("[A] mere breach of contract does not give rise to liability under the False Claims Act.  If the breaching party falsely claims to be in compliance with the contract to obtain payment, however, there may be an actional false claim.").

15.     Here, the Agency alleges that Fueling Brains violated material terms of their agreement but withheld that information in order to received inflated reimbursements for materials and services not provided.  *See, e.g.*, SAC ¶¶ 44–90.  The Agency alleges that Fueling Brains, in collaboration with others, knowingly submitted legally and factually false and fraudulent claims to the Agency, which were material to the Agency's payment process and were also crucial for progress reporting and certification to the Federal Government.  *See, e.g.*, SAC ¶¶ 45–47, 53, 54,

56, 59–65.  Through its August 2020 proposal, Fueling Brains promised a comprehensive virtual learning program for low-income students, including assessment tolls, curriculum development, and ongoing professional development.  *See, e.g.*, SAC ¶¶ 33, 60, 61.  Despite these promises, Fueling Brains failed to deliver on its commitments, as evidenced by its failure to respond to requests for information, its submission of incomplete and misleading documents, and its inability to provide the promised services.  *See, e.g.,* SAC ¶¶ 63–69.  Fueling Brains, and its agents, including Darrough, acted with intent to defraud the Agency and unlawfully obtain federal grant funds.  *See, e.g.,* SAC ¶¶ 45–47, 53, 54, 56, 59–69.  The Second Amended Complaint includes communications indicating an intent to bypass procurement processes, misrepresentations regarding the scope and costs of services, and fraudulent invoicing practices.  *See, e.g.,* SAC ¶¶ 85–90.  Fueling Brains made material misrepresentations regarding its capabilities and services, leading to the submission of false claims for payment, including falsely inflated cost comparisons, fictitious service offerings, and fraudulent invoices.  *See, e.g.,* SAC ¶¶ 45–47, 53, 54, 56, 59–69, 85–90.

16.    Fueling Brains submitted claims to the Agency totaling $800,000, of which the Agency paid Fueling Brains $550,000.  After the Agency learned of the fraudulent conspiracy, it refused to pay any outstanding invoice and demanded return of the $550,000 already paid; however, Fueling Brains has wrongfully retained the Federal Government monies.  SAC ¶ 83.

17.    The disputed and fraudulent claims made by Fueling Brains are as follows:

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 10/16/2020 | Fueling Brains submits invoice for Purchase of Fueling Brains Program for 2020-2021 school year | $10,000.00 | | Invoice No. 20201002 |
| | | | | |

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 12/04/2020 | Fueling Brains "revises" its prior invoice:<br><br>Purchase of Fueling Brains Program for 2020-2021 school year | $100,000.00 (including prior invoice for $10,000) | | Invoice No. 20201002 |
| 12/15/2020 | Purchase Order created at Darrough's direction for $100,000.00. | | | The Purchase Order indicates: $10k was for the Fueling Brains Program with an "increase" of 90k on December 15, 2020. |
| 1/11/2021 | Check Request Approved and signed by Darrough | | $100,000.00 | Invoice No. 202201002<br><br>PO # 40389 |
| 1/20/2021 | Purchase of Fueling Brains Program for 2020-2021 school year (2nd Installment) | $100,000.00 | | Invoice No. 20210101 |
| 2/22/2021 | Check Request Approved and Signed by Darrough (2nd Installment) | | $100,000.00 | PO # 13720 |
| 2/23/2021 | Purchase of Fueling Brains Program for 2020-2021 school year (3rd Installment) | $100,000.00 | | Invoice No. 20210201 |
| | | | | |

| Date Invoice Submitted | Description of Fueling Brains Services | Amount Invoiced | Amount Paid by Agency | Notes |
|---|---|---|---|---|
| 03/24/2021 | Fueling Brains submits Professional Development invoice for $250,000.00 | $250,000.00 | **Not Paid by Agency** | Invoice No. 2113 |
| 03/25/2021 | Professional Development CQS completed *after* Payment made to Fueling Brains. Fueling Brains quoted $250,000.00 | | | Invoice No. 2113 |
| 03/24/2021 | Fueling Brains Activity Kits Invoice submitted | $250,000.00 | | Invoice No. 2112 |
| 4/08/2021 | Check Request Approved and Signed by Darrough for Fueling Brains Program (3rd Installment) | | $100,000.00 | PO # 40389 |
| 06/03/2021 | Check Request Approved and signed by Darrough for Virtual Learning Material Kits | | | Invoice No. 2112 |
| 06/20/2021 | ACH Wire Transfer for Virtual Learning Material Kit approved and submitted by Darrough | | $250,000.00 | Invoice No. 2112 PO # 349693 |
| **Totals** | | **$800,000.00** | **$550,000.00** | |

SAC ¶ 84.

18.     Fueling Brains additionally violated the FCA by fraudulently inducing the Agency and the Government to enter into the contract in the first place.  Notably, the FCA applies "to all attempts to cause the Government to pay out sums of money."  *U.S. v. Neifert–White Co.*, 390 U.S. 228, 233 (1968).  This includes claims for payment or approval, and claims submitted under a contract the Government was fraudulently induced into entering, even if the claims for payment

pursuant to those contracts themselves were not false. *U.S. ex rel. Guzder v. MKM Eng'rs, Inc.*, No. H–05–895, 2010 WL 11595351, at \*5 (S.D. Tex. Jan. 14, 2010); *Neifert–White Co.*, 390 U.S. at 233 (applying the FCA to a loan application); *U.S. v. Americus Mortg. Corp.*, No. 4:12–cv–02676, 2014 WL 4274279, at \*4–5, 8–9 (S.D. Tex. Aug. 29, 2014) (applying the FCA to requests for HUD approval); *Abbott v. BP Expl. and Prod., Inc.*, 781 F. Supp. 2d 453, 464–65 (S.D. Tex. 2011) (applying the FCA to a permit application); *U.S. ex rel. Longhi v. Lithium Power Tech., Inc.*, 513 F. Supp. 2d 866, 882–84, 889 (S.D. Tex. 2007) (applying the FCA to proposals for contracts).

19.     "Under the fraudulent inducement theory, then, it is sufficient if the allegations show that a claim for payment 'derived from the original fraudulent misrepresentation.'" *U.S. ex rel. Guzder*, 2010 WL 11595351, at \*5 (*quoting U.S. ex rel. Longhi v. U.S.*, 575 F.4d 458, 468 (5th Cir. 2009)).   The requisite scienter for this type of FCA claim is not a specific intent to defraud; but rather is derived from § 3729(b)'s "knowing" and "knowingly" definitions. *U.S. ex rel. Longhi*, 575 F.4d at 468.   Thus, the question for this particular breach asks if Fueling Brains had actual knowledge of the falsity of its claims or statements or acted with reckless disregard or deliberate indifference as to the truth or falsity of its claims or statements, when it fraudulently induced the Agency into its contract. *Id*.   The Second Amended Complaint sufficiently alleges wrongful acts taken by Fueling Brains material to the Agency's decision to pay out government funds:

- "Fueling Brains, individually and in concert with others, knowingly submitted legally and factually false and fraudulent claims and made false statements or records material to the false or fraudulent claims to the Agency—a Federal Government grantee. These false claims and false statements or records were material to the Grantee's Agency's payment of the claims and were also material to the Grantee Agency's progress reporting and certification of the claims to the Federal Government." SAC ¶ 58;

- "On December 11, 2020, rather than submitting the additional information needed for the $300,000 contract, Darrough submitted a CQS form for the Fueling Brains

virtual learning platform for a total cost of $100,000.00. However, the comparators Darrough listed on the Fueling Brains CQS form were materially false because the comparable quote provided in the amount of $175,002 was actually from a daycare franchisee that does not advertise any training services, much less training comparable to the training quote that was to be provided by Sterling on the CQS form.[1] Darrough materially misrepresented the facts by creating a false narrative using fictional comparative quotes to further the submission of false claims and fraud. Had the Agency knew of the Darrough's or Fueling Brains' fraud, it would not have entered into an agreement or paid the false claims." SAC ¶ 63;

- "On December 15, 2020, despite not having received any goods or services from Fueling Brains as promised, Darrough submitted a purchase order request for payment to Fueling Brains in the amount of $100,000.00 for the 'Fueling Brains Program for the 2020-2021 school year.'" SAC ¶ 64;

- "However, it is clear Darrough and Fueling Brains had always intended for Fueling Brains to be fraudulently compensated, with federal grant money, for the original $300,000.00. Despite representing to the Agency that the service agreement totaled $100,000.00, Darrough worked behind the scenes to ensure Fueling Brains received the full $300,000.00." SAC ¶ 65;

- "On December 15, 2020, Fueling Brains submitted an invoice for $100,000.00, for the 'Purchase of Fueling Brains Program for 2020-2021 school year.' Included in this $100,000.00 claim was $10,000.00 for a 'pilot program' that never existed. The Fueling Brains invoice also stated that an incremental increase of $90,000.00 was included because more students were unforeseeably added to the program. However, this was another false claim as no 'additional' students were added to the program." SAC ¶ 67;

- "Sidestepping the procurement process, Fueling Brains submitted another invoice to the Agency in January 2021 for an additional $100,000.00, asserting it was for the 'Purchase of Fueling Brains Program for 2020-2021 school year (2nd installment).' Fueling Brains submitted a third claim for $100,000.00 in February 2021, noting 'Purchase of Fueling Brains Program for 2020-2021 school year (3rd installment).' These references to 'installment' payments make clear that Darrough and Fueling Brains understood that this was a scheme to avoid the procurement requirements and to pay Fueling Brains a total of $300,000.00 despite having been granted $100,000 for the entire program." SAC ¶ 68;

- "This was because Fueling Brains' entire program, as promoted, was a sham, and they were never capable of performing." SAC ¶ 73;

---

[1] "Daycare centers generally do not provide professional development to teachers, and according to this daycare's website, this company does not offer this or any comparable service. Notably, the contact information for the franchisee included a Hotmail email address, which is unexpected if the quote was actually obtained from a national company. Moreover, the franchisee uses @krkcare.com for its email server, not @hotmail.com."

- "When the Agency asked Darrough about the two additional invoices for $100,000.00 in February 2021, Darrough's assistant represented that payment was required, despite the lack of a proper procurement because '*we have already incurred the charges*.' This statement was false. Darrough knew at that time Fueling Brains had provided no 'virtual learning platform,' no "brain metric assessment,' no 'customized individual curriculum' and conducted no work for the Agency during the 2020-2021 school year, aside from a single meeting at a single Head Start location, some Zoom calls to interview staff, and a report based on existing third party GOLD data in June 2021, months after Darrough's assistant sent the email misrepresenting that '*we have already incurred the charges*.' Had the Agency known of Defendants' wrongdoing discussed herein, it would not have paid any of these claims. SAC ¶ 69;

- "Further, it was only after the invoice was submitted to the Agency for payment that Darrough completed a CQS for this service that unambiguously noted she obtained the comparable quotes *after* Fueling Brains submitted its claim for payment. The comparable quotes were also cut and pasted from the prior Fueling Brains CQS and were materially false." SAC ¶ 75;

- "Corrales was a salesman who did not understand or have any interest in the data. I recall that he told a superintendent that Fueling Brains would help students achieve higher scores on STAAR tests. After the meeting, I told Corrales to stop saying that because it wasn't true and the children suing Fueling Brains were not even taking STAAR tests. He responded, 'I'm a salesman and I know what I am doing. You're talking this too seriously.' I heard Corrales make other statements and promises to school districts in order to sell Fueling Brains that he knew Fueling Brains would not be able to deliver." Ex. A to Dkt. 1;

- "In the August 2020 proposal, Fueling Brains explained that it would assess 300 children based on teacher input into the Fueling Brains platform. After the preliminary findings of these assessments were reviewed, Fueling Brains would then assess the remaining student population of approximately 2,700 students and based on an analysis of the data, create a customized program of curriculum and instruction which would integrate strategies purportedly provided to teachers during its professional development training. It never happened." SAC ¶ 70;

- "Fueling Brains only provided access to teachers to enter information on the Fueling Brains platform for beginning-of-year assessments to two (2) of the twenty-six (26) Agency Head Start locations in the Fall of 2021. Not only did Fueling Brains fail to provide access to the platform for all of the campuses, Fueling Brains never provided any analysis or reports for data entered by the teachers that did have access to its platform." SAC ¶ 71;

- "In its proposal Fueling Brains promised to offer "access to parents to learn about how to help their children at home," offering parents 'professional development, activities, initiatives, and first-hand coaching to help their children's brain

development at home in an easy and nurturing way.' Fueling Brains promised to provide '[a]ccess to home based activities for virtual learning" and "[v]irtual communication to manage asynchronous learning.' It never happened. The Agency's Head Start families were never provided any access to any aspect of Fueling Brains' alleged "curriculum" online or in person, and Fueling Brains never communicated with families or solicited any input from them."  SAC ¶ 72;

- "Fueling Brains' August 2020 proposal included providing interactive coaching, training, and professional development to the Agency's teachers through December 2021. Fueling Brains failed to provide the services it agreed to provide. During the summer of 2021, 497 teaching staff were entered into the system to attend Fueling Brains virtual teacher training/professional development. Of those staff, 266 completed the training. Seventy-eight staff members did not receive any training, and despite requests to Fueling Brains to reopen the platform and allow these staff to get the training towards the end of the summer in 2021, Fueling Brains never reopened the platform. The only training Fueling Brains provided, which was provided under the August 2020 proposal, was for approximately <u>11</u> hours, which occurred primarily in the summer of 2021. This was because Fueling Brains' entire program, as promoted, was a sham, and they were never capable of performing." SAC ¶ 73;

- "Not only did Fueling Brains fail to provide the summer 2021 professional development services it agreed to provide under the August 2020 proposal, but on March 24, 2021, Fueling Brains submitted an additional invoice for $250,000 for the same professional development services it had already agreed to—but failed—to provide."  SAC ¶ 74;

- "Further, it was only after the invoice was submitted to the Agency for payment that Darrough completed a CQS for this service that unambiguously noted she obtained the comparable quotes *after* Fueling Brains submitted its claim for payment. The comparable quotes were also cut and pasted from the prior Fueling Brains CQS and were materially false."  SAC ¶ 75;

- "Fueling Brains was obligated to provide, *inter alia*, professional training, and material kits before the school year started; beginning-of-year, middle-of-year, and end-of-year assessments to provide an individualized program and to demonstrate the success of the Fueling Brain program. Fueling Brains' August 2020 proposal stated that all training and all necessary materials, including virtual material kits, would be provided to the Agency. As with the 'professional development' proposal, Fueling Brains separately invoiced the Agency for an additional $250,000.00 for "virtual" material kits that it was already obligated to provide and had been paid for.[2]"  SAC ¶ 77;

---

[2] "Although Fueling Brains repeatedly used the word 'virtual' to describe aspects of its program—a particularly salient selling point during a global pandemic—there was no aspect of the 'curriculum' or material kits that was virtual." SAC ¶ 77.

- Deryk Ousley, the Senior Manager, Brand & Communications for Fueling Brains, admitted "that the Fueling Brains data was 'artificial, not accurate, and inflated.' His statements were consistent with a complaint I had fielded from a Mission CISD teacher, who told me that she didn't think the Fueling Brains data was accurate, she didn't understand the program, and didn't think it worked." Ex. B to Dkt. 1.

20.    In addition to the allegations detailed above, the Agency has sufficiently alleged that Fueling Brains and Darrough fraudulently induced the Agency into the August/November 2020 contract by submitting false proposals and fraudulent CQS forms containing fraudulent comparative price quotes, and by avoiding Agency and Federal procurement procedures.   To reiterate, Fueling Brains submitted an original proposal in August for $300,000.  SAC ¶¶ 63–64. In November, after learning the Agency and Federal government's internal policies from Darrough, Fueling Brains amended its proposal and represented to the Agency its program would cost only $100,000.    *Id.*    Relying on this amended proposal, and the comparative quotes additionally submitted, the Agency agreed to the proposal.  *Id.* ¶ 75.  But Fueling Brains submitted invoices totaling $300,000.   *Id.*  ¶¶ 65, 67–68.   Therefore, from the beginning, Fueling Brains intended on being paid $200,000 more than it originally contracted for without providing more services, or even the original services it was obligated to provide.  *Id.*, ¶¶ 65, 67–68, 73, 75.

21.    Finally, Fueling Brains is not only liable under the FCA for its express fraudulent and false submissions for payment as detailed above, but also for its implied false certifications. *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 187 (2016).  "When, as here, a defendant makes representations in submitting a claim but *omits its violations of* statutory, regulatory, or *contractual requirements*, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided."  *Id.* (emphasis added). Thus, when a defendant submits a claim for payment, it implicitly certifies its compliance with all

conditions of payment, including adherence to applicable statutes, regulations, and contractual requirements. *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 599 (S.D. Tex. 2016).

22.     For defendants to be liable under the implied false certification theory, the Fifth Circuit further requires that the false claim made "specific representations about the goods or services provided" and "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *U.S. ex rel. Smith v. Wallace*, 723 Fed. App'x 254, 255 (5th Cir. 2018); *see also Macquarie Infrastructure Corp. v. Moab Partners*, L.P., 601 U.S. 257, 258 (2024) (defining half-truths as "representations that state the truth only so far as it goes, while omitting critical qualifying information." (*quoting Universal Health Servs., Inc. v.*, 579 U.S. at 188)). Materiality is determined on a holistic basis which includes a non-exhaustive list of factors of: "(a) whether the alleged violations are conditions of payments; (b) whether the Government would deny reimbursement if it knew of the violations; and (c) whether the noncompliance is substantial or minor." *U.S. v. Corporate Mgmt., Inc.*, 78 F.4th 727, 737 (5th Cir. 2023).

23.     Through its contract with the Agency, Fueling Brains was to provide virtual learning modules to children and parents. Specifically, Fueling Brains

> promise[d] to provide access to home based activities for virtual learning and virtual communication to manage asynchronous learning. It never happened. The Agency's Head Start families were never provide[d] any access to any aspect of Fueling Brains' alleged 'curriculum' online or in person, and Fueling Brains never communicated with families or solicited any input from them.

SAC ¶ 72. Fueling Brains also failed to offer the interactive coaching, training, and professional development to the Agency's teachers as promised. SAC ¶ 73. "This was because Fueling Brains' entire program, as promoted, was a sham, and they were never capable of performing." SAC ¶ 73. The false certifications followed when Fueling Brains demanded payment for services it was

supposed to provide, but didn't, implicitly certifying that its contractual obligations had been satisfied, when they had not. *See, e.g.,* SAC ¶ 85; SAC ¶ 88 ("[T]he Agency overpaid Fueling Brains a total of $550,000 for: (a) a $300,000 program it failed to provide, including an individualized 'curriculum' that did not exist and that could not have been implemented in any case, in part due to the delay in delivery of the material kits; and (b) material kits that were untimely delivered for an additional $250,000.00."); SAC ¶ 89 ("Additionally, and as discussed above, Fueling Brains submitted an invoice for $250,000.00 for 'professional development' training that was also included in the August 2020 proposal and thus was a 'double bill.'").

24. Fueling Brains contends for its wrongfulness to be actionable, its promises must have been false when made. Dkt. No. 34, at 9. Even if that was the standard in the Fifth Circuit, the Fueling Brains proposal was a misrepresentation and the promises within were false when made as Fueling Brains never intended on performing its services for $100,000 as contracted. *See U.S. ex rel. Longhi*, 575 F.4d at 468; *U.S. ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946, 951 (7th Cir. 2015); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996). Moreover, the entire Fueling Brains program was a sham and Fueling Brains was never capable of performing the promised services. SAC ¶ 73. It is evident that Fueling Brains had every intention of falling short of its obligations from the beginning, and Fueling Brains' storied history of false and fraudulent statements and records began with the fraudulent CQS form.

25. Because the Agency sufficiently pled Fueling Brains submitted false claims and used false statements in violation of the FCA, Fueling Brains' Motion to Dismiss on these grounds should be denied.

### ii. Fueling Brains Wrongfully Participated in a Kickback Scheme in Violation of the FCA.

26. Fueling Brains contends the Agency failed to plead its claims related to a kickback scheme between the defendants. Dkt. No. 34, at 11–16. Specifically, Fueling Brains says it cannot identify the "who, what, when, where, and how" of the kickback scheme, or how the kickback scheme is linked to any false claims. This is untenable based upon the allegations set forth in the Second Amended Complaint.

27. When an FCA claim alleges a kickback scheme, courts look to the Anti-Kickback Statute ("AKS"). 41 U.S.C., ch. 87. A defendant violates the statute by "soliciting, receiving, offering, or paying any remuneration in return for a referral or recommendation." *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 611 (S.D. Tex. 2016). For an AKS violation allegation to survive, the "relator must provide reliable indicia that there was a kickback provided in turn for the referral." *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664 (S.D. Tex. 2013). Pleading reliable indicia only requires the relator allege the defendant paid specific persons in exchange for referrals. *Id.* at 665. The details surrounding each kickback, or each false claim related to the kickback scheme need not be plead with particularity at this stage, particularly when facts supporting such contentions are solely in the possession of defendants. *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), *abrogated on other grounds, U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928 (2009). Instead, this Court takes a common-sense approach to inquire whether "allegations [], if true provide a strong inference of the existence of a kickback scheme." *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08–cv–3396, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014) (*quoting U.S. ex rel. Parikh*, 977 F. Supp. 2d at 670).

28.     The Agency sufficiently plead the circumstances regarding the kickback scheme. Particularly:

- **Who**: all Defendants, including Fueling Brains, a company purportedly offering educational services to low-income students.  SAC ¶¶ 17, 36, 51.

- **What**: a kickback scheme to defraud the Government and obtain federal grant funds unlawfully, where Fueling Brains, either directly or through its employee Corrales d/b/a Sterling, paid referral sources for successfully procuring contracts and government funds, exploiting benefits meant for low-income students during the COVID-19 pandemic.  SAC ¶¶ 17, 34, 36, 51, 45, 53, 55.

- **When**: During the COVID-19 pandemic, specifically, July 2020–June 2021, and lasting through subsequent months, as late as April 2022.  SAC ¶¶ 59–60, 63-65, 67–68, 75, 84–85.[3]

- **Where**: Houston, Texas area, and where the Defendants were physically located at the time they took actions related to the kickback scheme, including the Rio Grande Valley and South-Central Texas.  SAC ¶¶ 2, 156; Dkt. No. 1-1; Dkt. No. 1-2.

- **How**: Fueling Brains employed a number of referral sources who would make introductions and facilitate relationships with government grantees and school districts, enticing the Agency and districts to use Fueling Brains by making false promises and misrepresentations about their services.  Through deliberate actions aimed at circumventing procurement processes and misleading

---

[3] A plaintiff need not plead the exact dates, just dates sufficient to give a defendant fair notice; otherwise, such evidence would require "significantly more than any federal pleading rule contemplates."  *Grubbs v. Kanneganti*, 565 F.3d 180, 189–90 (5th Cir. 2009).

government agencies, Fueling Brains submitted and assisted in submitting fraudulent claims for payment, despite failing to deliver on the promised services. The referral sources would also facilitate claims for government funds, and, in exchange, Fueling Brains would share profits with the referral sources. SAC ¶¶ 53, 59–60, 63–65, 67–68, 75, 84–85, 155–69.

29.     Fueling Brains, through its agents, offered or solicited remuneration in the form of fraudulent claims and invoices to government agencies. *See id.* Through its agent, Darrough, Fueling Brains engaged in clandestine communications and back-channel dealings with Corrales, an employee of Fueling Brains, to conceal their nefarious intentions from the agency. SAC ¶ 62. By intentionally circumventing standard procurement processes and concealing their financial relationship, Darrough and Fueling Brains sought to exert improper influence over the Agency's decision-making process and ensure the payment of fraudulent claims using federal grant funds. SAC ¶¶ 53, 59–60, 63-65, 67–68, 75, 84–85, 155–69.

30.     The Second Amended Complaint fully details the kickback scheme:

- "[T]he Defendants further benefitted from the conspiracy by paying each other commissions or "kickbacks" on the contracts fraudulently obtained with other school systems and federal grantees." SAC ¶ 17;

- "Defendants' actions resulted in significant overcharging and submission of false and fraudulent claims to the Federal Government through the Agency, claims which would not have been submitted or paid had the Agency known of the Defendants' wrongful conduct." SAC ¶ 20;

- "Unknown to the Agency at the time, Corrales and/or Sterling received the aforementioned 20% commission for referrals that resulted in contracts between Defendant Fueling Brains and educational entities including school districts and Head Start agencies. To increase sales, Corrales, Sterling, and/or Fueling Brains recruited persons to be referral sources for Fueling Brains. These referral sources included persons who, through their employment, exercise discretion in connection with Federal Government contracts, purchases, payments, claims, or other financial transactions." SAC ¶ 34;

- "The Fueling Brains referral sources circumvented procurement guidelines with respect to federal (and commingled state) transactions in order to push through contracts which would result in the purchase of sham goods and services. In exchange for the Fueling Brains procurement of these Federal Government vendor contracts, the referral source received financial benefit in the form of kickbacks from Fueling Brains, Corrales, and/or Sterling. The referral sources were encouraged to create entities through which payments were made in order to avoid detection." SAC ¶ 36;

- "Corrales and/or Corrales d/b/a Sterling received remuneration in the form of kickbacks and unlawful payments structured as 'commissions' from Fueling Brains for the sale of Fueling Brains program and services. Fueling Brains, Corrales, and/or Sterling also paid others for their referrals and assistance in the procurement of Sterling and/or Fueling Brains contracts. The payments that were made used at least part of federal funds received by the Agency." SAC ¶ 51;

- "Darrough participated in a conspiracy against the Agency along with multiple vendors, specifically including the other Defendants. Darrough, acting in concert with these vendors, conspired to circumvent federal and Agency contract procurement law and requirements to award fraudulent HHS vendor contracts to the certain vendors with whom she had both professional and personal relationships. Once the contracts were awarded, the vendors failed to perform under the contracts (failures Darrough helped obfuscate while she pushed payments through the Agency's financial systems) and colluded to affirmatively cover up the fraudulent claims and payments." SAC ¶ 45;

- "The arrangement included: a) Darrough procuring and approving contracts with Defendants outside of the proscribed contract procurement requirements of both the Federal Government and the Agency; b) Darrough directing Defendants to 're-structure' submittals, quotes, contracts, and invoices to circumvent Federal Government and Agency policies and controls; c) Darrough authorizing, approving, and directing payments to the other Defendants for services that she knew were not rendered or knew were of no value and did not meet the needs of the Agency or the Head Start Program; d) Darrough authorizing fraudulent and/or duplicative payments to the Defendants in order to meet the financial terms and objectives of the Defendants and likely "off the books" arrangements between Defendants; and e) doing all of the above and other wrongful acts knowing of prohibited conflicts of interest amongst the Defendants and in conspiracy with same." SAC ¶ 53;

- "From 2019 through 2021 Darrough, created false and fraudulent procurement forms, authorized false and fraudulent contracts, and made and authorized federal fund payments on false or fraudulent claims submitted by, among others: (1) Fueling Brains; (2) Antonio Corrales, individually and/or Corrales d/b/a Sterling Evaluation and Assessment, LLC; and (3) Michelle Peters,

individually and/or Peters d/b/a MNA Evaluation & Assessment, LLC to provide goods and services to the Agency's Head Start program."  SAC ¶ 55;

- "The Defendants share joint financial and career arrangements which are clear conflicts of interest. Not only did Darrough benefit with respect to her career goals and doctoral candidacy by assisting Corrales d/b/a Sterling and Peters d/b/a MNA to submit false claims to the Agency, but on information and belief Darrough, along with Corrales and Peters, received financial and career benefit from Fueling Brains for the leads and referrals she directed to Fueling Brains, including contracts obtained through the Agency."  SAC ¶ 142;

- "The only reasonable explanation as to why Darrough would make such blatant misrepresentations to a school district that is gathering information to decide whether to purchase the Fueling Brains program is that Darrough had a professional and/or financial incentive to further the false claims and fraud of Fueling Brains against another school system."  SAC ¶ 150;

- "The 'marketing' arrangement between Corrales, Fueling Brains, and Darrough was designed to assist the Defendants in marketing Fueling Brains to other Head Start grantees and public-school systems where they would, on information and belief, defraud and submit false claims to numerous other federally funded agencies and school systems and receive remuneration from Sterling and/or Fueling Brains."  SAC ¶ 152; and

- "Based on information and belief, and her otherwise inexplicable efforts regarding Bryan ISD and FBISD, it is likely Darrough was to receive a "commission" from Fueling Brains and/or Sterling for referrals she made to Fueling Brains that resulted in contracts. These likely were kickbacks related to Darrough's position with the Agency as Darrough was directly responsible for procuring, contracting, and implementing vendor contracts, and because Darrough was using her position as a senior director at the Agency to promote Fueling Brains through her endorsements."  SAC ¶ 154.

31.     Additionally, the affidavits attached to the Original Complaint discuss the kickback scheme in detail.  Dr. Nici Esch and Vinicius Ozorio, both former Fueling Brains employees, attested to Corrales' and Fueling Brains' scheme to enroll school districts in the non-existent services Fueling Brains would promise to provide.  Dkt. No. 1-1, ¶¶ 8, 9; Dkt. No. 1-2, ¶ 8. Dr. Esch's affidavit describes Corrales' "job was to get districts to sign up with Fueling Brains, for which he received 20% commissions."  Ex. A to Dkt. 1.  Both affiants also discussed the kickback scheme Fueling Brains was engaged in with referral sources.  Dkt. No. 1-1, ¶¶ 14, 15;

Dkt. No. 1-2, ¶¶ 5–6, 8.  Dr. Esch expressly states "I was also concerned that Fueling Brains was involved in a kickback scheme with some of the school district administrators.  I personally joined in 'wining and dining' school administrators in order to obtain their business."  Ex. A to Dkt. 1. She further attested to the false promises Corrales' would give school districts despite knowing "Fueling Brains would not be able to deliver."  Dkt. No. 1-1, ¶ 9; *see also* Dkt. No. 1-2, ¶ 4.

32.     Unlike the Relators in *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, which Fueling Brains uses to support its relationship with Corrales, who never identified any employees of Tenet Healthcare who offered remuneration to referring physicians, the Agency here has identified Fueling Brains, either through its founder Anil Karim or indirectly through its employee Corrales d/b/a Sterling, issued payments to Darrough, Corrales, and school officials to refer school districts and the Agency to Fueling Brains.  *See U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 698 (W.D. Tex. 2007); *supra*, ¶¶ 30–31; *see also* SAC ¶¶ 142–43.

33.     Moreover, the kickback scheme is linked to every false claim Fueling Brains submitted, including those related to its procurement of contracts with the Agency, invoices submitted pursuant to those contracts, and requests for payment outside those contracts that were either duplicative of other payments or wholly false and fabricated.  Although each kickback and each claim resulting from the alleged kickback scheme need not be identified, the kickback structure included Darrough, who introduced the Agency to Fueling Brains, assisted Fueling Brains in sidestepping the Agency's internal procedures, submitted fraudulent CQS forms in furtherance of procuring contracts with the Agency, and submitted or approved fraudulent and false invoices from Fueling Brains in exchange for financial and career benefit.  *See U.S. v. Abundant Life Therapeutic Servs. Texas, LLC*, No. H-18-773, 2019 WL 1930274, at \*6 (S.D. Tex. April 30, 2019); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08–cv–3396, 2014 WL 2618158,

at *10 (S.D. Tex. June 12, 2014). Moreover, paragraph 84 of the Second Amended Complaint provides a detailed table of the false claims Fueling Brains submitted. SAC ¶ 84.

34. These claims were submitted or authorized, or in some cases intentionally ignored, by Darrough for the purpose of receiving financial benefit from Fueling Brains. SAC ¶¶ 142, 150. Corrales was employed by Fueling Brains, and Corrales and Fueling Brains both maintained the referral sources who would be reimbursed for contracts Fueling Brains secured with school districts and other education entities, including the Agency. SAC ¶¶ 17, 20, 34, 36, 157. Even if Fueling Brains never paid Darrough directly, it only did so to avoid accountability by instructing its Strategic Advisor, Corrales to pay Darrough, instead. SAC ¶¶ 34, 36, 143–45, 159–69, Dkt. No. 1-1; Dkt. No. 1-2.

35. Therefore, the Agency has sufficiently plead its claims related to Fueling Brains' kickback scheme, and this scheme is within the type of wrongful conduct the FCA was enacted to address. *See U.S. v. Neifert–White Co.*, 390 U.S. 228, 233 (1968).

### iii. Defendants, Including Fueling Brains, Wrongfully Benefited Despite Undisclosed Conflicts of Interest.

36. Fueling Brains incorrectly asserts that they are not bound by any prohibition against conflicts of interest. The Head Start Act strictly prohibits "any conflict of interest, and any appearance of a conflict of interest. . . by officers and employees of the Head Start agency**, and consultants and agents who provide services or furnish goods to the Head Start agency**." 42 U.S.C. § 9837(c)(1)(E)(iv)(X) (emphasis). Likewise, applicable Federal regulations and guidance provide standards governing conflicts of interest, both real and apparent. 45 CFR Part 75, § 75.327(c)(1) (as authorized by 5 U.S.C. 301; 2 CFR part 200). There is no doubt that Fueling Brains provided services and furnished goods to the Agency, and it knew in providing those goods for the Head Start program that it was bound by these federal regulations. Consultants, contractors,

vendor and service providers that do business with Head Start agencies, such as BakerRipley, know full well what the parameters, laws and requirements are, as Fueling Brains is a sophisticated vendor/contractor. Moreover, Fueling Brains executives/officers who are co-Defendants Corrales and Peters, signed agreements expressly noticing the applicable conflict of interest restrictions. It should also be clear to the Court that the inexplicable lack of Fueling Brains signing the normal contract documents that BakerRipley used for all other vendors, even including Corrales and Peters, is simply part of the fraud employed by Darrough and Fueling Brains, working in union, circumventing Baker Ripley's processes and controls.

37. Our sister federal courts have opined that "there can be little doubt that 'a government contractor's failure to disclose an organizational conflict of interest constitutes a false claim under the False Claims Act.'" *U.S. v. Science Applications Intern. Corp.*, 555 F. Supp. 2d 40, 51 (D.D.C. 2008) (citing *U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group,* 370 F. Supp. 2d 18, 51–52 (D.D.C. 2005)); *see also U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916–17 (4th Cir. 2003).

38. Fueling Brains knew of its illicit relationship with Darrough and Corrales and used these relationships to secure improper advantages. *E.g.*, SAC ¶¶ 16, 46–47, 53, 55, 59, 142, 157. This should have been—but was not—disclosed to the Agency. Had it been disclosed, the Agency would not have approved the contracts. SAC ¶¶ 128, 131, 136, 140, 141. If the Court believes that the allegations are insufficient to state a proper claim for violation of the FCA for conflicts of interest, the Agency respectfully requests leave to amend the complaint to correct any deficiencies.

**B.** **FUELING BRAINS' MOTION TO DISMISS SHOULD BE DENIED AS TO THE REVERSE FALSE CLAIMS ACT CLAIMS.**

39. The Agency's Third Claim for Relief alleges a reverse false claims cause of action under 31 U.S.C. § 3729(a)(1)(G). Section 3729(a)(1)(G) imposes liability on one who "knowingly

makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). In a reverse-false claims suit, the defendant's action "does not result in improper payment by the government to the defendants, but instead results in no payment to the government when a payment is obligated." *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004). "Reverse false claim liability" for failing to disclose and return an overpayment from the government requires proof of the following elements: (1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the government; and (5) the misrepresentation is material. *See* 31 U.S.C. § 3729(a)(1)(G); *accord U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012).

40.     Fueling Brains moves to dismiss the reverse false claim cause of action because, it contends, it is merely a recasting of the affirmative cause of action. But it is well settled that claims may be pled in the alternative. *See, e.g.*, *U.S. v. United Techs. Corp.*, No. C-3-99-093, 2000 WL 988238, at *3 (S.D. Ohio Mar. 20, 2000). In the unlikely event that the Court were to determine the original overpayment was not based upon a false claim, the failure to remit payment upon demand under the circumstances alleged in the Complaint would trigger liability under section 3729(a)(1)(G) for all the same reasons identified *supra* Part A.

**C.     FUELING BRAINS' MOTION TO DISMISS SHOULD BE DENIED AS TO THE FCA CONSPIRACY CLAIMS.**

41.     Section 3729(a)(3) provides that liability under the False Claims Act shall attach to any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3); *U.S. ex rel. Wilkins v. N. Am. Const. Corp.*, 173 F. Supp. 2d 601, 639 (S.D. Tex. 2001). General civil conspiracy principles apply to conspiracy claims

under the False Claims Act. *See U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 546 n.3 (7th Cir. 1999). "To allege civil conspiracy, the government and the relator must plead [] 'the defendants . . . had an agreement to commit an illegal act which resulted in the plaintiff's injury.'" *U.S. ex rel. Wilkins,* 173 F. Supp. 2d 601 at 639 (quoting *Thomas v. City of New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). The injury in this case need not be specific damages because the "Government's recovery here is comparable to the recovery under liquidated-damage provisions which fix compensation for anticipated loss." *Rex Trailer Co. v. U.S.*, 350 U.S. 148, 152 (1956) ("[T]here is no requirement, statutory or judicial, that specific damages be shown."); *U.S. ex rel. Wilkins*, 173 F. Supp. 2d at 619 n. 10 ("Although the courts generally require materiality, the Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim."). In this case, the "illegal act" is the alleged knowing submission of a false or fraudulent claim to the Government.

42.     Here, the Second Amended Complaint specifies, as reprinted in ¶¶ 19, 20, 21, and 30 *supra*, that Fueling Brains conspired with Darrough to submit false claims, statements, and records to the Agency in hopes of procuring contracts and receiving payment via government funds. The Second Amended Complaint further states:

- "Darrough acted in concert with Co-Defendants—conspiring to circumvent federal and Agency contract procurement requirements in order to award HHS vendor contracts to the Defendants. Darrough's undisclosed relationships with the Agency vendors named as Defendants, both financial, professional, and personal constituted impermissible conflicts of interest. The Defendant vendors failed to perform under the contracts with the Agency, which failures Darrough helped obfuscate while she facilitated their false and fraudulent claims pushing payments through the Agency's system." SAC ¶ 16;

- "Defendants, among other fraudulent activities, knowingly and recklessly conspired to submit, caused to be submitted, or facilitated the submission of false and fraudulent documents and claims and made false and fraudulent representations to the Agency, a Federal Government grantee, over a period of several years,

thereby plundering the Agency's federal funds and resources for the Defendants' illegitimate and unlawful purposes." SAC ¶ 21;

- "As described below with respect to each vendor contract, from 2020 through 2021 Darrough, among other things, authorized fraudulent contracts with, and made and authorized federal fund payments to, among others: . . . (3) Michelle Peters, individually and/or Peters d/b/a MNA Evaluation & Assessment LLC. Despite knowing these vendors materially failed to perform under the contracts, Darrough authorized payments to them using HHS funds. In some instances, Darrough colluded with the vendors and authorized fraudulent contract payments (and double payments) for services that were not contracted for and not provided to the Agency. Had BakerRipley known of this wrongful conduct, it would not have paid the invoices presented by these vendors." SAC ¶ 46;

- "Once Darrough negotiated services or executed a contract with a vendor to provide services under the HHS/ACF/OHS program, in compliance with the terms of the agreement or contract, Darrough was to submit a purchase order request for payment. Darrough knew that the invoiced services were not contracted for, not provided, and/or double billed, and deliberately and recklessly withheld this information from BakerRipley. Based upon Darrough's material representations regarding vendor payment requests, and her failure to disclose critical information about the legitimacy of the invoiced services, Agency employees would 'draw down' the HHS/ACF/OHS grant funds and pay the vendors." SAC ¶ 47;

- "The Defendants share joint financial and career arrangements which are clear conflicts of interest. Not only did Darrough benefit with respect to her career goals and doctoral candidacy by assisting Corrales d/b/a Sterling and Peters d/b/a MNA to submit false claims to the Agency, but on information and belief Darrough, along with Corrales and Peters, received financial and career benefit from Fueling Brains for the leads and referrals she directed to Fueling Brains, including contracts obtained through the Agency." SAC ¶ 142;

- "Corrales entered into arrangements with referral sources to support his efforts to sell Fueling Brains to federal grantees. He entered into sales agreements with at least two different Regional Education Service Center ('ESC') employees for them to promote Fueling Brains to the exclusion of competing products. These individuals, acting individually and not on behalf of their employer ESCs, have since steered opportunities to Fueling Brains. Additionally, Fueling Brains hired a current assistant superintendent of a Houston area ISD, who has since steered opportunities to Fueling Brains." SAC, ¶ 157;

43. The Second Amended Complaint clearly pleads a claim for conspiracy by specifically referencing the Defendants' agreement—working in concert to submit, conceal, push through, and approve false and fraudulent claims to the Agency to procure contracts and

government funds[4]—and the actions taken by Fueling Brains in furtherance of that agreement—submitting false and fraudulent claims within proposals, bids, CQS forms, and invoices to receive government funds.[5]  Furthermore, the exhibits submitted along with the Agency's Complaint demonstrate Fueling Brains was in an agreement with Co-Defendants to defraud multiple education entities.  Dkt. No. 1-1, Dkt. No. 1-2.  Thus, it is clear the aim of the Defendants' agreement was to defraud education entities, including the Agency, to obtain government funds.  *E.g.*, SAC ¶¶ 36, 53.

**D.     FUELING BRAINS' MOTION TO DISMISS SHOULD BE DENIED AS TO THE COMMON LAW CLAIMS.**

44.     Fueling Brains says the Court should dismiss the remaining claims (except the breach of contract claim) because: (1) the Agency did not plead with particularity its fraud claims; (2) its equitable claims are barred because of the existence of a valid contract; and (3) the Agency did not plead Fueling Brains never intended to perform under the contract(s).  Dkt. No. 34, at 3, 21.

### i.     The Agency's Fraud, Fraud by Nondisclosure and Civil Conspiracy Claims Survive Dismissal.

45.     Common law claims are often sought in addition to claims under the False Claims Act.  *See*, *e.g.*, *Wilkins v. N. Am. Const. Corp.*, 173 F. Supp. 2d 601, 645 (S.D. Tex. 2001).  To prove a claim for common-law fraud, the plaintiff must prove that: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation, and (4) the plaintiff actually and justifiably

---

[4] In part found at SAC ¶¶ 17, 36, 45, 53, 55, 58, 68, 75, 152.
[5] *Supra*, ¶¶ 19, 20, 21, 30; SAC ¶¶ 53, 58, 63–65, 67–68, 75, 84–85, 88–89.

relied upon the representation and suffered injury as a result. *West Loop Hosp., LLC v. Houston Galleria Lodging Assoc., LLC*, 649 S.W.3d 461, 484 (Tex. App.—Houston [1st Dist.] 2022).

46. Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007) (citations omitted). For fraud based on non-disclosure, the defendant must have a duty to disclose. *Id*. When particular circumstances impose on a person a duty to speak, silence can constitute a false impression. *Id*.; *see also World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.—Fort Worth 1998, pet. denied). "An affirmative duty to disclose may arise: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier representation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d at 794. "Texas also recognizes a common law fraud cause of action where the false representation was made with the intent of reaching and deceiving a third person and thereby causing that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence." *Id*.; *see also Ernst & Young, L.L.P v. Pacific Mut. Life Ins. Co.*, 52 S.W.3d 573, 578–80 (Tex. 2001).

47. Here, the Agency identified the who, what, when, where, and how of Fueling Brains' fraud. *Supra* Part A & B. The Second Amended Complaint further sufficiently plead Fueling Brains' fraudulent inducement of the Agency into contracts Fueling Brains never intended on performing, Fueling Brains' kickback scheme with other Defendants, and Fueling Brains submissions of wholly false claims and double-billing. *Supra* Part A(ii)–B.

48.     Fueling Brains incorrectly asserts it had no duty to disclose. Dkt. No. 34, at 22.  A duty to disclose exists where a party made a representation but subsequent information "makes the earlier representation misleading or untrue;" or where a party "makes a partial disclosure and conveys a false impression." *Shaver v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, 593 Fed. App'x 265, 271 (5th Cir. 2014).  When Fueling Brains submitted its proposal, it represented that it would be providing materials and services that it knew it could not provide and never did provide. SAC ¶¶ 70–75, 78.  Further, when the proposal was initially submitted, Fueling Brains represented that the total cost of the program would be $100,000, despite knowing that it intended to bill $300,000 to bypass the Agency's and federal grant requirements to ensure payment of fraudulent claims using federal HHS funds.  SAC ¶¶ 63–64, 66.  Fueling Brains had a duty to disclose that there was never a pilot program, and no students were added to the program, because it falsely represented both of those facts to be true.  SAC ¶ 67.  Moreover, when Fueling Brains double and triple billed the Agency—assuming this was not its plan all along—once it learned it had already been paid under that contract, it had a duty to disclose that fact before the Agency submitted additional payments.  SAC ¶¶ 68, 69, 84, 89.  Therefore, because of changes that made its previous representations misleading, Fueling Brains was under a duty to disclose.

49.     Fueling Brains next contends the Agency's civil conspiracy claim does not plead with particularity an underlying fraud claim and an intent to defraud.  Dkt. No. 34, at 23.  "Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort."  *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013).  Thus, "to adequately plead a claim for civil conspiracy, a plaintiff must adequately plead the underlying tort."  *Id.*

50.    Here, the Agency pleads, in detail, the facts concerning Fueling Brains' fraud, fraud by non-disclosure, and breach of contract and all related equitable claims within the entirety of its Second Amended Complaint.  *Supra* Part A–C.  The Agency referenced such underlying tort(s) not only with the "incorporation by reference" paragraph, SAC ¶ 203, but also with the succeeding paragraph wherein it directly cited Defendants' conduct which constituted fraud, breaches of contractual obligations and equitable duties, and violations of state and federal statutes.  SAC ¶ 204; *see Amazon Tours, Inc. v. Quest Glob. Angling Adventures, L.L.C.*, No. Civ.A. 303CV2551M, 2004 WL 1788078, at *4 (N.D. Tex. June 30, 2004) (finding sufficiency of facts within a conspiracy section to put the defendant on notice of an underlying tort because "the complaint alleges facts concerning conspiracy to [commit that underlying tort]," even though the underlying tort was not explicitly stated within that section).  Moreover, intent to defraud may be plead generally, and the Agency has, at minimum, met that burden.  FED. R. CIV. P. 9(b); *e.g.*, SAC ¶¶ 63–65, 67, 84.  Therefore, Fueling Brains' motion to dismiss the Agency's fraud, fraud by nondisclosure, and civil conspiracy claims should be denied.

**ii.    The Agency's Quasi-Contractual Claims Survive Dismissal.**

51.    The Agency's quasi-contractual claims likewise survive.  Fueling Brains does not challenge the merits of these claims beyond asserting that they "fail as a matter of law because a plaintiff maintain[s] a quasi-contract claim where it has alleged the existence of an actual contract." Dkt. No. 34, at 23.  However, the Supreme Court of Texas has recognized that "overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment."  *See Southwestern Elec. Power Co. v. Burlington Northern Railroad Co.*, 966 S.W.2d 467, 470 (1998); *see also Staats v. Miller*, 243 S.W.2d 686, 687–88 (1951) (allowing restitution for freight charges paid in excess of rates specified in shipping contract); *Gulf Oil Corp. v. Lone Star Producing Co.*,

322 F.2d 28, 31–33 (5th Cir. 1963) (holding that plaintiff could recover money mistakenly paid in excess of contract price). Thus, the Agency is entitled to recover under equitable theories for the overcharged amounts.

52. In any event, the quasi-contractual claims would survive to the extent they are pled in the alternative. If Fueling Brains concedes on the record that a valid contract exists between the parties (which it has not yet done), then the case will proceed on the contractual claims with the exception of the permissible claims for overpayments. It is well settled that under Texas law, an unjust enrichment claim may proceed when pleaded in the alternative to a breach of contract claim. *See*, *e.g.*, *Peters v. Norwegian Cruise Line Ltd.*, No. 01-05-00906, 2007 WL 1633555, at *10 (Tex. App.—Houston [1st Dist.] June 7, 2007). Because it is clear that claims for overpayment may exist in conjunction with valid breach of contract claims, and the quasi-contractual claims nevertheless exist in the alternative, these claims survive dismissal.

### iii. The Agency's Texas Theft Liability Act ("TTLA") Claim Survives Dismissal.

53. The Agency brings a claim for violation of the Texas Theft Liability Act against Fueling Brains. SAC ¶¶ 201–02. Fueling Brains believes the Agency "pleads no facts showing Fueling Brains never intended to perform [its contract]." Dkt. No. 34, at 24. Despite this not being required because Fueling Brains appropriated money by fraud, the Agency has plead such facts. *See Porter-Garcia v. Travis L. Firm, P.C.*, 564 S.W.3d 75, 91 (Tex. App.—Houston [1st Dist.] 2018) ("'[A] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.' Appropriation, as relevant here, means to exercise control over property, and it is unlawful when it is without the owner's effective consent.") (quoting TEX. PENAL CODE§ 31.03; and then citing TEX. PENAL CODE§§ 31.01(4), 31.03(b)(1)).

54. Under the TTLA, "[a] person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described in [certain sections of the] Penal Code." TEX. CIV. PRAC. & REM. CODE § 134.002(2).

55. "To recover for a civil theft under the TTLA, a plaintiff must establish: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft." *Khan v. Khaishgi*, No. 4:21-CV-02602, 2023 WL 5807841, at *6 (S.D. Tex. Sep. 6, 2023). "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03.

56. Fueling Brains appropriated money from the Agency when it submitted a false claim for payment to the Agency, the Agency tendered payment, and when the Agency requested the funds back, Fueling Brains refused that request and withheld the money. *See Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 253, 542–43 (S.D. Tex. 2011); *e.g.*, ¶ 84. Therefore, the Agency has asserted facts sufficiently stating Fueling Brains committed theft in violation of the TTLA.

57. Furthermore, Fueling Brains knew it was not entitled to the money when it submitted the claim for repayment because it knew it was only contracted for $100,000, and it also knew it never did any work to justify the excess payments, the claimed invoiced services were fabricated, it had conflicts of interest that it failed to disclosed, and it had not performed the work it was contracted to perform. *See*, *e.g.*, SAC ¶¶ 58, 63–65, 67, 73, 75; *see also supra* ¶¶ 19–21, 30, 42. Within the totality of the Second Amended Complaint, Fueling Brains, along with its Co-Defendants, concocted a scheme to defraud the Agency and the Government. Fueling Brains never intended to perform its contractual obligations and routinely submitted false claims for payment

and approval to take advantage of the COVID-19 pandemic and receive federal funds for work never performed, and for which it had no intent of ever materially performing. *See, e.g.*, SAC ¶¶ 63–65, 67–68, 84, 88–89; *Taylor v. State*, 450 S.W.3d 528, 534 (Tex. Crim. App. 2014) (holding the "intent not to perform" standard met when evidence reflects a pattern wherein the defendant "[did] a little bit of work, [took] a lot of money, and then [did] not complete the task.").

58.     Therefore, the Agency met its burden under Rules 8(a) and 12(b)(6) and Fueling Brains' Motion to Dismiss on this ground should be denied.

### IV.     ALTERNATIVE MOTION FOR LEAVE TO AMEND

59.     When a plaintiff's complaint fails to state a claim, a court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 309 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable, or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). In the unlikely event the Court determines the Complaint's allegations are insufficient to survive dismissal, the Agency respectfully requests leave to amend the complaint to plead with more particularity.

### V.     CONCLUSION

60.     For these reasons, the Agency respectfully prays that this Court DENY Defendants' Motion to Dismiss in its entirety and for all other relief to which it is justly entitled.

Dated: June 10, 2024.

Respectfully submitted,

**MARTINEZ REILLY, LLP**

/s/ Marion M. Reilly
**Marion M. Reilly**
State Bar No. 24079195
Federal ID. 1357491
Email: Marion@mrtrial.com
**John B. Martinez**
State Bar No. 24010212
Federal ID. No. 23612
Email: John@mrtrial.com
3636 S. Alameda, Ste. B119
Corpus Christi, Texas 78412
Dir: (361) 273-6771
Fax: (361) 704-8355
**Service Email address
Service@mrtrial.com

**SCHULMAN, LOPEZ, HOFFER &
ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone:       210-538-5385
Facsimile:       210-538-5384
**Joseph E. Hoffer**
**Attorney-in-Charge**
State Bar No. 24049462
Federal ID No. 2006011
Email: jhoffer@slh-law.com
**Elizabeth Angelone**
State Bar No. 24077349
Federal ID No. 3042089
Email: eangelone@slh-law.com

**ATTORNEYS FOR THE AGENCY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been sent to all known counsel pursuant to the Federal Rules of Civil Procedure on this 10th day of June 2024 via the CM/ECF system or via email.

Dinesh H. Singhal                          Tel: 713.222.8500
**The Singhal Law Firm**                   dinesh@singhallaw.com
2700 Post Oak Blvd., Suite 1750            **ATTORNEY FOR CIMBERLI DARROUGH**
Houston, Texas 77056

Jordan Raschke Elton
Andrew Mytelka
**Greer, Herz & Adams, L.L.P.**
One Moody Plaza, 18th Floor
Galveston, Texas 77550
P: (409) 797-3239
jraschkeelton@greerherz.com
**ATTORNEYS FOR MICHELLE PETERS AND
MNA EVALUATIONS AND ASSESSMENTS,
LLC**


Amanda Gadison
Randal H. Miller
**Bryan Cave Leighton Paisner**
2200 Ross Ave., Suite 4200 W
Dallas, Texas 75201
P: 214-721-8117
Amanda.gadison@bclplaw.com
**ATTORNEYS FOR KIDS U US, INC.
D/B/A FUELING BRAINS**

Fred D. Raschke
**Mills Shirley L.L.P.**
2200 Market Street Ste 300
Galveston, TX. 77550
P: 409-761-4028 (direct line)
fraschke@millsshirley.com
**ATTORNEY FOR ANTONIO CORRALES AND
STERLING EVALUATIONS AND
ASSESSMENT, LLC**