**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | § | |
| BakerRipley | § | |
| 4450 Harrisburg, Suite 200 | § | |
| Houston, TX 77011 | § | |
| | § | |
| & BakerRipley | § | |
| ***Plaintiffs*** | § | **Case No.23-cv-1124** |
| | § | |
| | § | |
| | § | **FILED *IN CAMERA* AND UNDER SEAL** |
| **v.** | § | **PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| | § | |
| | § | |
| Kids U US, Inc. d/b/a Fueling Brains, | § | |
| Cimberli Johnson Darrough, an individual, | § | |
| Antonio Corrales, an individual, | § | |
| Sterling Evaluation and Assessment, LLC, | § | **JURY DEMANDED** |
| Michele Peters, an individual, and | § | |
| MNA Evaluation and Assessment, LLC | § | |
| | § | |
| | § | |
| ***Defendants*** | § | |

## RESPONSE TO CORRALES' MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT

BakerRipley, Plaintiff and Relator on behalf of the United States of America ("Agency," or "Relator"), asks the Court to deny Defendants', Antonio Corrales and Sterling Evaluation and Assessment, LLC ("Defendants"), Motion to Dismiss the Second Amended Complaint.

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

I. INTRODUCTION ............................................................................................................. 1

II. STANDARD OF REVIEW ............................................................................................. 2

    A.    Federal Rule of Civil Procedure 9(b) ..................................................................... 2

    B.    Federal Rule of Civil Procedure 12(b)(6) .............................................................. 2

III. ARUGMENT ................................................................................................................. 3

    A.    Defendants' Motion to Dismiss Should be Denied Because the Claims for False Submissions and False Statements are Pled with Sufficient Particularity Under Rule 9(b) ............................................................................... 3

    B.    Defendants' Motion to Dismiss Should be Denied as to Defendants' Implied False Certifications .......................................................................................... 7

        i.    Defendants failed to comply with their contractual obligations material to the Agency's decision to pay the claims .................................. 8

        ii.    Defendants wrongfully benefitted despite undisclosed conflicts of interest and operated in violation of anti-kickback regulations ............... 15

C.    Defendants' Motion to Dismiss Should be Denied as to the Reverse False Claims ........ 19

D.    Defendants' Motion to Dismiss Should be Denied as to the FCA Conspiracy Claim .... 20

E.    Defendants' Motion to Dismiss Should be Denied as to the Common Law Claims ....... 22

        i.    The Agency's Fraud, Fraud by Nondisclosure, and Civil Conspiracy claims survive dismissal ........................................................................ 22

        ii.    The Agency's Quasi-Contractual Claims Survive dismissal ................... 24

        iii.    The Agency's TTLA Claim survives dismissal ...................................... 24

F.    Alternative Motion for Leave to Amend ...................................................................... 26

IV. CONCLUSION .............................................................................................................. 26

# INDEX OF AUTHORITIES

UNITED STATES SUPREME COURT CASES:

*Bell Atl. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................3

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,*
    507 U.S. 163 (1993) ........................................................................................... 2

*Neder v. United States,*
    527 U.S. 1 (1999) ...............................................................................................7

*Rex Trailer Co. v. United States,*
    350 U.S. 148 (1956) ......................................................................................... 21

*Universal Health Servs. v. U.S. ex rel. Escobar,*
    579 U.S. 176 (2016) ...................................................................................... 8, 9


CASES FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT:

*Baker v. Putnal,*
    75 F.3d 190, 196 (5th Cir. 1996) ...................................................................... 2

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,*
    313 F.3d 305 (5th Cir. 2002) ........................................................................... 26

*Tuchman v. DSC Communications Corp.,*
    14 F.3d 1061 (5th Cir. 1994) ............................................................................ 2

*U.S. ex rel. Bain v. Georgia Gulf Corp.,*
    386 F.3d 648 (5th Cir. 2004) ...........................................................................19

*U.S. ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ............................................................................ 3

*U.S. ex rel. Longhi v. U.S.,*
    575 F.3d 458 (5th Cir. 2009) ......................................................................... 6,7

*U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg. Healthcare Sys.,*
    384 F.3d 168 (5th Cir. 2004) ...........................................................................18

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
    125 F.3d 899 (5th Cir. 1997) ............................................................................2

*Thomas v. City of New Orleans,*
687 F.2d 80 (5th Cir. 1982) ........................................20

*Williams v. WMX Tech., Inc.,*
112 F.3d 175 (5th Cir. 1997) ........................................ 2


CASES FROM OUR SISTER CIRCUITS:

*U.S. ex rel Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.,*
816 F.3d 428 (6th Cir. 2016) ........................................ 19

*U.S. ex rel. Durcholz v. FKW, Inc.,*
189 F.3d 542 (7th Cir. 1999) ........................................ 20

*U.S. ex rel. Fowler v. Caremark RX, L.L.C.,*
496 F.3d 730 (7th Cir. 2007) ........................................ 19

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908 (4th Cir. 2003) ........................................ 16

*U.S. ex rel. Matheny v. Medco Health Solutions, Inc.,*
671 F.3d 1217 (11th Cir.2012) ........................................ 20


DISTRICT COURT CASES:

*In re Enron Corp. Securities, Derivative & "ERISA" Litig.,*
490 F. Supp. 2d 784 (S.D. Tex. 2007) ........................................ 22, 23

*Peters v. Norwegian Cruise Line Ltd.,*
No. 01-05-00906, 2007 WL 1633555 (Tex. App.—Houston [1st Dist.] June 7, 2007) .. 25

*U.S. ex rel. Ervin & Assocs. V. Hamilton Secs. Group,*
370 F. Supp. 2d 18 (D.D.C. 2005) ........................................ 16

*U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC,*
No. 4:12-CV-543, 2016 U.S. Dist. LEXIS 67780 (E.D. Tex. May 24, 2016) .................. 8

*U.S. ex rel. Garibaldi v. Orleans Parish Sch. Bd.,*
21 F. Supp. 2d 607 (E.D. La. 1998) ........................................ 18

*U.S. ex rel. King v. Solvay*, S.A.,
823 F. Supp. 2d 472 (S.D. Tex. 2011) ........................................ 8

*U.S. ex rel McCurdy v. Gen. Dynamics Nat. Steel & Shipbuilding (NASSCO),*
   No. 07-cv-982, 2010 WL 3463675 (S.D. Cal. Aug. 31, 2010) ..................................... 18

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.,*
   200 F. Supp. 2d 673 (S.D. Tex. 2002) ........................................................................... 8

*U.S. ex rel. Wilkins v. N. American Const. Corp.,*
   173 F. Supp. 2d 601 (S.D. Tex. 2001) ......................................................................... 22

*U.S. ex rel. Wuestenhoefer v. Jefferson,*
   105 F. Supp. 3d 641 (N.D. Miss. 2015) ....................................................................... 18

*U.S. v. Science Applications Intern. Corp.,*
   555 F. Supp. 2d 40 (D.D.C. 2008) ......................................................................... 15, 17

*U.S. v. United Techs. Corp.,*
   No. C-3-99-093, 2000 WL 988238 (S.D. Ohio Mar. 20, 2000) ................................... 20

*Waldmann v. Fulp,*
   259 F. Supp. 3d 579 (S.D. Tex. 2016) ........................................................................... 8


**STATE LAW CASES:**

*Ernst & Young, L.L.P v. Pacific Mut. Life Ins. Co.,*
   52  S.W.3d 573 (Tex. 2001) ......................................................................................... 23

*West Loop Hospitality, LLC v. Houston Galleria Lodging Assoc., LLC,*
   649 S.W.3d 461 (Tex. App.—Houston [1st Dist.] 2022) .............................................. 22

*World Help v. Leisure Lifestyles, Inc.,* 9
   77 S.W.2d 662 (Tex. App.—Fort Worth 1998, pet. denied) .......................................... 23


**RULES & STATUTES:**

45 CFR Part 75, § 75.327(c)(1) (as authorized by 5 U.S.C. 301; 2 CFR part 200) .................... 15

31 U.S.C. §§ 3729 et seq. ................................................................................................................. 1

31 U.S.C. § 3729(a)(1)(A) ........................................................................................................... 4, 7

31 U.S.C. § 3729(a)(1)(B) ........................................................................................................... 4, 7

31 U.S.C. § 3729(a)(1)(G) ..........................................................................................................19, 20

42 U.S.C. § 9837(c)(1)(E)(iv)(X) ..................................................................15234.002

FED. R. CIV. P. 9(b).................................................................................... *passim*

FED. R. CIV. P. 12(b)(6) ............................................................................. *passim*

TEX. CIV. PRAC. & REM. CODE § 134.002(2) ...............................................25

TEX. CIV. PRAC. & REM. CODE § 134.003(a) ...............................................25

TEX. PENAL CODE § 31.01 .................................................................... 25, 26

# I.    INTRODUCTION

1.    BakerRipley is a Texas nonprofit corporation and public charity designated by the Federal Government to operate head Start and Early Head Start Federal programs throughout the Houston, Texas region. To overcome the disadvantages COVID-19 posed to low-income children and their families, BakerRipley contracted with entities, including Defendants, to launch a virtual learning platform through Fueling Brains, which purportedly offered a curriculum and materials uniquely tailored to assess and promote the needs of a classically underserved population of children.  Although Defendants made grand promises of providing "individualized curriculum," "professional development," and "material kits," none of it materialized as promised. Instead, Defendants' programs resulted in over $800,000.00 in false claims being submitted to the Government for payment for goods and services that were either never provided or were not provided as promised.

2.    BakerRipley filed this qui tam action alleging violations of the False Claims Act, 31 U.S.C. §§ 3729 et seq. BakerRipley also brought state law claims for fraud, fraud by nondisclosure, civil conspiracy, breach of contract and covenant of good faith and fair dealing, unjust enrichment, payment by mistake, money had and received, and violations of the Texas Theft Liability Act ("TTLA"). This *qui tam* action seeks to rectify the Defendants taking advantage of vulnerable school districts and publicly funded entities during the COVID-19 pandemic through their scheme providing sham "learning kits," and involving improper payments and kickbacks targeting the Head Start program.

# I.  STANDARD OF REVIEW

## A.  Federal Rule of Civil Procedure 9(b)

3.      A complaint in a False Claims Act suit must fulfill the requirements of Rule 9(b). *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997). Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularly. Malice, intent, knowledge, and other condition of a mind of a person may be averred generally." Fed. R. Civ. 9(b).  The amount of particularly required for pleading fraud differs from case to case. *See Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.), *modified on other grounds,* 355 F.3d 356 (5th Cir. 2003). To plead fraud with particularly in the Fifth Circuit, a plaintiff must include the "'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Williams v. WMX Tech., Inc.,* 112 F.3d 175, 177 (5th Cir. 1997) (*quoting Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994)), *cert. denied*, 522 U.S. 966 (1997); *see also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (The 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent.").

## B.  Federal Rule of Civil Procedure 12(b)(6)

4.      When evaluating a motion to dismiss a claim under Rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded therein must be accepted as true. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim

showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusion," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. v. Twombly,* 550 U.S. 544, 555-57 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

## II.    ARGUMENT

**A.    Defendants' Motion to Dismiss Should be Denied Because the Claims for False Submissions and False Statements are Pled with Sufficient Particularity Under Rule 9(b).**

5.    The False Claims Act "protects the Treasury from monetary injury." *U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 189 (5th Cir. 2009). The statute "is remedial and exposes even unsuccessful claimants to liability." *Id.* With respect to 31 U.S.C. §3729(a)(1), which makes it a civil violation to "knowingly present[] or cause[] to be presented, [to the Government] a false or fraudulent claim for payment or approval," as to the express presentment requirement, the Fifth Circuit stated that: "[f]raudulent presentment requires proof only of the claim's falsity, not of its exact contents." *Id.* at 189. Further, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove a preponderance that fraudulent bills were actually submitted." *Id.* "To require these details at pleading is one small step shy of requiring production of the actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.* at 189-90. "[T]o plead with particularly the circumstances constituting fraud for a False Claims Act §3729(a)(1)[(A)] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless

survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

6.      Moreover, a False Claims Act violation of §3729(a)(1)(B) occurs when any person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729(a)(1)(B). "For this section, the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; we need not make the step of inferring that the record actually caused a claim to be presented to the Government." *Id.* at 192-93.

7.      Here, the complaint alleges violations of both §3729(a)(1)(A) and (B) sufficiently. Namely, it satisfies the four "Ws"—who, what, when, and where—requirement of FCA claims in the following particulars:

- The Complaint specifies that Darrough "authorized fraudulent contracts with, and made and authorized federal fund payments to … Antonio Corrales d/b/a Sterling Evaluation and Assessment." Second Amended Complaint ("SAC") at ¶ 46;

- "Darrough knowingly created and submitted false contracts and false claims to the Agency and directed fraudulent payments to be made to … Corrales d/b/a Sterling (Darrough's business partner); Corrales and Peters (Darrough's Ed.D dissertation professors and Fueling Brains employees) for goods and services not provided under the terms of the contracts when such contracts even existed and even when they did not exist." SAC ¶ 50;

- "Corrales and/or Corrales d/b/a Sterling received remuneration in the form of kickbacks and unlawful payments structured as 'commissions' from Fueling Brains for the sale of Fueling Brains programs and services. Fueling Brains, Corrales, and/or Sterling also paid others for their referrals and assistance in the procurement of Sterling and/or Fueling Brains contracts. The payments that were made used at least part of federal funds received by the Agency." SAC ¶ 51;

- "From 2019 through 2021 Darrough created false and fraudulent federal fund payments on false or fraudulent claims submitted by … Antonio Corrales, individually and/or Corrales d/b/a Sterling Evaluation and Assessment, LLC"; SAC ¶ 55;

- "Corrales and/or Sterling …each individually or in concert with others, knowingly submitted legally and factually false and fraudulent claims and made false statements or

records material to the false or fraudulent claims to the Agency—a Federal Government grantee." SAC ¶ 91;

- "[I]n April 2021, Darrough submitted requisition requests of $250,000.00 and $329,000.00 for Fueling Brains, which Corrales also worked for and received commissions from, to provide goods and services that were already included under another contract." SAC ¶ 94;

- "[I]n May 2021 and while Darrough was Corrales' doctoral student and business partner, Corrales d/b/a Sterling submitted, to Darrough, two separate contract proposals to provide: 1) emotional intelligence/trauma training and 2) financial literacy training for a total cost of $300,110.00." SAC ¶ 95;

- "However, the cost of the two proposals were above the Agency's small purchase threshold and required a full Request for Proposal (RFP). While the procurement of the training courses began as two separate proposals, since they were provided by the same vendor using the same delivery medium using the same billing method, Darrough and Corrales worked together to consolidate the courses into one proposal and contract for a total cost of $149,990." SAC ¶ 98;

- "On July 22, 2021, the parties entered into a formal services agreement for Corrales d/b/a Sterling to provide training to the Agency's Head Start/Early Start parents in financial literacy, emotional intelligence, and trauma for a total cost of $149,990.00." SAC ¶ 100;

- "Corrales ultimately submitted false claims for $300,110.00, and Darrough fraudulent ensured Corrales was paid the $300,110.00. While in the midst of a cyber-attack, which Darrough knew incapacitated the Agency's financial tracking systems and controls, Corrales submitted four separate fraudulent claims to Darrough which totaled $300,110.00—the exact amount of the original, but rejected, proposal. During the exigency and knowing the Agency did not have the capacity or controls at the time to verify the claims due to the cyber-attack, Darrough directed the Agency pay the $300,110.00 using government grant funds." SAC ¶ 103;

- "Specifically, on September 10, 2021, while the system was still down due to the cyber attack, Corrales submitted, and Darrough authorized and approved, payment to Sterling for trauma and emotional intelligence training for $74,995 and financial literacy training for $75,060. Because the financial systems were down, the Agency relied on Darrough's representation that the amounts she was requesting were valid and accurate. Consequently, it provided the payments to Sterling." SAC ¶ 104;

- "On October 13, 2021, while the financial systems were still down, Corrales submitted two additional invoices for trauma and emotional intelligence training for $74,995 and for financial literacy training for $75,060." SAC ¶ 105;

- "Shortly after Corrales aided Darrough regarding a job opportunity, on October 29, 2021, Darrough approved the two additional payment requests and directed Accounts

Payable to make payments of $74,995 and for $75,060 to Corrales d/b/a Sterling using federal grant funds. Because Accounts Payable could not check the Purchase Order directly because its program was still down, it relied on Darrough's material representation that the amounts requested were valid. Consequently, the Agency made the payment to Corrales using government funds." SAC ¶ 107;

- "Corrales knowingly made false claims to the Agency, and Darrough knowingly approved, authorized, and submitted the false claims to the Agency four times in September and October 2021 for a total cost of $300,110.00":

| Invoice Number | Invoice Date | Invoice Amount |
|---|---|---|
| 001 | 09/09/2021 | $74,995 |
| 002 | 09/09/2021 | $75,060 |
| 003 | 10/13/2021 | $74,995 |
| 004 | 10/13/2021 | $75,060 |

SAC ¶ 108;

- "Having later detected the overpayment, in December 2022, the Agency demanded Corrales d/b/a Sterling return the overbilled payments. Corrales has refused to return the government's monies to the Agency." SAC ¶ 110;

- "The second quote on the CQS was for $190,000.00 and was purportedly submitted by Corrales d/b/a Sterling" SAC ¶ 110; and

- Corrales told a "superintendent that Fueling Brains would help students achieve higher scores on STARR tests." Ex. A at 3. After being told to stop making such claims because they were false and because the children using Fueling Brains were not even taking STARR test, Corrales responded, "I am a salesman and I know what I am doing. You're taking this too seriously." Ex. A at 3. "Corrales ma[de] other statements and promises to school districts in order to sell Fueling Brains that he knew Fueling brains would not be able to deliver." Ex. A at 3.

8.     Based upon the foregoing, there is no question that Corrales and Sterling knew that its contract was only for $149,990.00, but that despite that fact, got paid for $300,110.00 because of numerous fraudulent demands for payment it made from the government, taking advantage of downed financial systems. *See U.S. ex rel. Longhi v. U.S.,* 575 F.3d 458, 467 (5th Cir. 2009) ("The FCA defines the terms 'knowing' and 'knowingly,' which mean that a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information."). Defendants' refusal to pay back the owed funds further bolsters their reckless disregard for their fraudulent nature. *See, e.g., id.* at 472 ("Based on the foregoing analysis, we conclude that Defendants violated the FCA….[Defendant] blatantly deceived the [Relator and Government] and received funds that it was not entitled to.").

9.      There is also no question that the fraudulent demands for payment were material. "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision making body to which it was addressed." *Neder v. United States,* 527 U.S. 1, 16 (1999) (internal citations omitted). Even though it is only necessary to show that a defendant's false statements "could have" influenced the government's payment decision or had the "potential" to do so, in this instance, the Government *actually paid* the fraudulent invoices, reflecting unambiguous materiality. *See U.S. ex rel. Longhi,* 575 F.3d at 469; *see also* SAC ¶ 91 ("These false claims and false statements or records were material to the Grantee's Agency's payment of the claims and were also material to the Grantee Agency's progress reporting and certification of the claims to the Federal Government."); SAC ¶ 108. Defendants' Motion should be denied because the Agency pled their FCA claims for false submissions and false statements with sufficient particularity.

**B.      Defendants' Motion to Dismiss Should be Denied as to Defendants' Implied False Certifications.**

10.      As explained about, Defendants are liable under §3729(a)(1)(A) and (B) for their express fraudulent and false submissions for payment. Defendants are also liable for their implied false certifications. SAC ¶ 111 ("Not only did Corrales submit false claims to the Agency for payments from HHS grants, but Corrales also failed to comply with the requirements for services he was contracted to provide—a fact that Darrough was aware of all along."). The theory of implied false certification is a recognized basis for liability under the FCA. *Universal Health Servs.*

*v. U.S. ex rel. Escobar,* 579 U.S. 176, 185 (2016). This theory posits that when a claimant submits a claim for payment, it implicitly certifies compliance with all conditions of payment, including adherence to applicable statutes, regulations, and contractual requirements. *Waldmann v. Fulp,* 259 F. Supp. 3d 579, 599 (S.D. Tex. 2016); *U.S. ex rel. King v. Solvay*, S.A., 823 F. Supp. 2d 472, 504 (S.D. Tex. 2011). If the claimant knowingly fails to disclose noncompliance with these requirements, the claim becomes a misleading half-truth, and the claimant may be held liable under the FCA. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 200 F. Supp. 2d 673, 678 (S.D. Tex. 2002); *U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No.4:12-CV-543, 2016 U.S. Dist. LEXIS 67780, *14 (E.D. Tex. May 24, 2016).

11.　　The Supreme Court set forth a two-prong test for liability of implied false certification claims. *Escobar,* 579 U.S. at 185. First, the claim does not merely request payment, but also makes specific representations about the goods or services provided. *Id.* Second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths. *Id.* Here, a reasonable fact-finder could find that Defendants violated contractual and regulatory requirements that were material to the Agency's decision to pay the claims. *See id.,* 579 U.S. at 187.

### i. Defendants failed to comply with their contractual obligations that were material to the Agency's decision to pay the claims.

12.　　Defendants entered into contract with the Agency to provide training to begin in October 2021. SAC ¶ 100 ("Darrough subsequently submitted a revised proposal and CQS, which covered both the financial literacy and emotional intelligence training for the total cost of $149,990.00, to be split into two payments."); SAC ¶112. "Sterling was contracted to provide 10 hours of training each month for 10 months to 3,000 families for a total cost of $149,999.00." *Id.* However, "[o]ver the 10 month period, Sterling, at most, provided virtual emotional intelligence

training to 3 people and provided financial literacy training to a total of 127 people." *Id.* "Corrales failed to provide the training as agreed to. Of the 125 financial literacy sessions, 105 sessions had zero attendees. Darrough was aware that participation in these classes was virtually non-existent, but instead of cancelling the contract that included a termination with or without cause clause, as early as December 2021, Darrough inexplicably directed the "classes" continue—even though most had zero participants. Corrales knowingly failed to perform the services for which he received federal monies, and Darrough perpetuated the fraud." SAC ¶ 113.

13. By invoicing the Agency the first $150,055.00 through the first and second invoices for financial literacy and emotional intelligence training, Defendants represented they provided services that were never provided (10 hours of training each month for 10 months to 3,000 families) as per the contract. SAC ¶ 112; *see Escobar,* 579 U.S. at 185. The third and fourth invoices totaling $150,055.00 and sent months later were wholly fabricated and NO services were ever provided to justify such claims. SAC ¶ 114.

14. The facts at bar are similar to those presented in *Escobar.* 579 U.S. 190. There, the Court emphasized that "by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided individual therapy, family therapy, preventative mediation counseling, and other types of treatment." *Id.* Like the defendants in *Escobar*, Defendants here "submitted two additional invoices for trauma and emotional intelligence training for $74,995 and financial literacy training for $75,060," SAC ¶ 105. These codes were for specific services and "these representations were clearly misleading in context." *See Escobar,* 579 U.S. 190. Anyone looking at the invoices would probably—by wrongly—conclude that Defendants actually provided those specific services. By using these specific payment designations that conveyed the rendition of these training services without

disclosing that (1) the services were never provided and that (2) the additional $150,055.00 had already previously been expressly rejected, Defendants' claims constituted misrepresentations. *See id.* at 190; *see also* SAC ¶ 103.

**ii. Defendants operated in violation of anti-kickback regulations.**

15.     The Anti-Kickback Act ("AKA") prohibits providing kickbacks, soliciting kickbacks, or including kickbacks in contract prices so that the costs of such kickbacks are passed on to the Government. 41 U.S.C. § 8702. A "kickback" is "any…gratuity, thing of value, or compensation of any kind that is provided to a…prime contractor employee…to improperly obtain or reward favorable treatment in connection with a…subcontract relating to a prime contract." *Id.* at § 8702(2). The Fifth Circuit clarified the scope of proper and improper conduct related to kickbacks in *U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 848 F.3d 366, 371 (5th Cir. 2017). The court made clear:

> [W]e conclude that anything of value offered in order to subvert the 'proper' process for awarding contracts is a potential kickback…Is the thing of value intended to cause the person in authority to forgive deficiencies in performance, overlook shortcomings in a bid or suggested contract, or obtain some other treatment not generally available? Is the gift of such substantial value—monetarily or in some other way—as to gain an advantage beyond general goodwill? These are all examples of the pursuit of improper favorable treatment.

*Id.*

The *Vavra* Court went on to cite the Senate Report that provided examples of "favorable" treatment under the AKA, noting:

> Examples of "favorable treatment" covered by S.2250 include, but are not limited to, receiving *improper* advance notice of a request for bids on a subcontract; obtaining certification as an eligible bidder *without meeting the proper standards* or when the bidders list has been *improperly* restricted; obtaining *normally unavailable* information about a competitor's bid or a project that is the subject of the subcontract; receiving *unusual* assistance in writing a bid; being allowed to submit a bid after a deadline has passed; receiving *improper* sole source consideration; *improperly* obtaining an award; obtaining *unwarranted* contract modifications; obtaining acceptance of substandard goods; being permitted to

charge inflated prices or to recover *improper* expenses; and, in the case od independent sales representatives, receiving *improper* referrals of persons interested in bidding on subcontracts."

*Id.* at 379, n.4 (citing S. REP. NO. 99-435, at 11) (1986)) (emphasis in original)).

16.     The Complaint's allegations are more than sufficient for a reasonable fact-finder to conclude that Defendants improperly obtained favorable treatment in regard to the Government's contracts. In some instances, the examples virtually mimic the examples of improper conduct delineated by the Senate Report and by the Fifth Circuit. For example, the Complaint provides:

- "Unbeknown to the Agency at the time, Corrales and/or Sterling received the aforementioned 20% commission for referrals that resulted in contracts between Defendant Fueling Brains and educational entities including school districts and Head Start agencies. To increase sales, Corrales, Sterling, and/or Fueling Brains recruited persons to be referral sources for Fueling Brains. These referral sources included persons who, through their employment, exercise discretion in connection with Federal Government contracts, purchases, payments, claims, or other financial transactions." SAC ¶ 34;

- "These referral sources included state and local government or federal grantee public employees and officials who are legally prohibited from using their offices and positions in this manner or accepting monies or gratuities from vendors such as Defendants. There exists strict conflict of interest laws, both federal and state, that impose criminal and civil penalties for violations." SAC ¶ 35;

- "Corrales and/or Sterling entered into arrangements with referral sources to support sales of Fueling brains to federal grantees, including entering into personal sales agreements with at least two public employees to promote Fueling Brains." SAC ¶ 13. Payments to "these referral sources are also funneled at times through other entities in order to circumvent conflict of interest reporting and transparency requirements under state law." SAC ¶ 13.

- "Corrales d/b/a Sterling received a 20% referral fee from Fueling Brains for contracts procured. Specifically, Corrales d/b/a Sterling informed Fueling Brains in an email that he has or is expecting to receive the following "cuts":

| School District | Total Fueling Brains Contract | Total "Referral" Fee to Corrales d/b/a Sterling |
|---|---|---|
| Goose Creek CISD | $1,403,800.00 | $252,437.50 |
| Sheldon | $216,500.00 | $38,862.50 |
| Sheldon | $282,500.00 | $55,362.50 |
| Mission | $806,575.00 | $147,383.25 |
| Pasadena ISD | $51,750.00 | $12,937.50 |
| North East ISD | $428,400.00 | $107,100.00 |
| Poteet | $84,065.00 | $21,016.25 |
| San Marcos ISD | $129,250.00 | $23,617.50 |
| Bay City | $171,460.00 | $42,865.00 |

SAC ¶ 156;

- "The Fueling Brains referral sources circumvented procurement guidelines with respect to federal (and commingled state) transactions in order to push through contracts which would result in the purchase of sham goods and services. In exchange for the Fueling Brains procurement of these Federal Government vendor contracts, the referral source received financial benefit in the form of kickbacks from Fueling Brains, Corrales, and/or Sterling. The referral sources were encouraged to create entities through which payments were made in order to avoid detection." SAC ¶ 36;

- "As discussed above, also in April 2021, Darrough submitted requisition requests of $250,000.00 and $329,000.00 for Fueling Brains, which Corrales also worked for and received commissions from, to provide goods and services that were already included under another contract." SAC ¶ 94;

- "Shortly thereafter, in May 2021 and while Darrough was Corrales' doctoral student and business partner, Corrales d/b/a Sterling submitted, to Darrough, two separate contract proposals to provide: 1) emotional intelligence/trauma training and 2) financial literacy training for a total cost of cost of $300,110.00." SAC ¶ 95;

- "On June 16, 2021, Darrough completed Competitive Quote Summaries (CQS) approving Corrales' proposals despite both being over the small purchase procurement threshold," SAC ¶ 96;

- "Under a simplified acquisition procurement threshold, the purchasing department or program must obtain an adequate number of quotes from qualified sources to ensure that services and prices are reasonably competitive against comparable options. However, the alternative quotes on the CQS form for Sterling demonstrate Darrough knowingly used invalid and/or inaccurate comparisons in favor of Corrales and/or Sterling." SAC ¶ 116;

- "[A]lternative quotes on the CQS form for Sterling demonstrate Darrough knowingly used invalid and/or inaccurate comparisons in favor of Corrales and/or Sterling." SAC ¶ 116;

- "[B]ased on the vendor's publicly posted prices, the Agency's purchase of training for all 34 of the Agency's Head Start locations with this vendor would have been $135,830.00.[]

Yet, just 18 locations, based on the Sterling quote, would have cost $71,910.00." SAC ¶ 117;

- "The third quote Darrough listed on the CQS form was materially false because the quote of $175,002 was actually from a daycare franchisee that does not advertise any training services, much less training comparable to the training that was to be provided by Sterling.[] Darrough materially misrepresented the facts by creating a false narrative using fictional comparative quotes to further false claims and fraud. Had the Agency knew of the Darrough's or Corrales' fraud, it would not have entered into a contract with or paid the false claims to Sterling d/b/a Corrales." SAC ¶ 118;

- "Corrales has individually or in concert with others knowingly submitted a legally and factually false claim and made a false statement or record material to his false or fraudulent claim to a Federal Government grantee. Further, Corrales d/b/a Sterling has refused to return to the government its monies. Every claim presented to the Agency, a Federal Government HHS grantee, and all monies retained by Corrales d/b/a Sterling, as a result of false or fraudulent representations by Darrough and/or Corrales d/b/a Sterling constitutes a false or fraudulent claim under the FCA. The Agency would not have certified its compliance with HHS grant guidelines or paid these claims had it been aware of the Defendants' wrongdoing." SAC ¶ 118;

- "Corrales and/or Corrales d/b/a Sterling received remuneration in the form of kickbacks and unlawful payments structured as 'commissions' from Fueling Brains for the sale of Fueling Brains program and services. Fueling Brains, Corrales, and/or Sterling also paid others for their referrals and assistance in the procurement of Sterling and/or Fueling Brains contracts. The payments that were made used at least part of federal funds received by the Agency." SAC ¶ 51;

- "These payments are core to the fraud and false claims submitted to the Agency. To further her Ed.D. program and career goals and likely other impermissible personal benefit, Darrough approved an arrangement with Fueling Brains that circumvented and violated the Agency's procurement policies." SAC ¶ 52;

- "The arrangement included: a) Darrough procuring and approving contracts with Defendants outside of the proscribed contract procurement requirements of both the Federal Government and the Agency; b) Darrough directing Defendants to 're-structure' submittals, quotes, contracts, and invoices to circumvent Federal Government and Agency policies and controls; c) Darrough authorizing, approving, and directing payments to the other Defendants for services that she knew were not rendered or knew were of no value and did not meet the needs of the Agency or the Head Start Program; d) Darrough authorizing fraudulent and/or duplicative payments to the Defendants in order to meet the financial terms and objectives of the Defendants and likely "off the books" arrangements between Defendants; and e) doing all of the above and other wrongful acts knowing of prohibited conflicts of interest amongst the Defendants and in conspiracy with same. As discussed above, in the Spring of 2021 Darrough also formed a non-profit entity, Imperial Community Resources Inc., with Corrales as a co-director." SAC ¶ 53;

- "Corrales d/b/a Sterling entered into contracts with a number of ESC employees to compensate them for promoting Fueling Brains including Public Servant B, Consultant at ESC 20, and Public Servant C, Senior Education Specialist at ESC 4. As evidence of those relationships, in April 2022 Corrales sent a list of Fueling Brains clients with dollar breakdowns including who receives a 'cut' for which services as between Fueling Brains and Corrales d/b/a Sterling. He stated, *'Obviously some of these stuff are still being negotiated and on the Sterling side, I'll have to pay commission to [Public Servant C, an ESC 4 State Employee] too for example and [Public Servant B] ...'*[1] However, the compensation arrangements were structured through various other entities to avoid detection and to circumvent state and federal conflict interest laws." SAC ¶ 162;

- "As noted above, Public Servant C also received a "cut" of contracts obtained by Sterling and/or Fueling Brains. In July 2021, Corrales circulated a 'Non-Exclusive Sales Representative Agreement' for review by Fueling Brains, noting, *'I'm planning to use this one for the first time with [Public Servant C].'* Public Servant C is a Senior Education Specialist in Education Service Center Region 4, a state agency and recipient of federal funds. Public Servant C is in a position of leadership and providing technical support to school districts and charter schools throughout the service area of ESC 4. It is wholly improper and unlawful for a vendor such as Fueling Brains, Corrales, or Sterling to employ or pay a 'commission,' perhaps better described as a kickback, to a state employee in return for using their position of influence and power to steer contracts to unsuspecting recipients of federal funds such as school districts, charter schools and other federally funded agencies. On information and belief, Public Servant C's conflicts of interest and financial arrangements were never disclosed to the ESC or to any school districts or charter schools serviced by the ESC." SAC ¶ 166;

- "As further evidence of this far-reaching scheme, in November 2021 Corrales confirmed that Public Servant D, an Assistant Superintendent of Public School District B had been hired by Fueling Brains, noting '[Public Servant D] has accepted working for us.... She'll get $3,000 per month and will give us 15 hours a week. She is a current assistant superintendent at [Public School District B]. To avoid conflict of interest and *avoid closing the [Public School District B] doors on Fueling Brains, she will be under Sterling.'*[2] The documented communications show again a clear pattern and intent to avoid detection and circumvent conflict of interest laws (state and federal), an effort to defraud Public School District B, and a broader circle of fraud by the Defendants. These actions appear to violate state conflict of interest laws and constitute state and likely federal criminal offenses." SAC ¶ 167;

- "In 2022, Public Servant D forwarded Corrales a confidential email exchange regarding the Bezos Academy and Public School District B, noting it was 'For your eyes only.'" SAC ¶ 168;

---

[1] Email from Corrales (April 10, 2022).
[2] Email from Corrales (Sept. 17, 2021) (emphasis added).

- Corrales received and provided improper "confidential information" related to the contracts, SAC ¶ 169;

- Corrales' "job was to get districts to sign up with Fueling Brains, for which he received a 20% commission. My understanding came from a conversation that I had with Karim, wherein he explained that Corrales received a 20% commission for every school district that signed up with Fueling Brains. For example, I also recall that when Fueling Brains signed up Poteet ISD, Karim told me that Fueling Brains would need to prepare a check for Corrales. He stated, 'Poteet just signed up and I need to give Corrales his share. Please get a check ready.' The secretary would then get a check ready for Corrales." Ex. A to SAC;

- "'I was also concerned that Fueling Brains was involved in a kickback scheme with some of the school district administrators. I personally joined in 'wining and dining' school administrators in order to obtain their business. On one occasion, I attended a dinner with Karim, Dr. Carol Perez, the Mission ISD Superintendent, Dr. Sharon Roberts, the Assistant Superintendent of Academics, and Vinicius Ozorio, who worked for Fueling Brains…Fueling Brains made at least one donation to a non-profit organization for which Perez is a director." Ex. A to SAC.

17.     These allegations particularly plead that Corrales and Sterling improperly accepted gratuities meant to improperly obtain or reward favorable treatment for Corrales, Sterling, and Fueling Brains.

### iii.     Defendants wrongfully benefited despite undisclosed conflicts of interest.

18.     The Head Start Act strictly prohibits "any conflict of interest, and any appearance of a conflict of interest. . . by officers and employees of the Head Start agency, and consultants and agents who provide services or furnish goods to the Head Start agency." 42 U.S.C. § 9837(c)(1)(E)(iv)(X). Likewise, applicable Federal regulations and guidance provide standards governing conflicts of interest, both real or apparent. 45 CFR Part 75, § 75.327(c)(1) (as authorized by 5 U.S.C. 301; 2 CFR part 200).

19.     Our sister federal courts have opined that "there can be little doubt that 'a government contractor's failure to disclose an organizational conflict of interest constitutes a false claim under the False Claims Act.'" *U.S. v. Science Applications Intern. Corp.,* 555 F. Supp. 2d

40, 51 (D.D.C. 2008) (citing *U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group,* 370 F. Supp. 2d 18, 51-52 (D.D.C. 2005)); *see also U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908, 916-917 (4th Cir. 2003).

20. Defendants attempt to circumvent liability for their blatant conflicts of interest by arguing that the Agency was the grantee of the governmental contract. However, liability under the False Claims Act is not "contingent upon the defendant's status as a recipient and beneficiary of the contract. More importantly, the language of the False Claims Act statute does not anywhere state that False Claims Act liability depends upon a defendant's status as the recipient or beneficiary of the fraudulently induced contract. All that is required is the submission of a false claim." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 792 (4th Cir. 1999).

21. In addition to the aforementioned paragraphs which contain factual detail pleading improper conflicts of interest, the Complaint also details, at length, additional improper conflicts of interest that, had the Agency been aware of, would have precluded false statements made to the Government:

- Corrales was Darrough's dissertation committee chairperson and was also employed by Fueling Brains at all relevant times. SAC ¶¶ 48, 49;

- "In August 2019, as Darrough was beginning the second year of her doctoral program (which focuses on working with advisors in order to complete a dissertation), Darrough authorized a contract between Corrales, one of her dissertation advisors, and the Agency." SAC ¶ 92;

- "Unbeknownst to the Agency at the time, in April 2021, as co-directors, Darrough and Corrales established Imperial Community Resources, Inc., an educational 501(c)(3) operating in Texas. Darrough and Corrales are listed as the co-directors, which may have been formed to further Defendants' fraudulent scheme against the Federal Government and the Agency." SAC ¶ 93;

- "Shortly thereafter, in May 2021 and while Darrough was Corrales' doctoral student and business partner, Corrales d/b/a Sterling submitted, to Darrough, two separate contract proposals to provide: 1) emotional intelligence/trauma training and 2) financial literacy training for a total cost of cost of $300,110.00." SAC ¶ 95;

- "[O]n October 14, 2021, Corrales referred Darrough, who he describes as one of his doctoral students, to UH College of Education Director of Student Relations for instructions on applying for a superintendent certification to assist her with a job opportunity." SAC ¶ 106;

- "These payments are core to the fraud and false claims submitted to the Agency. To further her Ed.D. program and career goals and likely other impermissible personal benefit, Darrough approved an arrangement with Fueling Brains that circumvented and violated the Agency's procurement policies." SAC ¶ 52; and

- "Corrales d/b/a Sterling entered into contracts with a number of ESC employees to compensate them for promoting Fueling Brains including Public Servant B, Consultant at ESC 20, and Public Servant C, Senior Education Specialist at ESC 4. As evidence of those relationships, in April 2022 Corrales sent a list of Fueling Brains clients with dollar breakdowns including who receives a 'cut' for which services as between Fueling Brains and Corrales d/b/a Sterling. He stated, *'Obviously some of these stuff are still being negotiated and on the Sterling side, I'll have to pay commission to [Public Servant C, an ESC 4 State Employee] too for example and [Public Servant B] ... '[]* However, the compensation arrangements were structured through various other entities to avoid detection and to circumvent state and federal conflict interest laws." SAC ¶ 162.

22.     It is also evident that the Agency relied on these material representations made in the false and fraudulent procurement forms, CQSs, agreements, and claims to provide grant assurances, financial reports, and grant progress reports to trigger payments from the Federal Government. SAC ¶ 56. In the absence of these material representations (and misrepresentations) the Agency would never have provided these assurances and reports to trigger governmental payments. *Id.; see U.S. v. Science Applications Intern. Corp.,* 626 F.3d 1257, 1272 (D.D.C. 2010) ("The jury could have concluded that SAIC employees knew that either the company or its employees had other relationships that placed SAIC in a conflicting role that might have biased its judgment.").

23.     Moreover, the public disclosure bar does not apply to foreclose the Agency's false claims based on undisclosed conflicts of interest.[3] The purpose of the public disclosure bar is to accommodate the primary goals of the False Claims Act: (1) promoting private citizen involvement in exposing fraud against the government; and (2) preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud. *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg. Healthcare Sys.,* 384 F.3d 168, 174 (5th Cir. 2004).

24.     To trigger the public disclosure bar, the Fifth Circuit requires satisfaction of a three-part test: (1) whether there has been a public disclosure of allegations or transactions; (2) whether the qui tam action is based upon such publicly disclosed allegations; and (3) if so, whether the relator is the original source of the information. *U.S. ex rel. Schweizer v. Canon, Inc.,* 9 F.4th 269, 275 (5th Cir. 2021).

25.     Initially, Defendants do not cite any evidence, or make any argument, to support why the relationships were in the public domain—and the Agency knows of no relevant evidence or argument. The absence of this evidence is fatal to Defendants' argument. *See U.S. ex rel. Wuestenhoefer v. Jefferson,* 105 F. Supp. 3d 641, 662 (N.D. Miss. 2015) ("Here, there is no evidence that the LFA or Lloyd's reports to HUD were ever placed in the public domain. In the absence of such evidence, the public disclosure bar cannot apply regarding them."); *see also U.S. ex rel. Garibaldi v. Orleans Parish Sch. Bd.,* 21 F. Supp. 2d 607, 615 (E.D. La. 1998) (declining to apply public disclosure bar in absence of evidence that relevant information was made public); *U.S. ex rel McCurdy v. Gen. Dynamics Nat. Steel & Shipbuilding (NASSCO),* No. 07-cv-982, 2010 WL 3463675, at *2 (S.D. Cal. Aug. 31, 2010) (same).

---

[3] Defendants limit their argument regarding public disclosure to Darrough and Corrales' advisor-advisee relationship and Corrales' "strategic partnership" with Fueling Brains—none of the Agency's other allegations are contested on this ground.

26.     Second, the qui tam is not based upon the relationships in and of themselves, but the reciprocal nature and benefits received by virtue of those relationships—this is information for which the Agency is unquestionably the original source. Even if such allegations of wrongdoing had been publicly disclosed—and they were not—that is not enough; the relator's allegations must also be "based upon" the public disclosure. *U.S. ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 737 (7th Cir. 2007).

27.     Finally, and in the alternative, the public disclosure bar was amended in 2010, changing it from jurisdictional to non-jurisdictional in nature. *U.S. ex rel Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.,* 816 F.3d 428, 433 (6th Cir. 2016). This means that it is not an absolute prohibition, but rather a discretionary one that the court may choose to apply or not. The public goals of promoting a private citizen to reveal governmental fraud and preventing parasitic lawsuits are both furthered by allowing the instant qui tam to survive. Even assuming any allegations were public this suit was based upon them—facts disputed by the evidence—the Court should nevertheless exercise its jurisdiction and refuse to apply the bar.

**C.     Defendants' Motion to Dismiss Should be Denied as to the Reverse False Claims.**

28.     The Agency's Third Claim for Relief alleges a reverse false claims cause of action under 31 U.S.C. § 3729(a)(1)(G). Section 3729(a)(1)(G) imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." under 31 U.S.C. § 3729(a)(1)(G). In a reverse-false claims suit, the defendant's action "does not result in improper payment by the government to the defendants, but instead results in no payment to the government when a payment is obligated." *U.S. ex rel. Bain v. Georgia Gulf Corp.,* 386 F.3d 648, 653 (5th Cir. 2004). "Reverse false claim liability" for failing to disclose and return an overpayment from the

government requires proof of the following elements: (1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the government; and (5) the misrepresentation is material. *See* 31 U.S.C. § 3729(a)(1)(G); *accord U.S. ex rel. Matheny v. Medco Health Solutions, Inc*., 671 F.3d 1217, 1224 (11th Cir.2012).

29.     Defendants move to dismiss the reverse false claim cause of action because, they contend, it is merely a recasting of the affirmative cause of action. But it is well settled that claims may be pled in the alternative. *See, e.g., U.S. v. United Techs. Corp.,* No. C-3-99-093, 2000 WL 988238, at *3 (S.D. Ohio Mar. 20, 2000). In the unlikely event that the Court were to determine the original overpayment was not based upon a false claim, the failure to remit payment upon demand under the circumstances alleged in the Complaint would trigger liability under § 3729(a)(1)(G) for all the same reasons identified *supra* Part A & B.

**D.     Defendants' Motion to Dismiss Should be Denied as to the FCA Conspiracy Claim.**

30.     Section 3729(a)(3) provides that liability under the False Claims Act shall attach to any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3); *U.S. ex rel. Wilkins v. N. American Const. Corp.,* 173 F. Supp. 2d 601, 639 (S.D. Tex. 2001). General civil conspiracy principles apply to the conspiracy claims under the False Claims Act. *See U.S. ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 546 n.3 (7th Cir. 1999), To allege civil conspiracy, the Government and the Relator must plead "'the defendants . . . had an agreement to commit an illegal act which resulted in the plaintiff's injury.'" *U.S. ex rel. Wilkins,* 173 F. Supp. 2d 601 at 603 (*citing Thomas v. City of New Orleans,* 687 F.2d 80, 83 (5th Cir. 1982)). The injury in this case need not be specific damages because the "Government's recovery here is comparable to the recovery under liquidated-damage provisions

which fix compensation for anticipated loss." *Rex Trailer Co. v. United States,* 350 U.S. 148, 152 (1956) ("[T]here is no requirement, statutory or judicial, that specific damages be shown."); *U.S. ex rel. Wilkins,* 173 F. Supp. 2d 601 at 619 n. 10 ("Although the courts generally require materiality, the Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim.").

31.     In this case, the "illegal act" is the alleged knowing submission of a false or fraudulent claim to the Government. For the reasons previously set out, the allegations of a false or fraudulent claim are sufficiently pleaded. *See supra* Part A & B. The evidence of the agreement is sufficiently pleaded as well. The Complaint alleges that Darrough send "back channel" communications to Corrales to facilitate and ensure that Fueling Brains' false claims were paid by the Agency using HHS federal grant funding, SAC ¶ 62; that Darrough and Corrales coordinated CQSs approving proposals that exceeded the procurement threshold, SAC ¶ 96; that Darrough and Corrales worked together to consolidate courses and later submit false claims under the scheme, SAC ¶¶ 99-102; that Darrough and Corrales worked together to submit fraudulent claims for payment by taking advantage of a cyber-attack that they knew incapacitated the Agency's financial tracking system, SAC ¶¶ 103-105; that Darrough and Corrales created a non-profit and falsely touted Fueling Brains for their own financial benefit. SAC ¶¶ 148; and that Corrales and Sterling entered into inappropriate compensation arrangements with ESC employees and Public School District Employees to promote Fueling Brains, SAC ¶¶ 162, 167.  Further, email communications between Darrough and Corrales reflect actions taken in furtherance of the scheme: In December 2020, Darrough coordinated with Corrales when she provided him with a list of local Head Start providers so that he could market Fueling Brains, noting, *"This is everyone in the Houston Metropolitan Area that has any impact on Early Childhood Education…YOU OWE ME!"* SAC ¶

143. Corrales then asked Darrough, *"Can you ask your assistant to find an excel sheet with the following columns from all the Headstarts in the nation,"* concluding with *"That would be the best move…I will owe you then for sure!"* SAC ¶ 144. As Darrough was undoubtedly aware, Corrales requested this information so that he could expand his marketing efforts on behalf of Fueling Brains nationwide. SAC ¶¶ 144, 152.

32. The Agency also sufficiently alleged circumstances that could lead to a reasonable inference that there was an agreement among Darrough and Defendants to defraud the Government by submitting a false or fraudulent claim. *See, e.g.,* SAC ¶¶ 34, 36, 51-53, 95, 103-105, 116-118, 148, 152.

**E.   Defendants' Motion to Dismiss Should be Denied as to the Common Law Claims**

**i.   The Agency's Fraud, Fraud by Nondisclosure and Civil Conspiracy Claims survive dismissal.**

33. Common law claims are often sought in addition to claims under the False Claims Act. *See, e.g., Wilkins v. N. American Const. Corp.,* 173 F. Supp. 2d at 645. To prove a claim for common-law fraud, the plaintiff must prove that: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation, and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *West Loop Hospitality, LLC v. Houston Galleria Lodging Assoc., LLC,* 649 S.W.3d 461, 484 (Tex. App.—Houston [1st Dist.] 2022).

34.    Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *In re Enron Corp. Securities, Derivative & "ERISA" Litig.,* 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007) (citations omitted). For fraud based on non-disclosure, the defendant must have a duty to disclose. *Id*. When

particular circumstances impose on a person a duty to speak, silence can constitute a false impression. *Id*.; *see also World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 670 (Tex. App.— Fort Worth 1998, pet. denied). An affirmative duty to disclose may arise: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier representation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *In re Enron Corp. Securities, Derivative & "ERISA" Litig.,* 490 F. Supp. 2d at 794. "Texas also recognizes a common law fraud cause of action where the false representation was made with the intent of reaching and deceiving a third person and thereby causing that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence." *Id.*; *see also Ernst & Young, L.L.P v. Pacific Mut. Life Ins. Co.,* 52 S.W.3d 573, 578-80 (Tex. 2001).

35.     Defendants specifically contend that the Agency has not demonstrated the "who, what, when, where, and how" of any "knowing or reckless material representation." Mtn. at 21. This is not accurate. The Agency's fraud, fraud by nondisclosure, and conspiracy to commit fraud claims are based on the conduct described above and those arguments are incorporated specifically by reference to avoid duplicity. In addition to the details provided above, Corrales represented that "Fueling Brains would help students achieve higher scores on STARR tests," despite knowing that such claims were fraudulent. Ex. A at 3. Corrales d/b/a Sterling submitted invoices to the Agency for payment, and was paid, for "emotional intelligence/trauma training and financial literacy training" that Corrales d/b/a Sterling never provided. SAC ¶¶ 50, 51, 103, 114. Moreover, Corrales failed to disclose his relationship with Darrough to the Agency and the fact that he was getting

kickbacks from referrals and sales, and failed to disclose that the amounts paid were inflated. *See, e.g.,* SAC ¶¶ 36, 51, 52, 53, 55, 56, 57, 59, 62-66.

36.     The Agency further sufficiently pled that it relied on Defendants' misrepresentations, and paid Defendants for good and services that Defendants knew they would not or could not provide or perform, which caused injury to the Agency in an amount no less than $925,000.00. SAC ¶ 198. These allegations are sufficient to avoid dismissal.

**ii.     The Agency's Quasi-Contractual Claims Survive Dismissal.**

37.     The Agency's quasi-contractual claims likewise survive. Defendants do not challenge the merits of these claims beyond asserting that they "fail as a matter of law because a plaintiff cannot assert a quasi-contractual theory while simultaneously alleging the existence of an actual contract." Mtn. at 28. However, the Supreme Court of Texas has recognized that "overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment." *See Southwestern Elec. Power Co. v. Burlington Northern Railroad Co.,* 966 S.W.2d 467, 470 (1998); *see also Staats v. Miller,* 243 S.W.2d 686, 687-88 (1951) (allowing restitution for freight charges paid in excess of rates specified in shipping contract); *Gulf Oil Corp. v. Lone Star Producing Co.,* 322 F.2d 28, 31-33 (5th Cir. 1963) (holding that plaintiff could recover money mistakenly paid in excess of contract price). Thus, the Agency is entitled to recover under equitable theories for the overcharged amounts.

38.     In any event, the quasi-contractual claims would survive to the extent they are pled in the alternative. If Defendants concede on the record that a valid contract exists between the parties (which they have not yet done), then the case will proceed on the contractual claims with the exception of the permissible claims for overpayments. It is well settled that under Texas law, an unjust enrichment claim may proceed when pleaded in the alternative to a breach of contract

claim. *See, e.g., Peters v. Norwegian Cruise Line Ltd.,* No. 01-05-00906, 2007 WL 1633555, at *10 (Tex. App.—Houston [1st Dist.] June 7, 2007). Because it is clear that claims for overpayment may exist in conjunction with valid breach of contract claims, and the quasi-contractual claims nevertheless exist in the alternative, these claims survive dismissal.

> **iii.** **The Agency's TTLA Claim survives dismissal.**

39.     The Agency brings a claim for violations of the Texas Theft Liability Act against Peters. SAC ¶¶ 201–202. Defendants contend the Agency failed to plead Peters "intended not to perform 'at the time [it] entered into contracts.'" Dkt. No. 33, ¶ 61.

40.     Under the TTLA, "[a] person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described in [certain sections of the] Penal Code." TEX. CIV. PRAC. & REM. CODE § 134.002(2). "To recover for a civil theft under the TTLA, a plaintiff must establish: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft." *Khan v. Khaishgi*, No. 4:21-CV-02602, 2023 WL 5807841, at *6 (S.D. Tex. Sep. 6, 2023). "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03.

41.     Here, Defendants appropriated money from the Agency when they submitted a false claim for payment to the Agency, the Agency mistakenly tendered payment, and when the Agency requested the funds back, Defendants refused that request and withheld the money. *See Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 253, 542–43 (S.D. Tex. 2011) ("Deprive means, among other things, 'to withhold property from the owner permanently or for so extended a period

of time that a major portion of the value or enjoyment of the property is lost to owner." (quoting Tex. Penal Code § 31.01)); SAC ¶ 110. Therefore, the Agency has asserted facts sufficiently stating Defendants committed theft in violation of the TTLA.

42. Furthermore, Defendants knew they were not entitled to the money when submitting the claim and withheld repayment after requested by the Agency, because they knew they did not ever do the work to justify payment of the two 10/13/21 invoices, that they had conflicts of interest that they failed to disclose, and that they had not performed the work as contracted for. SAC ¶ 108, 111-113. Within the totality of the Second Amended Complaint, it is clear the Defendants, along with their Co-Defendants, concocted a scheme to defraud the Agency and the government. They never intended to perform their contractual obligations and routinely submitted false claims for payment and approval all to accomplish their task of taking advantage of the COVID-19 pandemic and receive federal funds for work never performed, and for which they had no intent of ever materially performing.

43. Therefore, the Agency met its burden under Rules 8(a) and 12(b)(6) and Defendants' Motion to Dismiss on this ground should be denied.

**E.** **Alternative Motion for Leave to Amend.**

44. When a Plaintiff's complaint fails to state a claim, a court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 309 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). In the unlikely event that the Court

determines that the Complaint's allegations are insufficient to survive dismissal, the Agency respectfully requests leave to amend to complaint to plead with more particularity.

## IV.    CONCLUSION

45.    For these reasons, the Agency respectfully prays that this Court DENY Defendants' Motion to Dismiss in its entirety and for all other relief to which it is justly entitled.

Dated: June 10, 2024

Respectfully submitted,

**MARTINEZ REILLY, LLP**

<u>/s/ Marion M. Reilly</u>
**Marion M. Reilly**
State Bar No. 24079195
Federal ID. 1357491
Email: Marion@mrtrial.com
**John B. Martinez**
State Bar No. 24010212
Federal ID. No. 23612
Email: John@mrtrial.com
3636 S. Alameda, Ste. B119
Corpus Christi, Texas 78412
Dir: (361) 273-6771
Fax: (361) 704-8355
**Service Email address
Service@mrtrial.com

**SCHULMAN, LOPEZ, HOFFER & ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone:      210-538-5385
Facsimile:      210-538-5384
**Joseph E. Hoffer**
**Attorney-in-Charge**
State Bar No. 24049462
Federal ID No. 2006011
Email: jhoffer@slh-law.com
**Elizabeth Angelone**
State Bar No. 24077349
Federal ID No. 3042089
Email: eangelone@slh-law.com

**ATTORNEYS FOR THE AGENCY**
Service@mrtrial.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been

sent to all known counsel pursuant to the Federal Rules of Civil Procedure on this 10th day of June

2024 via the CM/ECF system or via email.

Dinesh H. Singhal
**The Singhal Law Firm**
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Tel: 713.222.8500
dinesh@singhallaw.com
**ATTORNEY FOR CIMBERLI DARROUGH**

Jordan Raschke Elton
Andrew Mytelka
**Greer, Herz & Adams, L.L.P.**
One Moody Plaza, 18th Floor
Galveston, Texas 77550
P: (409) 797-3239
jraschkeelton@greerherz.com
**ATTORNEYS FOR MICHELLE PETERS AND**
**MNA EVALUATIONS AND ASSESSMENTS, LLC**

Amanda Gadison
Randal H. Miller
**Bryan Cave Leighton Paisner**
2200 Ross Ave., Suite 4200 W
Dallas, Texas 75201
P: 214-721-8117
Amanda.gadison@bclplaw.com
**ATTORNEYS FOR KIDS U US, INC.**
**D/B/A FUELING BRAINS**

Fred D. Raschke
**Mills Shirley L.L.P.**
2200 Market Street Ste 300

Galveston, TX. 77550
P: 409-761-4028 (direct line) [fraschke@millsshirley.com](mailto:fraschke@millsshirley.com)
**ATTORNEY FOR ANTONIO CORRALES AND**
**STERLING EVALUATIONS AND ASSESSMENT, LLC**